10 CV 5562

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

————————————————————————X
:
THOMAS P. DINAPOLI, COMPTROLLER OF THE :
STATE OF NEW YORK, AS ADMINISTRATIVE :
HEAD OF THE NEW YORK STATE AND LOCAL :    **Civil Action No.**
RETIREMENT SYSTEMS AND AS SOLE :
TRUSTEE OF THE NEW YORK STATE COMMON :
RETIREMENT FUND, :    **ECF Case**
:
               Plaintiff, :
:    **COMPLAINT**
     v. :
:
MERRILL LYNCH & CO., INC., E. STANLEY :
O'NEAL, and JEFFREY N. EDWARDS, :    **JURY TRIAL DEMANDED**
:
              Defendants. :
:
————————————————————————X



RECEIVED
JUL 22 2010
U.S.D.C. S.D. N.Y.
CASHIERS

# TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ................................................................................ 2

        A.      Defendants Knew Of Merrill's Exposure To Massive Losses Based Upon
                The Company's Leading Role In Originating And Securitizing Subprime
                Mortgages ................................................................................................................ 4

        B.      Defendants Misrepresented And Omitted Material Facts Regarding
                Merrill's Subprime Mortgage Activities, Risk Management Measures,
                Loss Exposures, And Actual Losses ........................................................................ 7

        C.      Defendants Gradually Disclosed The Truth, Causing Plaintiff To Suffer
                Losses And Ultimately Extinguishing Merrill As An Independent
                Company ................................................................................................................ 11

II.     JURISDICTION AND VENUE .............................................................................. 13

III.    THE PARTIES ........................................................................................................ 13

        A.      Plaintiff ................................................................................................................ 13

        B.      Defendant Merrill Lynch & Co., Inc. .................................................................. 14

        C.      The Individual Defendants ................................................................................... 15

                1.      E. Stanley O'Neal ................................................................................... 15

                2.      Jeffrey N. Edwards ................................................................................. 17

IV.     FACTUAL BACKGROUND AND SUMMARY OF DEFENDANTS' FRAUD ......... 19

        A.      Merrill's Role In Originating Subprime Mortgages ............................................. 21

                1.      Merrill Purchases Ownit Mortgage Solutions ......................................... 22

                2.      Merrill's Warehouse Borrowers Declare Bankruptcy ............................. 23

                3.      Merrill Acquires First Franklin and its Existing Mortgages .................... 25

        B.      Merrill's Role In Securitizing Subprime Mortgages ............................................ 28

                1.      Merrill's RMBS, ABS and CDOs ............................................................ 28

                2.      Merrill's Synthetic CDOs ........................................................................ 32

                3.      Merrill's CDO-Squared and CDO-Cubed Transactions ........................... 34

        C.      Merrill Concealed The Credit Default Swaps It Executed With
                Undercapitalized Monoline Insurers ..................................................................... 35

                1.      Merrill's Transactions with MBIA .......................................................... 41

                2.      Merrill's Transactions with XL Capital ................................................... 44

                3.      Merrill Concealed Its Exposure to Shaky Monoline Insurers ................... 46

        D.      Defendants Ignored External And Internal Warnings Concerning Merrill's
                CDO Business And Knowingly Assumed Excessive Undisclosed Risks ........... 49

E.     Without Making Required Disclosures, Merrill Used Client Assets In An Effort To Create A Market For The Company's Impaired CDOs ........................ 53

V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT DURING THE RELEVANT PERIOD ............................................................................................................... 56

A.     Defendants' Materially False And Misleading Statements And Omissions Of Material Fact Concerning Merrill's Risk Management Measures And Its Exposure To CDO Tranches Backed By Subprime Mortgages ...................... 59

1.     The 2006 Misstatements and Omissions ................................... 60

2.     The 2007 Misstatements and Omissions ................................... 66

B.     Defendants' Materially False And Misleading Statements And Omissions Of Material Fact Concerning Merrill's Hedging Activities With Poorly Capitalized Monoline Insurers ................................................................. 92

VI.     LOSS CAUSATION—MERRILL GRADUALLY DISCLOSES ITS FRAUD ............. 96

VII.     DEFENDANTS' VIOLATIONS OF GENERALLY ACCEPTED ACCOUNTING PRINCIPLES AND OTHER REPORTING REGULATIONS .......... 113

A.     Regulation S-X ............................................................................... 114

B.     Materiality Of Reported Financial Information ................................ 115

C.     Accounting For Contingent Loss And Risks ..................................... 117

1.     SFAS 5 .................................................................................. 117

2.     SOP 94-6 .............................................................................. 121

3.     FSP SOP 94-6-1 ................................................................... 124

D.     Principles Governing Valuation ....................................................... 126

1.     SFAS 115 .............................................................................. 127

2.     SFAS 107 .............................................................................. 131

3.     SFAS 133 .............................................................................. 134

E.     Determining Fair Value .................................................................. 135

F.     SEC Disclosure Requirements:  Item 303 Of Regulation S-K .......... 142

G.     Disclosures Concerning Internal Controls Over Financial Reporting ............... 147

VIII.     DEFENDANTS' MOTIVE AND OPPORTUNITY TO COMMIT FRAUD ............... 149

A.     Defendant O'Neal's Insider Stock Sales And Compensation ............ 149

B.     Merrill's Securities Offerings During The Relevant Period ............. 151

IX.     GROUP PLEADING ................................................................................... 153

X.     FRAUD ON THE MARKET PRESUMPTION .................................................. 154

XI.     THE SAFE HARBOR PROVISION OF THE PSLRA IS INAPPLICABLE ............... 155

XII.   TOLLING OF THE STATUTE OF LIMITATIONS.......................................................... 156

COUNT I:   Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder...................................................................................... 157

COUNT II:   Violation of Section 20(a) of the Exchange Act................................................... 159

XIII.   PRAYER FOR RELIEF ............................................................................................. 163

XIV.   JURY DEMAND ........................................................................................................ 164

Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and as sole Trustee of the New York State Common Retirement Fund ("Plaintiff"), alleges the following upon information and belief, except for those facts pertaining to Plaintiff, which are based upon personal knowledge.

Plaintiff's information and belief is based upon, among other things, a continuing investigation directed by Plaintiff and conducted by and through Plaintiff's undersigned counsel, into the facts and circumstances alleged herein including, without limitation, review and analysis of:

(i)     documents and statements that Merrill Lynch & Co., Inc. ("Merrill" or the "Company") and the Individual Defendants named herein authorized, drafted, created, and/or disseminated;

(ii)     Merrill's filings with the United States Securities and Exchange Commission ("SEC");

(iii)     press releases, public statements, telephone conferences, news articles, analyst commentary, and other publications issued by and/or concerning Merrill;

(iv)     Merrill's corporate website;

(v)     securities analyst reports concerning Merrill and its operations;

(vi)     pleadings filed by and/or against Merrill in state and federal court proceedings;

(vii)     information and reports prepared and/or released by state and federal governmental and regulatory bodies; and

(viii)     consultation with auditing, accounting, and structured finance experts.

Many additional facts supporting Plaintiff's allegations are known only to Defendants and/or are within their exclusive custody or control.  Plaintiff believes that additional evidentiary support will exist for its allegations after a reasonable opportunity for discovery.

## I.    SUMMARY OF THE ACTION

1.      Merrill, formerly one of the most revered financial institutions in the world, brought about its own demise by pursuing a reckless campaign to earn heightened fees through originating and proliferating subprime residential mortgages — loans extended to unqualified borrowers that presented an increased risk of default.  Merrill was a leading participant in the mortgage finance industry until the Company collapsed under the weight of the undisclosed and inordinate risk that it assumed in originating subprime mortgages and securitizing them into residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs") (described below in Section IV.B.).  These toxic RMBS and CDOs, and the subprime mortgages comprising them, are at the heart of the fraud alleged herein.

2.      During the period from October 17, 2006 through December 31, 2008 (the "Relevant Period"), Defendants knowingly and/or recklessly made a series of materially false and misleading statements and omissions of material fact concerning, among other things:  (i) Merrill's true exposure to poorly underwritten subprime mortgages, particularly within the subprime asset-backed security ("ABS") CDOs  (described below in Section IV.B.) accumulating on the Company's balance sheet; (ii) the value of the Company's subprime-exposed assets and liabilities; and (iii) the effectiveness of Merrill's risk management and risk monitoring policies and procedures, including Merrill's reckless attempts to hedge its subprime mortgage exposure through transactions with thinly capitalized monoline insurers.  Defendants' materially false and misleading statements, omissions of material fact, and violations of Generally Accepted Accounting Principles ("GAAP") caused Merrill's common stock to trade at artificially inflated prices during the Relevant Period.

3.      Merrill's direct involvement in originating and securitizing subprime mortgages during the Relevant Period provided Defendants with clear signs of the impending collapse of

the subprime mortgage market. As time passed, these warning signs, including internal warnings from Merrill's own executives, became increasingly acute. Defendants brashly ignored these known risks while recklessly and exponentially intensifying Merrill's subprime lending and related structured finance activities.

4. In October 2007, Merrill began to disclose certain previously misrepresented and/or concealed material facts regarding Merrill's losses in connection with the Company's subprime ABS CDOs. Upon these partial disclosures, the price of Merrill common stock declined in a series of material steps from $76.67 per share on October 5, 2007 to $11.64 per share on December 31, 2008. Each such disclosure removed a portion of the artificial inflation from the price of Merrill's common stock and directly caused Plaintiff to suffer damages.

5. During the Relevant Period, Defendants knew, but failed to disclose, that Merrill was suffering billions of dollars in losses on its ABS CDO portfolio and the Company's related securities holdings. In the third quarter of 2007, Merrill belatedly began to write-down the value of these toxic assets as the following chart illustrates and as further alleged herein:

| Merrill's Fiscal Quarter | Merrill's Relevant Period Write-Downs On Its ABS CDOs And Related Securities |
|---|---|
| Third Quarter 2007 (6/30/07-9/28/07) | $7.9 billion |
| Fourth Quarter 2007 (9/29/07-12/28/07) | $11.5 billion |
| First Quarter 2008 (12/29/07-3/28/08) | $1.5 billion |
| Second Quarter 2008 (3/29/08-6/27/08) | $3.5 billion |
| Third Quarter 2008 (6/28/08-9/26/08) | $5.7 billion |
| Fourth Quarter 2008 (9/27/08-12/26/08) | $1.7 billion |
| **TOTAL WRITE-DOWNS** | **$31.8 billion** |

6.      Ultimately, Merrill was forced to merge with Bank of America Corporation ("BOA") at the end of 2008 (the "Merger") as it took the above-referenced write-downs on its massive ABS CDO portfolio concerning which it previously misrepresented and concealed material facts.

**A.      Defendants Knew Of Merrill's Exposure To Massive Losses Based Upon The Company's Leading Role In Originating And Securitizing Subprime Mortgages**

7.      Under Defendant E. Stanley O'Neal's ("O'Neal") stewardship as Merrill's Chairman and Chief Executive Officer, the Company became the largest producer of CDOs backed by subprime mortgages in the world.  In 2004, the Company underwrote approximately $19 billion in CDOs — a number that Merrill increased to approximately $44 billion in 2006, and to approximately $30 billion during the first half of 2007.  By increasing its CDO securitization activity, Merrill also increased its underwriting fee income.  For example, in 2005 and 2006, Merrill's CDO underwriting fees were approximately $400 million and $700 million, respectively.

8.      Merrill obtained a substantial portion of the residential mortgages that it securitized by purchasing billons of dollars worth of these loans from non-depository originators such as ResMAE and Mortgage Lenders Network USA, Inc. ("MLN"), to which Defendants advanced warehouse lines of credit.  A warehouse line of credit is a credit line extended by a financial institution to a mortgage loan originator to assist in funding mortgage loans.  To achieve the rapid growth that Defendants desired to compete with other then-existing investment banks securitizing residential mortgages, such as Lehman Brothers Holdings, Inc. ("Lehman Brothers") and The Bear Stearns Companies, Inc. ("Bear Stearns"), Defendants also sought ownership in mortgage origination companies at the very time that the housing market was

visibly declining and default levels among poorly underwritten subprime mortgages were escalating.

9.      For example, in September 2005, Merrill invested $100 million in California-based subprime originator Ownit Mortgage Solutions ("Ownit") in exchange for a 20% ownership stake in the company.  Shortly after making this investment, Merrill instructed Ownit to weaken its underwriting guidelines to originate more stated income (or "liar") loans for which little or no documentation was requested or required to substantiate the borrowers' oral representations of their annual earnings.  Merrill's directive stemmed from Defendants' desire for increasing amounts of mortgages to repackage into ABS CDOs.  Ownit complied with Merrill's demands and originated an increased volume of mortgages to borrowers with poor credit histories.

10.      To obtain even more subprime mortgages for its securitizations, Merrill announced on September 5, 2006 that it would purchase First Franklin Financial Corporation ("First Franklin"), a mortgage origination unit owned by National City Corporation ("National City").  This transaction closed on December 30, 2006.  In subsequent litigation based upon the transaction, Merrill accused National City of, among other things, overvaluing the loans that Merrill acquired by "*fail[ing] to take into account the adverse conditions in the secondary market for mortgage loans that existed at the end of 2006. . . .*"[1]

11.      Based upon Merrill's direct involvement in originating subprime loans, Defendants knew that the market was spiraling downward during the Relevant Period.  Among other things, Defendants knew, but failed to disclose, that the loans Merrill purchased from other originators, such as ResMAE and MLN, were experiencing heightened early payment defaults,

---

[1] Unless otherwise noted, emphasis is added to quoted statements.

pursuant to which Merrill had the right to "put" the loans back to these companies, contributing to ResMAE and MLN's respective bankruptcy filings at the beginning of 2007. Moreover, as noted above, Merrill was directly involved in lowering underwriting standards at Ownit and admitted in its litigation with National City that certain mortgage loans were subject to severe devaluation as of, at least, the end of 2006.

12.     In addition to these known facts, Defendants brashly ignored warnings from Merrill's own executives concerning the clear dangers that the Company's subprime ABS CDO strategy posed. For example, during the summer of 2006, Jeffrey Kronthal ("Kronthal"), who led Merrill's Global Credit Real Estate and Structured Products Group and the Company's Global Markets and Investment Banking Group (including its CDO business), warned top Merrill executives that Merrill was taking too much risk in subprime ABS CDOs. Even though Merrill's exposure at this point was low in comparison to what it would become, Kronthal warned that Merrill should keep no more than $3-4 billion of CDO exposure on its books. Merrill ignored Kronthal's concerns, and Defendant O'Neal fired Kronthal and the other members of Kronthal's group for attempting to derail Merrill's fee stream from such securitized products. Merrill, instead, continued to march headfirst into undisclosed and inordinate risks for the Company and its shareholders.

13.     Ahmass Fakahany ("Fakahany") and Gregory Fleming ("Fleming"), Co-Presidents of Merrill's Global Markets and Investment Banking Group (which was responsible for underwriting CDOs), also internally warned Defendants of the risks associated with the Company's reckless accumulation of ABS CDOs. Both Fakahany and Fleming understood that Merrill was subject to increased credit risk exposure from its massive ABS CDO portfolio based upon the decline in the market for such instruments. In response to this growing risk, Fakahany

6

and Fleming sent a letter to Merrill's Board of Directors in August 2007 which warned of the losses the Company faced on its undisclosed ABS CDO holdings. Defendants did not heed this warning from Fakahany and Fleming, nor did they disclose it.

14.     Instead, as alleged herein, Merrill misrepresented the risks associated with its subprime origination activities. For example, the Company's 2006 Form 10-K assured, among other things, that: (i) Merrill managed risk resulting from mortgage loans through "adherence to underwriting guidelines"; (ii) credit risk was "closely monitored"; and (iii) loans were "***predominantly extended to high credit quality borrowers***." Defendants knew, but failed to disclose, that these and other similar representations were materially false and misleading because, in 2006, the Company was actively originating and purchasing subprime mortgages pursuant to deliberately reduced credit standards to generate the loan product necessary for Merrill's CDOs. Moreover, borrowers subject to these poorly underwritten loans were defaulting *en masse* by the end of 2006, forcing subprime lenders with which Merrill did business into bankruptcy.

## B.     Defendants Misrepresented And Omitted Material Facts Regarding Merrill's Subprime Mortgage Activities, Risk Management Measures, Loss Exposures, And Actual Losses

15.     With its increased focus on mortgage origination and securitization, Merrill appeared to be performing exceptionally well. For example, in 2006, Merrill reported total net revenues of $34.7 billion resulting in reported net earnings of $7.5 billion. Moreover, the Company reported total net revenues of $9.9 billion resulting in net earnings of $2.2 billion for the quarter ending March 30, 2007, and net revenues of $9.7 billion resulting in reported net earnings of $2.1 billion for the quarter ending June 29, 2007.

16.     Beginning no later than 2006, however, Merrill was having increasing difficulty selling its CDOs, forcing the Company quietly to become a major purchaser and holder of its

7

own subprime ABS CDOs.  By the end of June 2007, Merrill had saddled itself with more than $40 billion in ABS CDOs largely backed by subprime mortgages — hidden holdings that would require the Company to take tens of billions of dollars in write-downs in 2007 and 2008.

17.     Each of Merrill's SEC filings prior to the third quarter of 2007 described the Company as an originator and seller of mortgage-backed securitizations.  Defendants, however, wholly failed to disclose:  (i) that the Company had tens of billions of dollars of exposure to CDO tranches backed by subprime mortgages; (ii) Merrill's direct ownership of billions of dollars of subprime RMBS; or (iii) the Company's exposure to long and short positions on credit default swaps ("CDS") linked to mortgage-backed securities.  A CDS is a contract in which the buyer makes a series of payments for a specific time to the seller and, in exchange, receives a payoff if a financial or credit instrument defaults.  CDS are often used to manage, or "hedge," credit risk for parties holding debt instruments.  Defendants consistently misrepresented the application and effectiveness of Merrill's risk management measures and guidelines, including the Company's use of CDS.

18.     For example, in its April 19, 2007 Form 8-K addressing first quarter 2007 earnings, Merrill touted the Company's putative performance while misleadingly dismissing growing market concerns regarding exposure to subprime mortgages.  In this regard, Defendant O'Neal claimed that "***U.S. Revenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1 percent of Merrill Lynch's total net revenues over the past five quarters***."  While deliberately minimizing the apparent impact of the meltdown in the housing market, Defendant O'Neal failed to disclose that Merrill was exposed to tens of billions of dollars in risk through its subprime ABS CDOs.

19.     Defendants also mollified growing concerns over Merrill's potential exposure to subprime losses by knowingly misrepresenting the effectiveness of the Company's risk management measures.  For example, in the Company's First Quarter 2007 Form 10-Q, Defendants contended that Merrill maintained independent risk groups managed by Defendant Jeffrey N. Edwards ("Edwards"), Senior Vice President and Chief Financial Officer of Merrill at the time, that "*work[ed] to ensure risks [were] properly identified, measured, monitored, and managed throughout Merrill Lynch*."  Defendants, however, were deliberately ignoring risks known to them from, among other sources, Merrill's own mortgage origination activities.  As Defendant O'Neal would eventually admit in connection with Merrill's $7.9 billion revised write-down on its CDO and subprime exposures announced on October 24, 2007, Merrill's "assessment of the potential risk and mitigation strategies were inadequate."

20.     Defendants knew, but failed to disclose, that Merrill was exposed to crippling risks from the Company's holding of subprime ABS CDOs.  In a desperate and belated effort to reduce those risks, Defendants attempted to hedge such risks by entering into CDS with undercapitalized monoline insurers — companies that offered financial guarantees and other credit protection products designed to guarantee the timely repayment of principal and interest on bonds and other debt instruments such as RMBS and CDOs.

21.     Until approximately 2005, Merrill had obtained the vast majority of the credit protection for its AAA-rated super senior CDO tranches from American International Group ("AIG").  A super senior CDO tranche is comprised of the top portion of a senior CDO tranche and is meant to have the highest payment priority.  Super senior tranches are typically rated AAA.  At the end of 2005, however, AIG became concerned with the deplorably weak underwriting standards employed in the subprime mortgage sector and the increasing number of

defaults.  For these reasons, AIG stopped providing such credit protection for Merrill's CDO securities.

22.      Following AIG's refusal to continue providing credit protection for these risky Merrill CDO securities, the Company looked to certain other companies in 2006 and 2007 to obtain credit protection to help Merrill manage the growing risk of the CDO holdings on the Company's balance sheet.  Among other things, obtaining credit protection through CDS contracts written by monoline insurers would putatively enable the Company to book the present value of interest income from CDOs sooner than it could have without such protection.  Moreover, these CDS contracts allowed Merrill to move significant portions of its CDO liabilities off the Company's balance sheet, thereby presenting an inaccurate picture of Merrill's overall financial health.  Merrill failed to disclose the full extent of these activities and related exposures during the Relevant Period.

23.      Merrill also failed to disclose the full amount of its hedges with monoline insurers or the known doubts that these insurers would be able to honor the financial terms of their agreements.  While the Company was ultimately forced to disclose billions of dollars in "credit valuation adjustments" on the notional amount of its CDS hedges for ABS CDOs beginning in early 2008 and continuing through the remainder of the Relevant Period, Merrill failed to disclose in press releases or in any other public statement in 2008 that it had in fact entered into monoline CDS contracts to hedge approximately $50 billion in *non-CDO* assets.  The details concerning Merrill's enormous non-CDO hedges with monoline insurers were not revealed until after the Merger with BOA.

24.      As alleged below, in the midst of the known downturn in the housing and mortgage markets, Merrill also did not disclose any financial information at all pertaining to its

subprime-backed CDO exposures until the Company filed its Form 10-Q for the third quarter of 2007.  These disclosures in late-2007 were incomplete and were made when it was impossible for Merrill to reduce its exposures without taking the massive losses and impairments that it belatedly reported.

25.     John Thain, who succeeded Defendant O'Neal as Merrill's Chairman and Chief Executive Officer, ultimately confirmed during an interview conducted in connection with an article published in *The Wall Street Journal* on January 18, 2008, that Merrill's losses were the result of, among other things, a "lack of understanding of the risk in [subprime] positions and the lack of balance-sheet control."  According to Thain, Merrill's purported risk controls "just didn't function."  In addition, Thain stated that he was "shocked" upon his arrival at Merrill to discover that "the traders were able to put on positions that were way too big, and I don't think there was a good understanding of what the risk was."  The inadequate risk controls in place during the tenure of Defendants O'Neal and Edwards allowed Merrill to accumulate its massive ABS CDO portfolio which the Company was forced to write-down throughout 2008.

## C.     Defendants Gradually Disclosed The Truth, Causing Plaintiff To Suffer Losses And Ultimately Extinguishing Merrill As An Independent Company

26.     Beginning in October 2007, Defendants gradually disclosed previously misrepresented and concealed material facts concerning Merrill's subprime exposures and related losses.  These partial corrective disclosures removed portions of the artificial inflation in the Company's stock price that Defendants' materially false and misleading statements and omissions of material fact had caused.

27.     On October 5, 2007, Merrill disclosed, among other things, "[w]rite-downs of an estimated $4.5 billion, net of hedges, related to incremental third quarter market impact on the value of CDOs and subprime mortgages."  A little more than two weeks later, Merrill issued its

October 24, 2007 Form 8-K, which stated, among other things, that the Company *was increasing its third quarter CDO and subprime charge from $4.5 billion to a staggering $7.9 billion*.  In response to this news, Merrill's common stock price declined, and the Company announced Defendant O'Neal's "retirement" as CEO.

28.     Throughout late 2007 and 2008, the Company continued to make partial disclosures of previously omitted and misrepresented material facts that further corrected Merrill's artificially inflated stock price.  On September 13, 2008, out of concern that Merrill was facing imminent collapse, the Company initiated discussions with BOA regarding a potential investment in Merrill by BOA.  Ultimately, John Thain, Merrill's Chairman and Chief Executive Officer at the time, agreed to the Merger, the terms of which were negotiated in hastily arranged meetings between BOA and Merrill which transpired over the course of only a day-and-a-half.

29.     After the Merger was announced on September 15, 2008, Merrill continued to suffer staggering losses and impairments in connection with the Company's subprime-related exposures.  In December 2008, BOA officials met secretly with U.S. government officials to obtain massive federal financial assistance that BOA needed to complete the Merger and survive under the weight of Merrill's then-undisclosed losses for the fourth quarter of 2008.  The Merger was completed on January 1, 2009.  On January 16, 2009 — after Merrill ceased to exist as an independent company — BOA disclosed that Merrill had suffered $15.31 billion in net losses for the fourth quarter of 2008.  These devastating losses were largely attributable to Merrill's previously undisclosed ABS CDO exposures.

## II.      JURISDICTION AND VENUE

30.      The claims in this action arise under Sections 10(b) and 20(a) of the Securities

Exchange Act of 1934 ("Exchange Act"), as amended, 15 U.S.C. §§ 78j(b), and 78t(a), and SEC

Rule l0b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

31.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and

Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

32.      Venue is proper in this district pursuant to 15 U.S.C. § 78aa and 28 U.S.C.

§ 1391.  At all relevant times, Merrill maintained its corporate headquarters in this district, and

many of the acts, misrepresentations, and omissions occurred, in whole or in part, in this district.

33.      Defendants, in connection with the acts, transactions, and conduct alleged herein,

directly and indirectly used the means and instrumentalities of interstate commerce, including,

among others, interstate telephone communications, the United States mail, and the facilities of

the national securities exchanges.

## III.     THE PARTIES

### A.      Plaintiff

34.      Plaintiff, Thomas P. DiNapoli, Comptroller of the State of New York, is

Administrative Head of the New York State and Local Retirement Systems and sole Trustee of

the New York State Common Retirement Fund ("NYSCRF").  NYSCRF was established under

Article 9 of the New York Retirement and Social Security Law, and holds and invests the assets

of the New York State and Local Employees' Retirement System and the New York State and

Local Police and Fire Retirement System.

35.      NYSCRF is one of the largest public pension funds in the United States.

NYSCRF provides pension, disability and death benefits for New York state and local

government employees and employees of certain other participating employers.  As of March 31,

2010, NYSCRF had more than one million members, beneficiaries and retirees, and total net assets of approximately $132.5 billion.

36.     Plaintiff purchased 4,829,589 shares of Merrill common stock during the Relevant Period and has been damaged thereby.

**B.     Defendant Merrill Lynch & Co., Inc.**

37.     Defendant Merrill is a corporation organized and existing under the laws of the State of Delaware with its headquarters located in New York, New York.  During the Relevant Period, Merrill provided a wide variety of services to individuals, endowments, funds, and businesses through its two business divisions:  Global Wealth Management and the Global Markets and Investment Banking Group ("GMI").  At all times relevant hereto, Merrill's Fixed Income Currencies and Commodities business ("FICC") was the segment within GMI that, among other things, was responsible for underwriting CDOs.

38.     During the Relevant Period, Merrill, Lynch, Pierce, Fenner & Smith, Inc. ("MLPFS") was a wholly-owned operating subsidiary of Merrill.

39.     Prior to its Merger with BOA, Merrill was a worldwide provider of wealth management, securities trading and sales, corporate finance, and investment banking services. On September 15, 2008, BOA agreed to acquire Merrill in a $50 billion all-stock transaction in which 0.8595 shares of BOA common stock were exchanged for each Merrill common share held as of October 10, 2008.  On January 1, 2009, BOA announced that it completed its purchase of Merrill, making BOA the largest wealth management business in the world with 20,000 financial advisors and more than $2 trillion in client assets.  Merrill is now wholly-owned by BOA.

## C.      The Individual Defendants

### 1.      E. Stanley O'Neal

40.      Defendant E. Stanley O'Neal joined Merrill in 1986 and became head of its junk-bond department in 1989.  Defendant O'Neal was appointed as Merrill's Chief Financial Officer ("CFO") in 1998.  Defendant O'Neal served as Chairman of the Board from April 2003 and Chief Executive Officer ("CEO") from December 2002 until October 30, 2007, when Merrill announced his resignation.  Despite his leading role in burdening the Company with irresponsible and undisclosed structured finance risks, Defendant O'Neal was given a benefits package consisting of approximately $160 million in cash and stock when he resigned.

41.      Defendant O'Neal knew and/or recklessly disregarded the risks associated with the Company's increased subprime ABS CDO exposure during the Relevant Period, and he knowingly and/or recklessly ignored, misrepresented, and concealed these risks from the investing public.  Moreover, Defendant O'Neal fired or authorized the termination of Merrill employees who voiced concerns regarding Merrill's increasing exposure to subprime debt while continuing to report putatively improved results for the Company.  Such false financial results were directly linked to Defendant O'Neal's bonus and other compensation.

42.      During the Relevant Period, Defendant O'Neal sold approximately 199,887 shares of his personally held Merrill common stock for proceeds of more than $18.8 million, while privy to material, non-public information.  The following chart lists Defendant O'Neal's sales of Merrill common stock during the Relevant Period:

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 2/5/2007 | 5,202 | $94.35 | $490,808.70 |
| 2/5/2007 | 713 | $94.36 | $67,278.68 |
| 2/5/2007 | 9,050 | $94.37 | $854,048.50 |
| 2/5/2007 | 641 | $94.38 | $60,497.58 |

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 2/5/2007 | 3,278 | $94.39 | $309,410.42 |
| 2/5/2007 | 21,948 | $94.40 | $2,071,891.20 |
| 2/5/2007 | 1,710 | $94.41 | $161,441.10 |
| 2/5/2007 | 1,069 | $94.42 | $100,934.98 |
| 2/5/2007 | 713 | $94.43 | $67,328.59 |
| 2/5/2007 | 2,637 | $94.44 | $249,038.28 |
| 2/5/2007 | 12,898 | $94.45 | $1,218,216.10 |
| 2/5/2007 | 4,632 | $94.46 | $437,538.72 |
| 2/5/2007 | 4,347 | $94.47 | $410,661.09 |
| 2/5/2007 | 6,770 | $94.48 | $639,629.60 |
| 2/5/2007 | 5,416 | $94.49 | $511,757.84 |
| 2/5/2007 | 6,128 | $94.50 | $579,096.00 |
| 2/5/2007 | 2,138 | $94.51 | $202,062.38 |
| 2/5/2007 | 6,342 | $94.52 | $599,445.84 |
| 2/5/2007 | 4,489 | $94.53 | $424,345.17 |
| 2/5/2007 | 1,354 | $94.54 | $128,007.16 |
| 2/5/2007 | 1,780 | $94.55 | $168,299.00 |
| 2/5/2007 | 214 | $94.56 | $20,235.84 |
| 2/5/2007 | 713 | $94.57 | $67,428.41 |
| 2/5/2007 | 1,853 | $94.59 | $175,275.27 |
| 2/5/2007 | 855 | $94.60 | $80,883.00 |
| 2/6/2007 | 1,300 | $93.93 | $122,109.00 |
| 2/6/2007 | 5,673 | $93.94 | $532,921.62 |
| 2/6/2007 | 5,527 | $93.95 | $519,261.65 |
| 2/6/2007 | 5,500 | $93.96 | $516,780.00 |
| 2/6/2007 | 2,200 | $93.97 | $206,734.00 |
| 2/6/2007 | 4,354 | $93.98 | $409,188.92 |
| 2/6/2007 | 10,600 | $93.99 | $996,294.00 |
| 2/6/2007 | 42,346 | $94.00 | $3,980,524.00 |
| 2/6/2007 | 2,783 | $94.01 | $261,629.83 |
| 2/6/2007 | 2,533 | $94.02 | $238,152.66 |
| 2/6/2007 | 1,982 | $94.03 | $186,367.46 |
| 2/6/2007 | 1,900 | $94.04 | $178,676.00 |
| 2/6/2007 | 829 | $94.05 | $77,967.45 |

16

| Date | Number of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|
| 2/6/2007 | 1,170 | $94.08 | $110,073.60 |
| 2/6/2007 | 200 | $93.90 | $18,780.00 |
| 2/6/2007 | 2,800 | $93.91 | $262,948.00 |
| 2/6/2007 | 1,300 | $93.92 | $122,096.00 |
| TOTALS | 199,887 | | $18,836,063.64 |

43.     As alleged below, Defendant O'Neal made, signed, certified, and/or authorized the following SEC filings and related statements during the Relevant Period (defined below in Section V), which contained misrepresentations and/or omissions of material facts:  the October 17, 2006 Form 8-K; the Third Quarter 2006 Form 10-Q; the January 18, 2007 Form 8-K; the 2006 Form 10-K; the April 19, 2007 Form 8-K; the First Quarter 2007 Form 10-Q; the July 17, 2007 Form 8-K; the Second Quarter 2007 Form 10-Q; the October 5, 2007 Form 8-K; the October 24, 2007 Form 8-K; and the October 24, 2007 Analyst Call.

### 2.     Jeffrey N. Edwards

44.     From the beginning of the Relevant Period until December 3, 2007, Defendant Jeffrey N. Edwards ("Edwards") was Senior Vice President and CFO of Merrill.  Thereafter, Defendant Edwards served as Vice Chairman of the Company, focusing on capital markets and corporate finance clients.

45.     As Merrill's CFO, Defendant Edwards supervised the control groups that managed credit and market risks, and he knew and/or recklessly disregarded, that Merrill was increasingly exposed to subprime risk.  Despite such knowledge, Defendant Edwards knowingly and/or recklessly ignored, misrepresented and concealed these risks from the investing public.

46.     As alleged below, Defendant Edwards made, signed, certified, and/or authorized the following SEC filings and related statements, which contained misrepresentations and/or

omissions of material facts:  the October 17, 2006 Form 8-K; the Third Quarter 2006 Form 10-Q; the January 18, 2007 Form 8-K; the 2006 Form 10-K; the April 19, 2007 Form 8-K; the First Quarter 2007 Form 10-Q; the July 17, 2007 Form 8-K; the Second Quarter 2007 Form 10-Q; the October 5, 2007 Form 8-K; the October 24, 2007 Form 8-K; and the October 24, 2007 Analyst Call.

47.     Defendants O'Neal and Edwards are referred to herein as the "Individual Defendants."  Together, Merrill and the Individual Defendants are referred to herein as the "Defendants."

48.     The Individual Defendants had the duty to make full, candid, and timely disclosures of all material facts relating to Merrill's business, operations, performance and prospects.  Among other things, the Individual Defendants were required to:

- conduct and supervise Merrill's business in accordance with all applicable laws and regulations;

- supervise the preparation of the Company's SEC filings and approve any reports concerning Merrill's financial reporting and results;

- ensure that Merrill established and followed adequate internal controls; and

- refrain from obtaining personal benefit at the expense of the public purchasers of Merrill common stock by misusing proprietary non-public information.

49.     As senior officers and controlling persons of a publicly-held Company whose common stock was registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws during the Relevant Period, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's performance, operations, business, and prospects, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the

market price of the Company's publicly-traded securities would be based upon truthful and accurate information.

50.     As a result of the Individual Defendants' failure to fulfill the foregoing obligations, among others, Merrill's common stock was artificially inflated during the Relevant Period.  In response to the gradual emergence of the truth, Merrill's common stock fell in precipitous steps.  Plaintiff was damaged as a direct and proximate result of the Defendants' wrongdoing.

## IV.     FACTUAL BACKGROUND AND SUMMARY OF DEFENDANTS' FRAUD

51.     Generally, subprime mortgages are mortgage loans issued to consumers who have poor credit histories.  Because of their low credit scores, subprime borrowers are not able to qualify for conventional mortgages, making subprime mortgages, with high interest rates and penalties, the only financing option available for them to purchase a home.  Motivated by the income opportunities, particularly through securitizations, that a steady stream of subprime mortgages presented, Defendants deliberately disregarded prudent underwriting guidelines so that Merrill could originate and/or purchase an increasing supply of these products bearing an unacceptably high risk of default.

52.     By extending billions of dollars of mortgage loans to unqualified consumers, including those whose credit histories were marred by payment delinquencies, charge-offs, judgments, and/or bankruptcies, Merrill and other subprime lenders to which Merrill provided warehouse lines of credit for mortgage origination, among other things:

> (i)      originated loans with unacceptable credit risks;
>
> (ii)     failed to verify employment information for prospective borrowers;
>
> (iii)    ignored relevant negative mortgage history;

(iv)    inadequately analyzed borrowers' abilities to make required payments; and

(v)    deliberately understated debt-to-income ratios.

53.    In 2001, subprime mortgages constituted 8.6% of all mortgages originated in the United States.  By 2006, more than $600 billion in subprime mortgages were originated in the U.S., comprising 20% of all domestic mortgages.  As alleged herein, Merrill's rampant securitization of subprime mortgages was a critical driving force fueling this growth of subprime originations.

54.    Defendants knew, or recklessly disregarded, that no later than the beginning of the Relevant Period, the U. S. housing market was declining and default rates among subprime borrowers were escalating to dangerous levels.  Despite this knowledge, Merrill recklessly and exponentially intensified its subprime-related lending and financing activities without making truthful, complete, or accurate disclosures.  Defendants misrepresented the adequacy of Merrill's virtually nonexistent risk assessment and monitoring measures and subjected the Company and Plaintiff to irresponsibly heightened risks, all while misrepresenting and failing to disclose material facts concerning the Company's exposure to subprime mortgages.

55.    Merrill was among the largest participants in the subprime market.  During the Relevant Period, the Company operated as both an originator of subprime mortgage loans to unqualified borrowers and a repackager of subprime mortgages into RMBS and CDOs (described below).  Set forth below is a brief overview of the structured finance products at issue in this Complaint and Merrill's subprime mortgage origination and securitization activities during the Relevant Period which led to the Company's massive losses and Plaintiff's resulting damages.

### A.       Merrill's Role In Originating Subprime Mortgages

56.       In comparison to some of the other global financial institutions, including, but not limited to, Citigroup Inc., Merrill was late to plunge into subprime origination.  Merrill made up for the delay in its arrival to the sector by engaging in a reckless campaign of originating subprime mortgages in order to earn substantial fees by securitizing these mortgages into RMBS and CDOs.

57.       Shortly after becoming Merrill's CEO in 2002, Defendant O'Neal charted a new course for the Company that grew to include an intense concentration on subprime mortgage origination and securitization.  By mid-2004, Defendant O'Neal had replaced the manager of Merrill's mortgage department with Michael Blum ("Blum"), who was charged with securitizing pools of mortgages to sell to sophisticated investors.  Also added to the team was George Davies, a trader whose primary responsibility was to purchase the subprime mortgages for Merrill to securitize.

58.       Throughout 2004, Merrill competed with other investment banks to purchase subprime mortgages.  To increase the likelihood of obtaining the desired products, Merrill paid higher prices — as much as 105 cents on the dollar.  Moreover, Merrill often enticed non-depository originators to sell their subprime mortgages to Merrill by offering low-cost warehouse lines of credit, which would allow those originators to generate even more product to sell to Merrill.

59.       Based upon its focus on courting subprime originators, by 2005 — a year in which Merrill purchased and securitized approximately $30 billion in subprime mortgages — the Company had grown to become the seventh largest issuer of subprime RMBS.  But this was not enough for Defendant O'Neal or Merrill.

21

### 1.       Merrill Purchases Ownit Mortgage Solutions

60.     Unlike Merrill, other investment banks existing at the time, such as Lehman Brothers and Bear Stearns, actually owned and operated mortgage origination units that focused on subprime mortgages.  To compete, Merrill decided that it too needed ownership in an originating entity and made its initial foray into the field in 2005, at the very time that there was a downturn in the housing market and the increasing default levels among poorly underwritten subprime mortgages spelled disaster for companies with significant subprime exposure.

61.     In September 2005, Merrill invested $100 million in California-based subprime originator, Ownit, in exchange for a 20% ownership stake in the company.  Merrill quickly placed Blum, who was then a Merrill managing director in charge of global asset backed finance, on Ownit's board.  Additional Merrill personnel, including Matt Whalen, directly oversaw Ownit's loan originations for Merrill.

62.     According to William D. Dallas ("Dallas"), the founder and chief executive of Ownit, for the short period of approximately four months between September 2005 and December 2005, Ownit originated approximately $6 billion dollars of loans that were sold to Merrill — 2/3 of Ownit's total originations for 2005.

63.     According to a May 8, 2007 article appearing in *The New York Times*, Merrill instructed Dallas to heighten Ownit's loan volume by weakening its underwriting guidelines to originate more "liar" loans for which no documentation was requested or required to substantiate the borrowers' oral representations of their annual earnings.

64.     According to Dallas, prior to Merrill's investment in Ownit in 2005, approximately 90% of Ownit's loans were fully documented.  After Merrill asked for more stated income loans, the number of stated income loans climbed from almost zero to over 30%. Ownit also lowered the credit scores it required of its borrowers.

65.     The most widely accepted measure of creditworthiness in the credit industry is the "FICO" score, developed by the Fair Isaac Corporation.  Under the FICO scoring system, borrowers are assigned a credit score (the FICO score) ranging from 300 to 850, with 850 being the most creditworthy.  In determining the borrower's overall creditworthiness, the FICO score primarily takes into account the borrower's payment history, current indebtedness, length of credit history, recently-established credit and types of credit used.  According to Fitch Ratings, FICO scores are the "best single indicator" of mortgage default risk.  Thus, the lower the FICO score, the greater risk of borrower default.  The Federal Deposit Insurance Corporation defines a "subprime" loan as one for which the borrower has a FICO score of 660 or below.  Based upon Merrill's request, Ownit's average new borrower FICO score dropped from 690 to approximately 630.

66.     This intentional weakening of underwriting standards had an immediate and direct impact upon the performance of Ownit's loans.  From December 2005 through May 2006, Ownit began to experience first payment defaults and early payment defaults ("EPDs") — missing one of the first 3 payments — of 1% to 3%.  According to Dallas, prior to Merrill's involvement with Ownit, it had never experienced such defaults.

### 2.     Merrill's Warehouse Borrowers Declare Bankruptcy

67.     While bolstering Merrill's ability to obtain the subprime mortgages that the Company desired for securitizations, Merrill's minority interest in Ownit was not enough for Merrill to ensure guaranteed access to such products.  For this reason, Merrill provided financing to other mortgage originators which would then sell mortgages to Merrill for securitization.

68.     Merrill's extensive warehouse lending to other subprime originators such as ResMAE and MLN also failed to provide Merrill with enough subprime product to support its objective of acquiring more mortgages to securitize.  This activity did, however, provide Merrill

with direct knowledge of the poor performance of subprime mortgages, which formed a substantial portion of the collateral underlying its CDOs.

69.     For example, in 2006, Merrill purchased approximately $3.5 billion in mortgages from ResMAE.  Pursuant to these purchases, as was the case with most mortgages that Merrill purchased from originators to which it had extended warehouse lines, Merrill retained the right to require the originator to repurchase (*i.e.*, to "put") the loan under certain circumstances. Among the circumstances that enabled Merrill to "put" loans back to the originator were EPDs, which occurred when the borrower for the underlying loan failed to make an early loan payment, typically among the first three payments due under the loan agreement.  The $3.5 billion in mortgages that Merrill purchased from ResMAE contained such provisions.

70.     The loans that Merrill purchased from ResMAE in 2006 had such a high default rate that by December 2006, Merrill had made approximately $308 million in EPD demands upon ResMAE.  Notably, Merrill's tremendous EPD demands were a precipitating factor in ResMAE's Chapter 11 bankruptcy filing on February 12, 2007.

71.     Moreover, Merrill Lynch Bank USA and Merrill Lynch Mortgage Capital, Inc. (both wholly owned subsidiaries of Merrill) were together among MLN's four largest warehouse lenders.  In 2006, Merrill extended substantial warehouse lines of credit for MLN to originate subprime loans and sell them to Merrill so the Company could collateralize additional RMBS and CDOs.  As with ResMAE, the mortgages that Merrill purchased from MLN provided Merrill (and other warehouse lenders) with the right to force MLN to repurchase loans subject to EPDs. Like ResMAE, based upon the poor performance of the loans it originated, which gave rise to substantial EPD obligations, MLN also filed for bankruptcy protection in February 2007.

72.    Based upon ResMAE and MLN's February 2007 bankruptcy filings — in which Merrill was among the largest creditors — the Company *knew* that unqualified purchasers were obtaining mortgages, resulting in unusually high default rates.  In turn, Merrill *knew* many of these and similar loans underlying the CDOs that the Company maintained on its balance sheet presented an unacceptably high risk of default.  Despite this knowledge, Merrill failed to disclose these material facts.

### 3.    Merrill Acquires First Franklin and its Existing Mortgages

73.    Merrill was not content to rely upon Ownit and its warehouse counterparties as the sole means for obtaining subprime mortgages.  For this reason, on September 5, 2006, Merrill announced that it would purchase First Franklin, a mortgage origination unit owned by National City.  In announcing this $1.3 billion deal, Merrill stated, among other things:

> '*These leading mortgage origination and servicing franchises will add scale to our platform and create meaningful synergies with our securitization and trading operations,*' said Dow Kim, president of Merrill Lynch's Global Markets & Investment Banking Group.  'This transaction accelerates our vertical integration in mortgages, *complementing the three other acquisitions we have made in this area and enhancing our ability to drive growth and returns.*'

> \*       \*       \*

> '*This acquisition, and the origination platforms in particular, fills an important gap for us domestically providing a significant presence in both the wholesale and online retail channels,*' said Michael Blum, Managing Director and head of Merrill Lynch's GSFI Group.  'Home Loan Services adds scale to our existing servicing platform and allows us to enhance our special servicing and risk management of mortgage products.  In addition, we believe the acquisition will complement our existing third party client business, which has grown significantly in the past few years.'

74.    Just a few months after Merrill announced the First Franklin acquisition, Ownit fell victim to the perilously low underwriting guidelines Merrill had imposed.  On December 28, 2006, Ownit filed for Chapter 11 bankruptcy protection, listing Merrill as its single largest unsecured creditor with claims of approximately $93 million.  As a creditor, Merrill's claim in

the Ownit bankruptcy related to Merrill's "Repurchase Requests" for loans it acquired from
Ownit in 2006 that were the subject of EPDs and/or other delinquencies.

75.     Even Ownit's failure, the demise of numerous other mortgage lenders heading
into 2007, the clear downturn in the U.S. housing market, and the burgeoning defaults among
subprime borrowers could not dissuade Merrill from its mission to obtain an assured pipeline of
mortgages for continued securitizations — Merrill proceeded with the First Franklin acquisition
and closed on the purchase on December 30, 2006.  However, Merrill's honeymoon with First
Franklin did not last long.

76.     The parties agreed, as part of Merrill's purchase of First Franklin from National
City, that if First Franklin's estimated final *pro forma* net asset statement as of December 30,
2006 was lower than its *pro forma* net asset statement as of June 30, 2006, National City would
pay Merrill the difference.  Merrill ultimately was forced to commence litigation to enforce
National City's payment obligations under this agreement.  On April 10, 2008, a verified petition
that Merrill Lynch Bank & Trust Co. filed in New York State Supreme Court against National
City Bank, revealed, among other things, that on March 16, 2007, National City wrote a letter to
Merrill indicating that National City would reduce the purchase price by $30 million based upon
the above-mentioned agreement.  The petition further revealed that on April 13, 2007, Merrill
sent a letter to National City contending that, in fact, National City was required to pay Merrill a
total of approximately $97 million based upon the shortfall in its asset statement.

77.     According to the verified petition, the largest source of the pricing dispute
between the companies was a block of mortgages that Merrill claimed National City had
overvalued by $43.65 million.  According to Merrill, National City:

> calculated the value of mortgages held by First Franklin for sale by looking at the
> historical average of sale prices for comparable mortgage loans during the prior

six months. . . . This method of valuing First Franklin's mortgage loans held for sale *failed to take into account the adverse conditions in the secondary market for mortgage loans that existed at the end of 2006, and resulted in an overstatement of such loans held for sale of approximately $43.65 million*.

78.     As reflected above, Merrill acknowledged that the subprime mortgage market was in a nosedive at least as early as the "end of 2006."  Thus, Merrill knew not only that it had acquired overvalued First Franklin loans from National City, but also that the mortgage loans underlying its CDOs — and the CDO tranches themselves — were overvalued.  Merrill, however, did not write-down the value of any of its subprime-related holdings at this time or at any time prior to October 2007.  This failure to write-down the deteriorating value of its subprime-related holdings misrepresented Merrill's true financial condition during the Relevant Period.

79.     Merrill agreed to acquire First Franklin when the subprime market had already entered an obvious downturn.  During the second quarter of 2007 — shortly after the Merrill acquisition — First Franklin funded $5.3 billion in loans, down 21% from a year earlier.  In September 2007, Merrill announced that it would be cutting jobs at First Franklin and on March 5, 2008, Merrill announced that First Franklin would no longer originate mortgages:

> The company said it made the decision to discontinue lending by First Franklin because of the deterioration of the subprime lending market.
>
> '*Since July, we have reduced staffing at First Franklin by nearly 70 percent, but after evaluating a number of strategies, we believe it is appropriate to discontinue mortgage origination*,' said David Sobotka, head of Fixed Income, Currencies & Commodities at Merrill Lynch.

80.     According to Wayne Bereman, an underwriter at First Franklin both before and after Merrill acquired the company, the underwriting standards weakened and loan production quotas intensified after the Merrill acquisition.  Further, under Merrill's ownership, First

Franklin made an unprecedented number of "exceptions" to provide loans to applicants who failed to meet even the weakened underwriting guidelines.

81.     Despite the failure of the First Franklin deal, Merrill had obtained enough subprime mortgages for securitizations during the Relevant Period to saddle the Company with illiquid CDO products that infected the Company's balance sheet — ultimately leading to tremendous write-downs and losses.  At no point during the Relevant Period did Merrill disclose that it had dangerously weakened its underwriting criteria for non-prime mortgage originations. Worse, the Company did not disclose the volume of subprime mortgages that supported its precarious CDO holdings — information that became increasingly material as the housing market declined and default rates increased.

**B.     Merrill's Role In Securitizing Subprime Mortgages**

**1.     Merrill's RMBS, ABS and CDOs**

82.     As noted above, Merrill originated and purchased subprime mortgages primarily to pool them together into RMBS or ABS.  An RMBS is a type of mortgage-backed security whose value and income payments are derived from and collateralized by different types of residential mortgage loans.  An ABS is a security collateralized by the revenue stream from a specified pool of receivables or other financial assets such as credit card receivables, healthcare receivables, or mortgage loans.  Like CDOs (described below) RMBS and ABS are divided into different classes or "tranches" with varying degrees of risk and different credit ratings based on payment priority and the credit quality of the underlying collateral.

83.     RMBS or ABS can be sold to investors or used to collateralize other securities, such as CDOs.  Holders of RMBS or ABS are paid from the revenue stream of principal and interest payments created by the pool of assets serving as underlying collateral.  During the

Relevant Period, Merrill issued billions of dollars of RMBS through Merrill Lynch Mortgage

Investors Inc., Merrill Lynch First Franklin Mortgage Loan Trust, and other entities.

84.     CDOs are structured securities collateralized by a pool of debt instruments such as

RMBS, or other assets such as corporate bonds, bank loans, real estate investment trusts,

mortgage loans, auto loans, and/or credit card receivables.  An ABS CDO is a CDO with

underlying collateral consisting entirely of asset-backed securities such as RMBS and other debt

instruments.  As discussed herein, Merrill's ABS CDOs were collateralized in whole or in part

by subprime mortgages (*i.e.*, "subprime ABS CDOs").

85.     CDOs are split into different tranches with varying degrees of risk and different

credit ratings based upon the priority in which each is paid the revenue created by the underlying

collateral.  CDOs can be divided into the following different tranches:

> Super Senior Tranche:  A super senior CDO tranche is comprised of the top
> portion of a senior CDO tranche and is meant to have payment priority over even
> the senior CDO tranche.  Super senior tranches are typically rated AAA.
>
> Senior Tranche:  A senior CDO tranche is meant to be supported by the highest-
> quality collateral in the pool of assets and have the best credit quality but pay the
> lowest yield.  A senior tranche has payment priority over the lower CDO tranches.
> Senior tranches are typically rated AA to AAA.
>
> Mezzanine Tranche:  A mezzanine CDO tranche is meant to have slightly lower
> credit quality than the senior tranches but pay a higher yield.  Mezzanine tranches
> are typically rated A to BBB.
>
> Subordinate or Equity Tranche:  An equity CDO tranche is supported by collateral
> with the lowest credit quality in the pool and pays the highest yields.  Typically,

these tranches do not have any credit ratings and are the first to suffer losses in the event of a default.

86.     CDOs are created in steps.  First, a sponsor, typically a large financial institution such as Merrill, assembles a pool of assets such as residential mortgages that generate a stream of payments.  The sponsor then creates a shell entity, often a conduit or investment trust known as a "special purpose entity" ("SPE"), to which it transfers the asset pool that will act as the underlying collateral for the securities.  In turn, the SPE splits the right to repayment from the underlying collateral into the tranches described above.  The use of SPE's allowed financial institutions such as Merrill to finance CDOs in a way that would keep them off-balance sheet.

87.     To create CDOs, Merrill first established a shell SPE, devoid of material assets, to provide the nucleus for the sponsored transactions.  This Merrill sponsored SPE then issued short-term debt to investors, usually in the form of commercial paper.  The Merrill CDO debt was split into tranches which were arranged according to their respective anticipated degrees of risk and payment priority, as noted above.  Merrill primarily used RMBS consisting of subprime mortgages to serve as the collateral for its CDOs.  The revenue streams produced by this underlying RMBS collateral supported the repayment of principal and interest on the CDO debt securities issued to investors.

88.     Merrill used the proceeds of the commercial paper issued by its CDOs to purchase long-term assets, such as RMBS, which had maturities much longer than the short-term paper issued by the CDO.  This provided an opportunity for profit generated by the difference between the higher yields on the long-term assets purchased by the CDO entity and the lesser interest expense on the commercial paper or other short-term debt issued by the CDO entity.  Because the RMBS were structured as proportional claims on pools of assets, they reflected the risks of

the underlying collateral.  In turn, the loss exposure of CDO tranches directly correlated to the performance of the securities underlying the CDO.

89.     Defendant O'Neal's efforts to solidify Merrill's relationships with subprime originators and to move Merrill itself into subprime origination were based upon his desire to increase Merrill's revenues by securitizing subprime mortgages into RMBS and CDOs.  In 2002, when Defendant O'Neal became Merrill's CEO, Merrill underwrote approximately $2.2 billion in CDOs, ranking only 15th among CDO underwriters.

90.     Under Defendant O'Neal's leadership, Merrill became the largest CDO producer in the world.  On October 25, 2007 *The Wall Street Journal* reported that Merrill underwrote $19 billion of CDOs in 2004.  The following year, Merrill underwrote approximately $35 billion in CDOs, approximately $14 billion of which were backed by subprime mortgages.  By 2006, the overwhelming majority of the $44 billion in CDOs that Merrill underwrote were backed by subprime mortgages.  In the first half of 2007 Merrill underwrote approximately $30 billion in CDOs, but the Company was having an increasingly difficult time locating willing purchasers of such instruments.  Notably, as housing market conditions worsened, Merrill ramped up its origination and securitization activity.

91.     By increasing its CDO securitization activity, Merrill generated increased fee income.  In the CDO arena, fees are approximately 1% to 1.5% of the face value of the debt issued.  For 2005 and 2006, Merrill's CDO underwriting fees were approximately $400 million and $700 million, respectively.

92.     With its increased focus on mortgage origination and securitization, Merrill appeared to be performing exceptionally well.  Merrill reported total net revenues of $34.7 billion resulting in reported net earnings of $7.5 billion in 2006.  Moreover, the Company

reported total net revenues of $9.9 billion resulting in net earnings of $2.2 billion for the quarter

ending March 30, 2007, and net revenues of $9.7 billion resulting in reported net earnings of

$2.1 billion for the quarter ending June 29, 2007.

93.     Beginning no later than 2006, however, Merrill served not only as an underwriter

of CDOs, but also became a major purchaser and holder of the subprime ABS CDOs it was

unable to sell to institutional investors.  In this capacity, Merrill saddled itself with more than

$40 billion in ABS CDOs largely backed by subprime mortgages as of the end of June 2007 —

hidden holdings that would require the Company to take tens of billions of dollars in write-

downs in 2007 and 2008.

94.     Merrill's downfall lay in its myopic quest for short-term profits.  Beginning in

mid-2006, as the housing market softened and subprime defaults escalated, the Company began

to accumulate $5 billion to $6 billion of exposure per quarter on its balance sheet in very risky

subprime ABS CDOs.  Prior to August 2007, Merrill did not disclose that subprime mortgages

comprised any portion of its poisonous CDO holdings.

### 2.     Merrill's Synthetic CDOs

95.     Even when Merrill had a shortage of actual subprime assets to securitize it could

still maximize its revenue stream from the poorly underwritten subprime mortgages that it was

securitizing by irresponsibly creating numerous "synthetic" CDOs.  These synthetic CDOs

consisted of complex derivative securities, the performance of which was inextricably tied to the

performance of the underlying subprime mortgages.  Unlike cash CDOs, which use the cash

flows from the underlying ABS/RMBS to service debt, synthetic CDOs use cash from premium

payments on CDS contracts either to purchase low-risk securities or to service the synthetic

CDO's debt directly.

96.     These highly-leveraged devices enabled Merrill to multiply the volume of CDOs it issued from the pool of subprime mortgages that it originated and/or purchased from other originators, thus increasing its own fees.  Typically, only 10% of the assets of a synthetic CDO are actual RMBS.  The remaining 90% of the assets comprising the CDO are speculative derivative contracts, such as CDS.  With the CDS at issue in this case, the hedged securities were certain notes issued by CDOs, which entitled Merrill to payments of interest and principal based on a specified schedule.  The CDS contracts were little more than unregulated wagers on the performance of the underlying mortgages.

97.     For example, in a Merrill synthetic CDO with a face value of $1.4 billion, the issuing entity for the CDO would purchase approximately $140 million of RMBS or cash assets that would generate income streams.  Merrill would then enter into derivative contracts, such as CDS, with the CDO issuing entity for the remaining face value of the CDO, or approximately $1.26 billion.  Merrill would be effectively wagering the $1.26 billion that the underlying $140 million of RMBS would perform as required by the CDO.  Obviously, these undisclosed and irresponsible bets — made at the very time that the housing market was collapsing and the rate of mortgage defaults was escalating — only multiplied the risks of poorly underwritten subprime mortgages.

98.     Synthetic CDOs were easier to assemble than CDOs that consisted of tangible collateral assets.  In the case of CDS, Merrill was able to work with many counterparties who were more than happy to purchase CDS that would pay out if the subject RMBS declined in value and/or defaulted.  By using derivative contracts to fund CDOs, rather than relying exclusively upon RMBS consisting of actual mortgages, Merrill was able to dramatically

increase its issuance of CDOs and pocket further fee income.  When these structures collapsed, Merrill's losses were amplified by this reckless use of leverage.

### 3.    Merrill's CDO-Squared and CDO-Cubed Transactions

99.    In the face of the known market downturn, Merrill engaged in various strategies that the Defendants hoped would enable the Company to off-load the crippling risks that it was facing from its inventory of subprime-backed CDOs as well as its exposure to other mortgage-backed securities.  Pursuant to one such strategy — which Merrill deliberately employed to avoid taking write-downs on the clearly impaired values of its stockpile of damaged CDOs, RMBS, and other securities — the Company repackaged such assets into new highly complex CDOs known as "CDO-squared" and "CDO-cubed" to be sold to unsuspecting investors. Simply put, a CDO-squared is a CDO that uses tranches of other CDOs as the underlying collateral, and a CDO-cubed is a CDO that uses other CDO-squared tranches as the underlying collateral.  In exchange for foisting these Frankensteinian CDO-squared and CDO-cubed securities on investors, Merrill hid its losses while earning additional underwriting fees.

100.    Merrill's generation of CDO-squared and CDO-cubed structures was part of the Company's internal strategy to "de-risk" and "mitigate" the mounting losses from Merrill's CDOs (defined together herein as "de-risking").  An April 16, 2008 *Wall Street Journal* article gave the following description of Merrill's "de-risking" strategy:

> Merrill set out to reduce its exposure, in an effort innocuously referred to as 'de-risking.'  It could have sold off billions of dollars' worth of mortgage-backed bonds that it had stockpiled with the intention of packaging them into more CDOs.  But with the market for such bonds slipping, Merrill would have had to record losses of $1.5 billion to $3 billion on the bonds. . . . Instead, Merrill tried a different strategy: quickly turn the bonds into more CDOs. . . . As the CDO business slid, Merrill's top managers embarked on a new plan, referred to as the 'mitigation strategy.'  The aim was to find ways to hedge exposures through deals with bond insurers.

101.    While Merrill's "de-risking" strategy clearly demonstrates that Defendants knew of the detrimental and undisclosed impairment of Merrill's CDO holdings, the strategy merely postponed the Company's day of reckoning.  As alleged herein, Merrill's involvement with inadequately capitalized monoline insurers to write protection against the risk of default on the senior tranches of these amalgamations, which the Company belatedly began disclosing in January 2008, exposed Merrill to further losses.

102.    Ultimately, when the CDO market evaporated, Merrill was unable to sustain itself as an independent business under the weight of the subprime-related instruments on the Company's balance sheet.  To stave off bankruptcy, Merrill agreed to be acquired by BOA in a hastily negotiated all-stock transaction announced on September 15, 2008.  This transaction closed on January 1, 2009, and the terms of the deal and the disclosures related thereto have been the subject of regulatory proceedings and litigation.

### C.    Merrill Concealed The Credit Default Swaps It Executed With Undercapitalized Monoline Insurers

103.    Obtaining credit protection for Merrill's CDOs was critical to receiving investment grade ratings from Moody's Investors Service, Standard & Poor's, Fitch, Inc. and other Nationally Recognized Statistical Rating Organizations.  The financial guarantees and CDS contracts written by monoline insurers helped accomplish this by wrapping Merrill's CDOs with the insurer's investment grade credit ratings in exchange for premium payments.  The enhanced credit ratings resulting from monoline insurance allowed Merrill's CDOs to be more readily marketed and sold to investors.  With the higher credit ratings it received for its CDO issuances, Merrill was also able to lower the interest rates payable to CDO investors and thereby increase its overall profits.

104.     The credit protection Merrill obtained through CDS contracts with monoline insurers also allowed the Company to remove the liabilities of the underlying CDOs from its balance sheet.  This was accomplished through the accounting treatment for credit derivatives which Merrill applied to the monoline CDS contracts covering its CDO portfolio.  Such accounting treatment contrasts with traditional financial guarantee contracts, which are liabilities that the insured must maintain on its balance sheet.  However, as Merrill knew, but failed to disclose at the time, the offloading of its significant CDO liabilities through monoline CDS contracts was unwarranted given the substantial risk that such monolines would be unable to satisfy their enormous payment obligations on the hedged CDOs.

105.     As noted above, Merrill's CDOs were collateralized by pools of assets consisting of various types of debt securities, including RMBS and other CDOs.  The different tranches of Merrill's CDOs were based on the priority of payment from the cash flows generated by the CDOs' underlying collateral assets.  Specifically, the CDOs were typically divided into senior, mezzanine, and equity tranches, with the senior tranche paid first from any collateral cash flows.

106.     The risk of loss from a given CDO was felt first by the equity and mezzanine tranches and then the senior tranche when the loss allocations for the lower tranches were satisfied.  As noted above, the senior tranches also typically had higher credit ratings (AA to AAA, signifying a security with investment grade credit quality) based upon their payment priority and credit protection from the mezzanine and equity tranches.  Certain of Merrill's CDOs also had a "super senior" tranche which were AAA-rated and had payment priority over the senior tranche.  The CDS contracts between Merrill and the monoline insurers were written on these senior and super senior tranches of the Merrill CDOs despite the purported structural credit protection they offered.

36

107.    A CDS is a derivative instrument that operates somewhat like a standard insurance contract.  Merrill, as the buyer of protection, paid a periodic fee to the monoline insurers as the sellers of protection.  The fees paid by Merrill over the term of the contract were in exchange for compensation by the monoline insurers in the event that the hedged CDO tranches experienced default.

108.    As the demand for CDOs collateralized by subprime RMBS slowed in 2006, Merrill found itself increasingly unable to sell its CDO tranches, including its senior and super senior tranches, to outside investors.  As a result, Merrill began to accumulate and retain on its balance sheet significant amounts of unmarketable CDOs that were prone to growing credit risk. Rather than disclose these risks, Merrill turned to undercapitalized monoline insurers for billions of dollars of CDS protection on the Company's massive CDO portfolio.  None of the specific CDS contracts were disclosed during the Relevant Period.  Moreover, Merrill misleadingly used the CDS contracts to keep its retained CDO exposure off its balance sheet when the Company knew, but failed to disclose, that the monolines were exposed to substantial subprime debt in amounts many times greater than their claims-paying resources.  Put another way, the CDS "insurance" was no insurance at all.

109.    Until approximately 2005, Merrill had obtained the vast majority of credit protection for its AAA-rated super senior CDO tranches from AIG.  At the end of 2005, however, AIG concluded that it would no longer write CDS contracts on Merrill's CDOs given the poor underwriting standards used in the subprime sector and the increasing number of subprime mortgage defaults.

110.    The loss of AIG as a source of credit protection for its CDOs placed a tremendous risk on Merrill which the Company did not disclose.  In fact, this material information did not

emerge until it appeared in an April 16, 2008 *Wall Street Journal* article, which stated, among

other things:

> AIG was keeping a close eye on the housing boom because it had another unit
> that made subprime loans, those to home buyers with weak credit.  AIG did a
> review of the market.  Concerned that home-lending standards were getting too
> lax, AIG at the end of 2005 stopped insuring mortgage securities.
>
> Merrill was used to having to keep lots of mortgage bonds and pieces of CDOs on
> its books temporarily before selling them.  But without a firm like AIG providing
> credit insurance, Merrill had to bear the risk of default itself.
>
> Instead of scaling back its underwriting of CDOs, however, Merrill put the
> business in overdrive.  It began holding on its own books large chunks of the
> highest-rated parts of CDOs whose risk it couldn't offload.

111.    As an originator of subprime mortgages, Merrill knew that the underwriting

standards for such products posed a high risk of default.  AIG's decision to stop writing credit

protection based upon these same unacceptable underwriting standards (*i.e.*, low borrower FICO

scores, no documentation of borrower income) provided Merrill with additional and undeniable

knowledge of the risks that the Company was continuing to assume.  Rather than tempering its

approach, Merrill only accelerated its subprime origination and securitization.

112.    According to allegations in a complaint filed in *MBIA Insurance Corp. v. Merrill

Lynch, Pierce, Fenner and Smith Inc.*, Index No. 601324/09 (N.Y. Sup. Ct.) (the "MBIA

Action"), by September 2006, Merrill had on its balance sheet approximately $17 billion in

subprime ABS CDOs, $18 billion in mortgage-backed securities to be used as collateral for

newly issued Merrill CDOs, and $14 billion in actual subprime mortgages for further

securitizations.  Merrill realized that its ability to sell these deteriorating assets had become

severely compromised with the decline in the housing market at the end of 2006 and into 2007.

In response, Merrill sought to unload its enormous inventory of unmarketable RMBS and CDOs

into newly created CDOs which could be more readily sold to investors or hedged through CDS

contracts with monoline insurers.  All the while, Merrill knew, but failed to disclose, that the credit quality of the underlying collateral for the new CDOs hedged by the monoline insurers consisted of the most toxic subprime-related assets held by the Company and would likely result in significant payment obligations under the CDS contracts written by the monolines.

113.    Merrill entered into a number of putative "hedging" transactions during the Relevant Period with different monoline insurers that purported to provide Merrill with guarantees against shortfalls in interest or principal payments due on the CDO tranches. Specifically, pursuant to CDS contracts, monoline insurers, such as MBIA, Inc. ("MBIA"), XL Capital Assurance Inc. ("XL Capital," a subsidiary of Security Capital Assurance ("SCA")), and ACA Capital Holdings, Inc. ("ACA") purportedly provided protection to Merrill (or the Merrill-sponsored CDO issuing-entity) against the risk of loss to either or both principal and interest on the senior and super senior tranches of CDOs held by Merrill.  Sometimes these CDS contracts also purported to provide Merrill or Merrill's CDO issuing-entity with credit protection on the total return the particular CDO tranche was supposed to yield.

114.    In obtaining this protection, Merrill touted the high ratings assigned to its CDO securities.  But Defendants knew better.  As the arranger, warehouse provider, and broker of its CDOs, Merrill had particularized and undisclosed knowledge regarding the credit quality of these CDOs.  Moreover, many of these CDOs were collateralized by subprime mortgages that Merrill originated through Ownit and/or First Franklin based upon superficial underwriting.  In light of this information, including the Company's performance data on the loans underlying the securitized RMBS, Merrill knew, but failed to disclose, that the ratings did not reflect the true credit quality of its CDO tranches or the underlying collateral.

39

115.    The monoline insurers that Merrill contracted with to fill the void created when AIG bowed out of the market primarily insured municipal bonds and other debt securities issued by governmental entities and municipalities.  The risk profiles presented by these instruments were materially different from CDO securities, and the monoline insurers were highly leveraged and did not otherwise possess adequate capitalization to provide sufficient protection to hedge Merrill's exposure on the CDOs.  As Treasury Secretary Timothy Geithner stated in a speech on July 10, 2009 at a Joint Congressional Hearing on Regulation of OTC Derivatives:

> [The monoline insurance companies] and others sold huge amounts of credit protection on mortgage-backed securities and other more complex real-estate related securities *without the capacity to meet their obligations in an economic downturn*.

> Banks were able to get substantial regulatory capital relief from buying credit protection on mortgage-backed securities and other asset-backed securities from *thinly capitalized, special purpose insurers subject to little or no initial margin requirements*.

This statement certainly proved to be true with respect to the monoline insurers that Merrill contracted with to purportedly "de-risk" its CDO portfolio.

116.    Certain of the monoline insurers that sold CDS protection to Merrill were woefully undercapitalized to meet their payment obligations on the swaps.  For example, Merrill entered into CDS contracts with both MBIA and ACA during the third quarter of 2007 to hedge against losses on certain of Merrill's "AAA" CDO notes.  However, as of the end of the second quarter of 2007, MBIA had a capital base of only $6.55 billion to pay claims on financial guarantees and other credit protection for U.S. mortgage-backed securities and CDOs which significantly exceeded this amount.  During this same period, ACA reported credit protection obligations for approximately $20 billion in CDO and other mortgage-related exposures, yet ACA had approximately $400 million in equity available to pay claims.  Moreover, MBIA,

ACA, and XL Capital all reported that they provided credit protection for significant amounts of subprime RMBS and CDOs which only increased their exposure to actual payable claims.

117.    Merrill was aware of, but failed to disclose, any of these facts.  Instead, the Company falsely assured investors that Merrill's risks were adequately managed.  Although Merrill did make some generalized statements about its hedging activities during the Relevant Period, the Company failed to disclose that it had concentrated so much of its CDO risk with a limited group of poorly capitalized monoline insurers which, themselves, were subject to increased risks of credit downgrades and defaults.  Contrary to its assertions otherwise, Merrill remained exposed to the risk of billions of dollars in foreseeable losses.

118.    In addition, Merrill knew, but failed to disclose, that the ratings assigned to the various tranches of its CDOs were grossly inaccurate.  Merrill approached the monolines to provide credit protection for supposedly conservative super senior tranches of the Merrill CDOs. In reality, Merrill was obtaining protection on deteriorating securities, often repackaged into CDO-squared and CDO-cubed structures, which had little or no subordination protection and were backed by non-investment grade collateral.  Neither the risky nature of the purportedly hedged CDO tranches, nor the specific hedges themselves, were disclosed to Plaintiff during the Relevant Period.

### 1.    Merrill's Transactions with MBIA

119.    For example, as part of the "de-risking" strategy noted above, ¶¶ 99-101, Merrill entered into a series of CDS contracts with MBIA to protect against the risk of loss on the senior and super senior notes of four CDOs underwritten by Merrill from September 2006 through March 2007.  According to allegations in the MBIA Action, these Merrill CDOs were known as: (i) Broderick CDO 2, Ltd., (ii) Highridge ABS CDO I, Ltd., (iii) Broderick CDO 3, Ltd., and (iv)

Newbury Street CDO, Ltd.  The MBIA-Merrill CDS contracts on these Merrill CDOs were as follows:

- Broderick CDO 2:  A CDS between MBIA and Merrill Lynch International ("MLI") entered into on September 29, 2006 to hedge against the risk of loss on $376 million of the CDO's A-1AD super senior notes.

- Highridge CDO:  A CDS between MBIA and MLI entered into on February 15, 2007 to hedge against the risk of loss on $547.5 million of the CDO's A-1AD super senior notes.

- Broderick CDO 3:  A CDS between MBIA and MLI to hedge against the risk of loss on $225 million of the CDO's A-2 senior notes, and a CDS between MBIA and MLI to hedge against the risk of loss on $318.7 million of the A-3 senior notes.  Both CDS contracts were entered into on February 27, 2007.

- Newbury Street CDO:  A CDS between MBIA and MLI to hedge against the risk of loss on $450 million of the CDO's A-1 super senior notes, and a CDS between MBIA and MLI to hedge against the risk of loss on $800 million of the A-2 senior notes.  Both CDS contracts were entered into on March 8, 2007.

120.    MBIA also entered into separate CDS contracts with counterparties other than Merrill to hedge additional amounts of the same or different senior note tranches of the Merrill CDOs.  In all, MBIA wrote CDS contracts to provide credit protection for approximately $5.7 billion of the senior tranches of these four Merrill CDOs.  None of this information was disclosed to Plaintiff during the Relevant Period.

121.    Nor did Defendants disclose that much of the underlying collateral in these four CDOs was comprised of illiquid assets from Merrill's own balance sheet.  As noted above, the Merrill CDOs contained various RMBS and CDO securities serving as collateral for the payment of interest and principal on the different CDO tranches.  The CDO collateral within the Merrill CDOs was, in turn, made up of a multitude of additional RMBS and other CDO tranches.  Each of the four Merrill CDOs covered by the MBIA CDS contracts was supported by substantial

amounts of Merrill-originated CDO and RMBS collateral that the Company was otherwise unable to sell or obtain credit protection for.

122.    Specifically, as alleged in the MBIA Action, about 67% of the total notional, or face, amount of the inner CDOs collateralizing the Broderick CDO 2 were originated by Merrill. In addition, 52% of the notional amount of the inner CDOs within the Highridge CDO, and 65% of the notional amount of the inner CDOs within the Broderick CDO 3, were originated by Merrill.  At least 13% of the notional amount of the inner CDOs serving as collateral for the Newbury Street CDO were also originated by Merrill.  As only Merrill knew, most of these Merrill-originated CDOs had extremely poor credit quality and consequently did not provide adequate collateral support for the four Merrill CDOs hedged by the MBIA CDS contracts. Merrill was nonetheless able to secure monoline CDS contracts on these deteriorating assets to help market the CDOs to investors and remove them as liabilities from the Company's balance sheet.  Once again, none of this information was disclosed to Plaintiff during the Relevant Period.

123.    Defendants also knew, but failed to disclose, that future defaults on these four CDOs were likely because of the poor credit quality of the underlying collateral.  This is exactly what happened.  All of the purportedly AAA-rated senior tranches of these four Merrill CDOs were ultimately downgraded to junk status after the CDS contracts with MBIA were executed. Despite knowing that defaults on these CDOs were imminent, and that such defaults would impose significant payment obligations on an already undercapitalized MBIA, Merrill proceeded with its "de-risking" strategy throughout 2007 in a desperate attempt to unload its significant exposure to illiquid RMBS and CDO assets and earn enormous underwriting fees in the process.

Defendants concealed these efforts from Plaintiff despite their superior knowledge about the poor performance of the assets hedged with MBIA and other monoline insurers.

### 2. Merrill's Transactions with XL Capital

124.    The CDS contracts Merrill entered into with XL Capital during a seven month period in 2007 present another example of the Company's undisclosed strategy to "de-risk" its massive CDO portfolio with monoline insurers.  Like the MBIA CDS contracts described above, these XL Capital CDS contracts were meant to hedge against the risk of loss on the principal and interest payments due on the senior tranches of the Merrill CDOs at issue.

125.    According to allegations in a complaint filed in *Merrill Lynch International v. XL Capital Assurance Inc.*, 08-CV-2893 (JSR) (S.D.N.Y.), there were seven total CDS contracts between XL Capital and Merrill which purported to provide credit protection for over $3.1 billion in the Class A-2 senior notes of the following Merrill CDOs:

> (i)     West Trade Funding CDO II Ltd. and West Trade Funding CDO II LLC (collectively, the "West Trade II CDO");
>
> (ii)    Silver Marlin CDO I, Ltd. and Silver Marlin CDO I, LLC (collectively, the "Silver Marlin CDO");
>
> (iii)   West Trade Funding CDO III Ltd. and West Trade Funding CDO III LLC (collectively, the "West Trade III CDO");
>
> (iv)    Tazlina Funding CDO II Ltd. and Tazlina Funding CDO II LLC (collectively, the "Tazlina CDO");
>
> (v)     Jupiter High-Grade CDO VI, Ltd. and Jupiter High-Grade CDO VI, LLC (collectively, the "Jupiter CDO");
>
> (vi)    Robeco High Grade CDO I, Ltd. and Robeco High Grade CDO I, LLC (collectively, the "Robeco CDO"); and
>
> (vii)   Biltmore CDO 2007-1, Ltd. and Biltmore CDO 2007-1, LLC (collectively, the "Biltmore CDO").

The Class A-2 senior notes represented the second-highest tranche of each of these Merrill CDOs.

126.     The seven CDS contracts on these Merrill CDOs were executed between XL

Capital, or a trust created to serve as the CDS counterparty, and MLI.  They were as follows:

- <u>West Trade II CDO:</u>   A CDS entered into on January 25, 2007 to hedge against the risk of loss on $375 million in Class A-2 notes of the West Trade II CDO.

- <u>Silver Marlin CDO:</u>   A CDS entered into on April 11, 2007 to hedge against the risk of loss on $437.5 million in Class A-2 notes of the Silver Marlin CDO.

- <u>West Trade III CDO:</u>   A CDS entered into on May 25, 2007 to hedge against the risk of loss on $625 million in Class A-2 notes of the West Trade III CDO.

- <u>Tazlina CDO:</u>   A CDS entered into on June 4, 2007 to hedge against the risk of loss on $450 million in Class A-2 notes of the Tazlina CDO.

- <u>Jupiter CDO:</u>   A CDS entered into on June 15, 2007 to hedge against the risk of loss on $525 million in Class A-2 notes of the Jupiter CDO.

- <u>Robeco CDO:</u>   A CDS entered into on June 29, 2007 to hedge against the risk of loss on $385 million in Class A-2 notes of the Robeco CDO.

- <u>Biltmore CDO:</u>   A CDS entered into on August 10, 2007 to hedge against the risk of loss on $375 million in Class A-2 notes of the Biltmore CDO.

Notably, most of these CDS contracts were executed in the second and third quarters of 2007

when Merrill was desperately seeking to hedge its massive senior CDO tranche positions with

monoline insurers.  The seven XL Capital CDS contracts were part of this ultimately

unsuccessful campaign by Merrill.

127.     Nonetheless, Merrill was so eager to obtain the XL Capital CDS contracts for the

above senior CDO tranches it held that it was willing to relinquish to XL Capital certain control

rights over the seven CDOs.  Among others, this included the right to liquidate the CDOs'

collateral in the event of default, accelerate note maturity dates, and remove the CDOs' trustees or collateral managers upon a default of the CDOs' collateral assets.

128.    Such control rights normally only belong to the most senior tranche of a given CDO (here the Class A-1 notes of the Merrill CDOs), and/or to the financial guarantor providing credit protection for that CDO tranche.  However, to entice XL Capital to write CDS contracts on the Class A-2 CDO notes, Merrill conceded these important control rights as part of the consideration paid to XL Capital.  In turn, XL Capital insisted on obtaining the control rights to protect its financial interest in CDOs containing large amounts of risky RMBS and CDO collateral.

129.    Even with the XL Capital CDS contracts in place, Merrill was still not finished with its efforts to unload the senior tranches of these same CDOs.  On August 29, 2007, MLI entered into six additional CDS contracts with MBIA on the Class A-1 (super senior) notes of each Merrill CDO referenced in ¶ 125 above, except the Jupiter CDO.  Thus, Merrill was able to arrange for additional hedges on the same CDOs as part of its overall strategy to unload the foreseeable risks associated with these toxic assets, and market them more easily to investors.  However, Defendants knew, but failed to disclose, at the time the CDS contracts were executed that they would be ineffective in protecting against such risks.  This was true given the poor credit quality of the underlying collateral assets and the inadequate capital positions of the monoline insurers.

### 3.    Merrill Concealed Its Exposure to Shaky Monoline Insurers

130.    In fact, there were ample well-grounded doubts concerning the financial viability of XL Capital and MBIA by no later than the first quarter of 2007.  Merrill served as an underwriter on SCA's $460 million initial public offering in August 2006 and had access to detailed financial information regarding SCA and its subsidiary, XL Capital.  Merrill therefore

knew, but failed to disclose, that XL Capital was thinly capitalized.  Merrill nonetheless entered into CDS contracts with XL Capital to obtain investment grade credit ratings for the ABS CDOs the Company sold to investors.

131.    Others in the market recognized the risks posed by the poor capitalization of the monoline insurers at the time.  For example, a May 2007 presentation by hedge fund Pershing Square Capital Management, L.P. ("Pershing") stated that monoline insurers, including MBIA and Ambac Financial Group, Inc. ("Ambac"), were "inadequately capitalized to withstand a negative credit event" on the "senior tranches of ABS & CDO securitizations" for which they provided CDS protection.  Based on this and other components of its analysis of the monoline insurers at the time, Pershing concluded that both MBIA and Ambac were "effectively insolvent" and "need[ed] to be recapitalized."

132.    Moreover, at least one news report in early 2007 indicated that the market viewed monoline insurers as susceptible to the increased rate of mortgage delinquencies and defaults at the time.  On March 14, 2007, *The Wall Street Journal* published an article reporting that monoline insurers MBIA and MGIC Investment Corp. "were perceived as vulnerable to a waive [sic] of defaults" given their exposure to the mortgage industry.  In fact, each of the monoline insurers that entered into CDS contracts to hedge Merrill's CDO portfolio suffered significant credit downgrades throughout 2008.

133.    For these reasons, among others, Merrill's increased exposure to monoline insurers represented an irresponsible concentration of risk with sources unable to provide effective hedges against the Company's mounting subprime exposures and losses.  Merrill not only deliberately failed to disclose the risks presented by these monoline transactions, but failed to disclose the existence of these specific transactions at all.

134.    Despite the subterfuge, Merrill's arrangements with monoline insurers did not materially reduce the Company's actual exposure to CDOs.  Based upon the monolines' inadequate capitalization and related constraints preventing them from honoring their obligations, Merrill wrote-down, as "credit valuation adjustments," at least $11.72 billion in financial guarantees and CDS contracts provided by these companies during the Relevant Period.

135.    A "credit valuation adjustment" is the market value of the credit risk arising from a counterparty's failure to perform on a derivative obligation.  In the context of CDS contracts written by monoline insurers, it represents an income charge based on the decreased chance that the insurer will meet its payment obligations under the swap agreement.

136.    After Merrill began announcing its CDO-related write-downs beginning in October 2007, the damage arising from Merrill's desperate and reckless transactions with ill-equipped monoline insurers began to emerge.  Merrill revealed in a January 17, 2008 press release that it had a notional, or face, amount of over $13.2 billion in CDS contracts with unspecified "financial guarantors" on its U.S. super senior ABS CDOs.  In addition, Merrill disclosed that it had hedged a notional amount of $6.6 billion with CDS counterparties rated "non-investment grade or unrated" by credit rating agencies such as Moody's, S&P, and Fitch.

137.    The January 17, 2008 press release also stated that the Company was forced to take a credit valuation adjustment during the fourth quarter of 2007 on its hedges with "financial guarantors" amounting to negative $3.1 billion, including negative $2.6 billion related to U.S. super senior ABS CDOs.  Merrill also wrote-down approximately $1.9 billion from its exposure to ACA during the fourth quarter of 2007.  The press release disclosed for the first time that Merrill had $30.4 billion in super senior ABS CDO exposure hedged by approximately $23.6

billion in monoline CDS contracts.  The negative credit valuation adjustments on these CDS contracts continued throughout 2008.

138.     On April 17, 2008, Merrill issued another press release stating that it had "credit valuation adjustments related to the firm's hedges with financial guarantors [of] negative $3 billion, including negative $2.2 billion related to U.S. super senior ABS CDOs" during the first quarter of 2008.

139.     Remarkably, these press releases restricted their disclosures to the notional amount of Merrill's ABS CDOs hedged through CDS contracts with monoline insurers.  Merrill failed to disclose in the press releases, or in any other public statement in 2008, that it had in fact entered into monoline CDS contracts to hedge approximately $50 billion in *non-CDO* assets, including some RMBS.  Of this staggering amount, approximately $9.6 billion was with CDS counterparties that were considered "[n]on-investment grade or unrated" by S&P.  The details concerning Merrill's enormous non-CDO hedges with monoline insurers were not revealed until after the Merger with BOA.

### D.    Defendants Ignored External And Internal Warnings Concerning Merrill's CDO Business And Knowingly Assumed Excessive Undisclosed Risks

140.     During the Relevant Period, Defendants knew of the extraordinary risk of default in poorly underwritten subprime mortgages and in structured finance products, derivatives, and other securities for which such mortgages served as collateral or reference points.  Defendants knew such information from, among other things, Merrill's own subprime mortgage origination activity through warehouse lines to originators such as MLN and ResMAE, through its interest in Ownit, and its ownership of First Franklin.

141.     Merrill's originations through First Franklin provided the Company with representative loan-level performance data bearing upon the mortgage pools underlying the

Company's CDOs.  Thus, during the Relevant Period, Merrill possessed real-time data demonstrating the consistently deteriorating performance of the subprime mortgages underlying its CDO securities.  As Defendant Edwards proclaimed during the April 19, 2007 Analyst Call (defined below in Section V), the Company's purchase of First Franklin "enabled us to see trends emerge sooner and adjust underwriting standards and pricing more rapidly."  Based upon such information, Merrill knew that its CDO securities bore inaccurate ratings, but the Company prioritized its fee income over providing the market or the Company's investors with timely, truthful, and accurate information.

142.    Both before and during the Relevant Period, Defendants possessed direct knowledge of the deterioration of the subprime mortgage market and the harm that it would inevitably cause the Company from, among other things:

(i)    its own subprime origination activity;

(ii)    AIG's refusal to extend further CDS protection to Merrill's CDOs as of December 2005; and

(iii)    Defendants' need to implement Merrill's monoline-centered "de-risking" strategy to try to offload the Company's foundering subprime-backed securities.

In addition to these known and undisclosed facts, Defendants brashly ignored numerous warnings that other Merrill executives raised concerning the clear dangers that the Company's subprime CDO strategy posed.

143.    For example, during the summer of 2006, Kronthal, who led Merrill's Global Credit Real Estate and Structured Products, and GMI groups (including its CDO business), warned top Merrill executives that Merrill was taking on too much risk in subprime ABS CDOs. Even though Merrill's exposure at this point was low in comparison to what it would eventually become, Kronthal warned that Merrill should keep no more than $3-4 billion of CDO exposure

on its books.  Defendants ignored Kronthal's concerns, and Defendant O'Neal fired Kronthal and

the other members of Kronthal's group for interfering with the lucrative fees Merrill received

from its securitized products.  Defendants, instead, continued to march the Company headfirst

into undisclosed and inordinate risks.

144.    On October 28, 2007 — just before Merrill's Board of Directors fired Defendant

O'Neal — *The New York Post* published an article based upon interviews with Merrill executives

demonstrating that Defendants knowingly ignored Kronthal's warnings concerning the risk that

Merrill's subprime CDO strategy posed, electing instead to keep chasing the fee stream that such

products generated:

> The seeds of [O'Neal's] demise were sown in the summer of 2006 when he got
> rid of the firm's most knowledgeable asset- and mortgage-backed security pro,
> principal investment chief Jeff Kronthal.  He was Wall Street's guru on the
> subject and had helped develop and trade the first mortgage-backed securities in
> the early 1980s.
>
> Early that summer, according to Merrill executives, Kronthal began warning the
> firm's traders and bankers about the firm's inability to "clear," or trade, the
> increasing amounts of junk mortgage paper it generated.
>
> ***In late July 2006, fed up with Kronthal's concerns - which, admittedly, had
> been threatening the lucrative fee flows Merrill was reaping from its CDO-
> issuance machine - Neal fired him.***
>
> ***Executives and clients of the firm told The Post that Merrill's mistake came in
> ignoring every sign that the asset-backed securities markets were ready to
> overheat this spring and in choosing instead to continue to pump in more CDOs
> to keep the balls in the air.***
>
> One by one, they fell.

145.    After Defendant O'Neal fired Kronthal for raising well-founded concerns

regarding Merrill's CDO "golden goose," the Company replaced him with Ranodeb Roy

("Roy").  Based upon interviews conducted with Merrill executives, *The Wall Street Journal*

reported in a story published on April 16, 2008 that Roy had little experience in mortgage

securities, let alone CDOs.  Under Roy, Merrill's CDO holdings escalated dramatically —
growing to approximately $5-6 billion per quarter.  Initially, Roy objected to loading Merrill's
balance sheet with CDOs, but he later capitulated, claiming that he was "following orders."
Merrill ultimately fired Roy in November 2007.

146.     Merrill's myopic quest for fees caused Defendants to cast aside other internal
warnings that the Company was assuming far too much risk.  According to an April 16, 2008
*Wall Street Journal* article, a Merrill trader warned Harin De Silva ("De Silva"), a co-head of
Merrill's U.S. CDO origination business, about the risks associated with Merrill retaining $975
million on its balance sheet of a $1.5 billion CDO named Octans.  During a reportedly "heated
phone conversation," De Silva told the trader to accept the securities at issue, but the trader
expressed discomfort doing so because he felt as though he and the Company lacked the
information required to assume such risks.  De Silva convinced the reluctant trader to assume the
risks by reasoning that there was less risk in the super senior tranche at issue than the lower-rated
portions, for which Merrill had already conscripted investors.  In the end, the deal was done, and
Merrill booked approximately $15 million in fee income.

147.     Certain other senior executives at Merrill issued additional internal warnings
concerning the massive losses that Merrill was facing based upon its subprime exposures.
According to an October 29, 2007 article appearing in *The New York Times*, Merrill executives
Ahmass Fakahany and Gregory Fleming sent a three-page letter to Merrill's directors on August
9, 2007 entitled, "Board Market Update End July results:  Note from Fakahany and Fleming."
Fakahany and Fleming were Co-Presidents of Merrill's GMI group which underwrote the
Company's CDOs and both had intimate knowledge of the credit quality of these assets.  In their
letter, Fakahany and Fleming addressed the growing troubles in the market for Merrill's CDOs

and the losses that Merrill faced based upon the steep deterioration in the market in the preceding month.  Defendant O'Neal and the Company's General Counsel, Rosemary T. Berkery, received a copy of the letter addressing the ongoing crisis at Merrill.  Defendants did not disclose this material information to Plaintiff.  Instead, Defendants continued a futile game of "Beat the Clock," which increased the losses of Merrill and its shareholders.

<strong>E.    Without Making Required Disclosures, Merrill Used Client Assets In<br>An Effort To Create A Market For The Company's Impaired CDOs</strong>

148.    Throughout the Relevant Period, Defendants knew of the deepening downturn in the housing market that consistently eroded the "market" of purchasers for Merrill's CDOs. During the spring of 2007, it became particularly difficult for Merrill to find purchasers for its CDOs, and the Company was amassing greater damaging concentrations of these impaired assets on its balance sheet.  To offload some of this known risk, Merrill and its wholly-owned subsidiary, MLPFS, sold the Company's CDOs to Merrill's unknowing brokerage clients.   In so doing, Merrill effectively created a market for its unattractive CDOs.

149.    Some of the parties injured by Merrill's unilateral decision to load up its client portfolios with CDOs have commenced legal proceedings.  One such action is *MetroPCS Communications, Inc. v. Merrill Lynch & Co., Inc.*, Cause No. 07-12430, filed on or about October 18, 2007 in the District Court of Dallas County, Texas (the "Metro Action").  In the Metro Action, the plaintiffs allege that on or about May 2007, Merrill and MLPFS began investing the plaintiffs' funds in risky CDO securities without the plaintiffs' knowledge or consent, which was required under the investment advisory contracts pursuant to which Merrill and MLPFS were bound to invest the plaintiffs' cash.

150.    In sum, the plaintiffs in the Metro Action allege that Merrill and MLPFS invested approximately $133.9 million of the plaintiffs' cash reserves into unauthorized tranches of CDOs

during 2007 — the very time that Defendants knew the market for Merrill's CDOs was evaporating.  Making matters worse, Merrill allegedly invested the plaintiffs' cash into these unauthorized investments after the plaintiffs had withdrawn $250 million from their cash reserves with Merrill based upon Merrill's poor performance relative to the plaintiffs' other investment advisors.  The Metro plaintiffs allege that Merrill failed to provide the offering memoranda for these securities and that Merrill had a conflict of interest in connection with the investments because:  (i) Merrill was the arranger and seller of these and/or similar instruments; and (ii) Merrill had a general interest in supporting the vanishing market for subprime-backed CDOs.  Among other things, the plaintiffs in the Metro Action asserted claims for fraud and breach of contract.

151.    An Administrative Complaint filed by the Enforcement Section of the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth on February 1, 2008 (the "Administrative Complaint") contains similar allegations.  According to the Administrative Complaint, MLPFS used funds entrusted by the City of Springfield, Massachusetts to purchase approximately $14 million in CDO securities in April and June of 2007.  According to the Administrative Complaint, the three CDOs into which Merrill sank the City's cash "were purchased from Merrill's own inventory."  The Administrative Complaint further alleges that these transactions were completely unauthorized and that the City of Springfield did not know that it had somehow acquired CDOs until months after the transactions had closed.  When the City of Springfield requested that Merrill sell these securities in September 2007, Merrill informed the City that it would suffer considerable losses because there were likely no willing purchasers.

152.    After attempting for months to absolve itself of any responsibility for the

unauthorized CDO sales that it made to the City of Springfield, Merrill ultimately acknowledged

its misconduct.  According to a story appearing in *The Boston Globe* on February 1, 2008:

> Wall Street brokerage Merrill Lynch & Co. late yesterday agreed to reimburse
> Springfield for nearly $14 million in losses on risky investments its brokers sold
> to the city.
>
> In a deal brokered by Attorney General Martha Coakley, Merrill agreed to repay
> the city for all its holdings in specialized investments known as collateralized debt
> obligations, which plummeted in value last summer with the subprime mortgage
> collapse.
>
> Two Merrill Lynch brokers in Albany used city cash funds to purchase the
> complex investments without telling Springfield officials; moreover, state law
> forbids municipalities from investing cash in anything but conservative
> instruments.  In an unusual move, Merrill essentially admitted wrongdoing on the
> part of its brokers.
>
> 'The City of Springfield and the Springfield Financial Control Board have said
> that neither body approved the purchases of these investments,' the firm said in a
> statement. 'After carefully reviewing the facts, we have determined the purchases
> of these securities were made without the express permission of the city.  As a
> result, we are making the city whole and we have taken appropriate steps
> internally to ensure this conduct is not repeated.'
>
> Merrill declined to say whether the brokers were dismissed.  The firm agreed to
> pay Springfield's legal fees, which were approaching $200,000.
>
> *        *        *
>
> Springfield invested about $50 million in cash-management accounts with Merrill
> Lynch starting in November of 2006.  In the spring of 2007, $13.9 million of that
> was placed in the risky collateralized debt obligations - which are securities linked
> to bonds and loans, including subprime mortgages.
>
> The Globe reported earlier this week that Merrill failed to inform the city that it
> had purchased the debt obligations until last July, when it suddenly changed the
> names of three investments on the city's monthly statement to indicate that they
> were CDOs.  Most of the money had been in an investment called Centre Square
> Ltd., which was then renamed Centre Square CDO.

153.    As set forth herein, the above allegations in proceedings filed by the Metro Action

plaintiffs and on behalf of the City of Springfield are just two examples of the lengths to which

Merrill went to avoid disclosing its known subprime CDO problems and to try to support the rapidly vanishing market for such securities.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT DURING THE RELEVANT PERIOD

154.   During the Relevant Period, Defendants knew and/or recklessly disregarded and failed to disclose all the foregoing facts and other facts known to them concerning Merrill's exposure to irresponsibly assumed subprime mortgage risk and associated losses.  Merrill's material misrepresentations and omissions of material fact on the subject of its subprime exposure, while copious and continuous, principally concerned the following areas:

- Defendants misrepresented and failed to disclose material facts regarding the Company's exposure to poorly underwritten subprime mortgages that Merrill either originated or purchased from other originators.  In particular, Defendants failed to disclose that Merrill's "ABS CDOs" were based upon subprime mortgages and/or derivatives tied to subprime mortgages.  This exposure, further hidden from investors by Defendants' misrepresentations and omissions of material facts concerning the effectiveness of the Company's risk management and risk monitoring policies and procedures, resulted in, among other things, Merrill's inability to sell such products.  As a result, Merrill carried approximately $32.1 billion in falsely valued CDO assets and approximately $8.8 billion in additional exposures on its balance sheet that were infected by subprime mortgages.

- Defendants failed to disclose that a material component of the Company's strategy for hedging its subprime mortgage exposure involved purchasing putative credit protection, such as CDS, from thinly capitalized monoline insurers that posed at least as large of a risk of default as the risky securities that Merrill was seeking to hedge.  Merrill was forced to take billions of dollars in write-downs, or "credit valuation adjustments," as a direct result of its reckless reliance upon inadequate monoline insurers.

155.   Defendants' materially false and misleading statements and/or omissions of material fact, which artificially inflated the trading prices of Merrill securities, were made in the Company's SEC filings and other public statements during the Relevant Period, including, but not limited to:

- An October 17, 2006 press release entitled "Merrill Lynch Reports Record Net Earnings and Diluted EPS for Third Quarter and Year-To-Date 2006," filed with the SEC on Form 8-K (the "October 17, 2006 Form 8-K");

- The Quarterly Report on Form 10-Q for the Quarterly Period Ended September 29, 2006, filed with the SEC on November 3, 2006 (the "Third Quarter 2006 Form 10-Q");

- The Merrill Lynch Banking and Financial Services Investor Conference on November 14, 2006;

- A January 18, 2007 press release entitled "Merrill Lynch Reports Record Net Revenues, Net Earnings and Diluted EPS for Full Year 2006," filed with the SEC on Form 8-K (the "January 18, 2007 Form 8-K");

- A January 18, 2007 telephone conference with securities analysts (the "January 18, 2007 Analyst Call");

- A letter to Merrill shareholders from Defendant O'Neal dated February 22, 2007;

- The Annual Report for 2006, filed with the SEC on Form 10-K on February 26, 2007 (the "2006 Form 10-K");

- An April 19, 2007 press release entitled "Merrill Lynch Reports First-Quarter 2007 Results:  Net Revenues of $9.9 Billion, Up 24 Percent From First Quarter 2006," filed with the SEC on Form 8-K (the "April 19, 2007 Form 8-K");

- An April 19, 2007 telephone conference with securities analysts (the "April 19, 2007 Analyst Call");

- The Quarterly Report on Form 10-Q for the Quarterly Period Ended March 30, 2007, filed with the SEC on May 7, 2007 (the "First Quarter 2007 Form 10-Q");

- A July 17, 2007 press release entitled "Merrill Lynch Reports Second-Quarter 2007 Results:  Net Earnings Per Diluted Share of $2.24, Up 37 Percent From Second Quarter 2006," filed with the SEC on Form 8-K (the "July 17, 2007 Form 8-K");

- A July 17, 2007 telephone conference with securities analysts (the "July 17, 2007 Analyst Call");

- The Quarterly Report on Form 10-Q for the Quarterly Period Ended June 29, 2007, filed with the SEC on August 3, 2007 (the "Second Quarter 2007 Form 10-Q");

- An October 5, 2007 press release entitled "Merrill Lynch Says Credit Market Conditions to Adversely Impact Third Quarter 2007 Results," filed with the SEC on Form 8-K (the "October 5, 2007 Form 8-K");

- An October 24, 2007 press release entitled "Merrill Lynch Reports Third-Quarter 2007 Net Loss From Continuing Operations of $2.85 Per Diluted Share," filed with the SEC on Form 8-K (the "October 24, 2007 Form 8-K");

- An October 24, 2007 telephone conference with securities analysts (the "October 24, 2007 Analyst Call");

- The Quarterly Report on Form 10-Q for the Quarterly Period Ended September 28, 2007, filed with the SEC on November 7, 2007 (the "Third Quarter 2007 Form 10-Q");

- A January 17, 2008 press release entitled "Merrill Lynch Reports Full-Year 2007 Net Loss From Continuing Operations of $8.6 Billion," filed with the SEC on Form 8-K (the "January 17, 2008 Form 8-K");

- The Annual Report for 2007, filed with the SEC on Form 10-K on February 25, 2008 (the "2007 Form 10-K");

- An April 17, 2008 press release entitled "Merrill Lynch Reports First Quarter 2008 Net Loss From Continuing Operations of $1.97 Billion," filed with the SEC on Form 8-K (the "April 17, 2008 Form 8-K");

- The Quarterly Report on Form 10-Q for the Quarterly Period Ended March 28, 2008, filed with the SEC on May 6, 2008 (the "First Quarter 2008 Form 10-Q");

- A July 17, 2008 press release entitled "Merrill Lynch Reports Second Quarter 2008 Net Loss From Continuing Operations of $4.6 Billion," filed with the SEC on Form 8-K (the "July 17, 2008 Form 8-K");

- A July 28, 2008 press release entitled "Merrill Lynch Announces Substantial Sale of U.S. ABS CDOs, Exposure Reduction of $11.1 Billion," filed with the SEC on Form 8-K (the "July 28, 2008 Form 8-K");

- The Quarterly Report on Form 10-Q for the Quarterly Period Ended June 27, 2008, filed with the SEC on August 5, 2008 (the "Second Quarter 2008 Form 10-Q");

- An October 16, 2008 press release entitled "Merrill Lynch Reports Third-Quarter 2008, Net Loss From Continuing Operations of $5.1 Billion," filed with the SEC on Form 8-K (the "October 16, 2008 Form 8-K");

- The Quarterly Report on Form 10-Q for the Quarterly Period Ended September 26, 2008, filed with the SEC on November 5, 2008 (the "Third Quarter 2008 Form 10-Q"); and

- A December 5, 2008 press release entitled "Merrill Lynch Stockholders Approve Transaction With Bank of America," filed with the SEC on Form 8-K (the "December 5, 2008 Form 8-K").

156.    Each of the Forms 10-K and 10-Q filed during the Relevant Period contained material misrepresentations and omissions of material fact.  As alleged below, and except as otherwise noted, Merrill's Relevant Period SEC filings were materially misstated for substantially the same reasons.

157.    Prior to filing its Forms 10-Q and 10-K during the Relevant Period, the Company issued press releases, filed with the SEC on Forms 8-K, announcing the Company's financial results for the period covered by the respective Form 10-Q or 10-K.  Beginning in the third quarter of 2006 and continuing through the first half of 2007, Merrill's earnings announcements consistently stated that the Company had attained "record" revenues and earnings.

158.    As detailed herein, Merrill's earnings releases filed on Forms 8-K contained the same materially false and misleading financial information as the corresponding Forms 10-Q and/or 10-K.

**A.    Defendants' Materially False And Misleading Statements And Omissions Of Material Fact Concerning Merrill's Risk Management Measures And Its Exposure To CDO Tranches Backed By Subprime Mortgages**

159.    Concerning Merrill's exposure to subprime mortgages and related losses and impairments in the Company's CDOs, each of Merrill's SEC filings during the Relevant Period

described the Company as an originator and seller of mortgage-linked securitizations.  As alleged

below, Plaintiff would only later learn that certain of Defendants' vague and materially

incomplete disclosures referred to CDOs and RMBS backed by subprime mortgages.

Specifically, Defendants wholly failed to disclose that:

> (i)    the Company had tens of billions of dollars of exposure to CDO
>        tranches backed by subprime mortgages;
>
> (ii)   Merrill directly owned billions of dollars worth of subprime
>        RMBS; and
>
> (iii)  the Company was exposed to long and short positions on CDS
>        linked to mortgage-backed RMBS and CDOs.

Moreover, Defendants consistently misrepresented the application and effectiveness of Merrill's

risk management measures and guidelines.

160.    In the midst of the known downturn in the housing and mortgage markets, which

made Merrill's exposure all the more material to investors, Defendants did not disclose any

financial information at all pertaining to Merrill's subprime-backed CDO exposures until the

Company filed its Form 10-Q for the third quarter of 2007.  However, as alleged herein, these

disclosures in late-2007 were incomplete and were made when it was impossible for Merrill to

reduce its exposures without taking the massive losses and impairments that it belatedly reported.

## 1.    The 2006 Misstatements and Omissions

161.    At the beginning of the Relevant Period on October 17, 2006, Merrill filed its

October 17, 2006 Form 8-K attaching a press release announcing certain financial results for the

third quarter of 2006.  Among other things, the October 17, 2006 Form 8-K celebrated the

accomplishments of Merrill's FICC business, which was responsible for underwriting CDOs.

According to the October 17, 2006 Form 8-K, FICC achieved net revenues which "increased 26

percent, and were a quarterly record, driven primarily by record results in commodities and an

increase from trading credit products, which more than offset declines from principal investing and trading interest rate products."  During a conference call conducted the same day, Defendant Edwards stated:  "Our CDO business continues to be extremely strong.  Overall, it was our second best quarter there."

162.     In announcing the foregoing putatively positive results, Defendant Edwards failed to disclose that Merrill's aggressive and reckless leveraging of subprime mortgage-backed CDOs was the primary driver of the Company's growth, and that it exposed Merrill to known risks of loss based upon the escalating default rates in the underlying instruments.  Indeed, the increased revenues for Merrill's FICC business were achieved, in part, from fees that were earned by exposing Merrill to billions of dollars of CDOs that relied upon subprime mortgages for their performance and value.  Months earlier, Kronthal had issued an internal warning that Merrill was carrying too great a position in subprime ABS CDOs on the Company's books, presenting excessive and unacceptable risks.

163.     Merrill's putative financial results for the third quarter of 2006 were set forth in the Company's Third Quarter 2006 Form 10-Q filed on November 3, 2006.  Although Merrill was already saddled with undisclosed exposures to the sputtering subprime mortgage market, Defendants made the following representation, among others, concerning the Company's purportedly thorough risk management processes:

> Risk-taking is integral to many of the core businesses in which Merrill Lynch operates.  In the course of conducting its business operations, Merrill Lynch is exposed to a variety of risks including market, credit, liquidity, operational and other risks that are material and require comprehensive controls and ongoing oversight.  Senior managers of Merrill Lynch's core businesses are responsible and accountable for management of the risks associated with their business activities.  In addition, ***there are independent control groups that manage market risk, credit risk, liquidity risk and operational risk, among other functions, which fall under the management responsibility of the Chief Financial Officer.  Along with other control units these disciplines work to***

**ensure risks are properly identified, measured, monitored, and managed throughout Merrill Lynch.**

164.   The foregoing statement was materially false and misleading at the time it was made because, among other things, Defendants were deliberately ignoring risks known to them from Merrill's subprime mortgage origination activities and other sources which undermined Defendants purported management activities.  Defendant O'Neal also acknowledged that Merrill did not understand the risks associated with its subprime holdings and that Merrill's risk control mechanisms did not properly function at the time.  Specifically, in connection with Merrill's $7.9 billion revised write-down on its CDO and subprime exposures announced on October 24, 2007, Defendant O'Neal stated that Merrill's "assessment of the potential risk and mitigation strategies were inadequate."  When he arrived as CEO of Merrill, John Thain also confirmed that there was a "lack of understanding of the risk in [subprime] positions and the lack of balance-sheet control" at the Company.  Thain also stated that Merrill's putative risk controls put in place by Defendants O'Neal and Edwards "just didn't function."

165.   The Third Quarter Form 10-Q also contained the following materially false and misleading representation concerning Merrill's subprime origination activities and corresponding risks:

*Residential Mortgage Lending*

Merrill Lynch originates and purchases residential mortgage loans, certain of which include features that may result in additional credit risk when compared to more traditional types of mortgages.  ***The potential additional credit risk arising from these mortgages is addressed through adherence to underwriting guidelines.  Credit risk is closely monitored in order to ensure that reserves are sufficient and valuations are appropriate.***

166.   The foregoing statement was materially false and misleading at the time it was made because, among other things, Merrill had already deliberately weakened the underwriting criteria for subprime loans that it purchased from originators, including ResMAE, MLN and

Ownit.  As alleged herein, at ¶¶ 63-66, at the beginning of 2006, Merrill instructed Ownit's

founder to lower that company's underwriting standards.  Merrill issued this directive to Ownit

so that Ownit would increase the volume of subprime mortgages available for Merrill to

purchase for securitizations.  Moreover, Defendants knew, but failed to disclose, that the lowered

underwriting standards resulted in escalating default levels based upon the volume of EPDs on

mortgages that Merrill purchased earlier in 2006.  These very risks led Kronthal to warn Merrill

executives in July 2006 that the Company was carrying too great a position in subprime ABS

CDOs on its books, presenting excessive and unacceptable risks.

167.    The Third Quarter 2006 Form 10-Q made the following representation concerning

the Company's risk management in connection with derivative transactions:

> [T]o reduce the risk of loss, Merrill Lynch requires collateral, principally cash and
> U.S. Government and agency securities, on certain derivative transactions.  From
> an economic standpoint, Merrill Lynch **evaluates risk exposures net of related
> collateral. . . .**
>
> In addition to obtaining collateral, Merrill Lynch **attempts to mitigate its default
> risk on derivatives whenever possible** by entering into transactions with
> provisions that enable Merrill Lynch to terminate or reset the terms of its
> derivative contracts.

168.    The statements above were materially false and misleading with respect to

Merrill's derivatives related to CDOs and related assets because Defendants failed to disclose

that it was becoming increasingly difficult for the Company to manage its risk with respect to

derivatives-based subprime ABS CDO exposures.  Additionally, Defendants failed to disclose

that Merrill was having increasing difficulty selling AAA-rated tranches of CDOs to outside

investors and, therefore, had begun stockpiling these AAA-rated tranches on the Company's own

balance sheet.

169.    Defendants O'Neal and Edwards signed certifications under Section 302 of the

Sarbanes-Oxley Act of 2002 which were included in the Third Quarter 2006 Form 10-Q,

pursuant to which they certified:

1.      I have reviewed this quarterly report on Form 10-Q of Merrill Lynch & Co., Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

 (a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

170.    These certifications were materially false and misleading because, among other things, Merrill's Third Quarter 2006 Form 10-Q misrepresented the effectiveness and application of the Company's risk controls as well as the underwriting criteria for the mortgages that Merrill purchased and securitized.  Moreover, Defendants knew, but failed to disclose, that Merrill's failure to apply proper risk management had resulted in a material, but undisclosed, concentration of credit risk in connection with the Company's subprime-laden CDOs.

171.    Defendant O'Neal spoke at the Merrill Lynch Banking and Financial Services Investor Conference on November 14, 2006.  Among other things, Defendant O'Neal made the following statements relating to Merrill's acquisition of First Franklin, which was set to close on December 30, 2006:

Results continue to be good.  In the third quarter, FICC net revenues set a new record, of $2.1 billion, up 26 percent year-over-year, and were continuing to gain scale and share within a number of business lines.  A couple of examples: . . . In mortgages we've announced three transactions on three continents this year, most notably the acquisition of the First Franklin origination and servicing businesses here in the U.S.  Together, ***these acquisitions will help provide an additional attractive source of origination for our mortgage-backed securitization and trading platform, enhancing revenue velocity relative to assets and thereby increasing our returns.***

172.    Defendant O'Neal's November 14, 2006 statement was materially false and

misleading and omitted material facts, including that Merrill was both directly and indirectly (through warehouse lines of credit) originating poorly underwritten subprime mortgages for its securitizations, and that the Company already had billions of dollars of such exposure on its balance sheet that Defendants knew, but failed to disclose, was subject to an unacceptably high risk of default in the downward spiraling real estate market.  Defendant O'Neal knew of these facts directly and from Kronthal's July 2006 warning that the Company was overexposed to subprime ABS CDOs.  Defendant O'Neal's promise that the First Franklin acquisition would enhance "revenue velocity" and increase the Company's returns was materially false and misleading because Defendants knew that "adverse conditions in the secondary market for mortgage loans" already existed.

### 2.  The 2007 Misstatements and Omissions

173.    In the January 18, 2007 Form 8-K, Merrill reported financial results for the fourth quarter and full year 2006, in which the Company boasted "record net revenues."  Further, Defendant O'Neal stated that "by virtually any measure, our company completed the most successful year in its history."  Among other things, Defendant O'Neal attributed Merrill's apparent success to diversifying Merrill's business mix.  Defendants also celebrated the putative success of FICC, which reportedly attained $2.3 billion in net revenues, marking a 70 percent increase over the prior year and "setting a quarterly record."

174.    During the January 18, 2007 Analyst Call held in connection with Merrill's announcement of its financial results for the fourth quarter and full year of 2006, Defendant Edwards remarked that Merrill was "on its strongest competitive footing ever as we enter 2007." Moreover, Defendant Edwards praised the Company's CDO business, which was not otherwise specifically discussed in the Company's financial statements, as a substantial contributor to Merrill's apparent success:

Since the fourth quarter began, we have closed two previously announced acquisitions . . . **First Franklin,** a non-prime mortgage origination and servicing franchise . . . **will contribute to our business in 2007.**

Second, our Investment Banking business continues to make great strides ranking number one for the quarter in global equity and equity linked underwriting league tables and **number one in 2006 in CDO issuance for the third year in a row as we continue to be an innovator in that space.**

175. Merrill's January 18, 2007 statements celebrating the putative success of the Company's business in 2006 were materially false and misleading and omitted material facts. The statement in the January 18, 2007 Form 8-K concerning "record revenues from credit products" omitted the material fact that such "record revenues" resulted from Merrill's decision to materially increase its concentration of assets in highly risky subprime ABS CDO exposures. Moreover, Defendant O'Neal's representation that "by virtually any measure our company completed the most successful year in its history" was materially false and misleading because Merrill failed to disclose that revenue derived from Merrill's subprime ABS CDOs dangerously heightened the Company's risk. Likewise, Defendant Edwards' statements concerning the Company's position and putative success in the CDO market omitted material facts concerning the composition of Merrill's CDO exposures, which were infected with subprime collateral that was subject to escalating defaults. Defendants knew of the heightened risk of default from, among other sources, the EPDs on loans that the Company had purchased from other subprime originators as alleged above in ¶¶ 68-72.

176. Continuing to pump up the Company's 2006 financial results, Defendant O'Neal made the following representations in a February 22, 2007 "Letter to Fellow Shareholders and Clients":

I am pleased to report that, by virtually any measure, Merrill Lynch completed the most successful year in its history -- financially, operationally, and strategically. After several years of restructuring and investing in our business, all of the

components came together to reflect a company capable of strong, disciplined performance with tremendous potential for future success.

Revenues, earnings, earnings per share and return on equity all grew strongly as a result of our continued emphasis on broadening the asset classes and capabilities we offer clients, expanding our geographic footprint, diversifying our revenues, managing and deploying our capital more effectively and investing in top talent from within and outside the company.

\* \* \*

We also took a number of steps to further round out our capabilities. ***We acquired First Franklin, one of the nation's leading originators of residential mortgage loans, adding scale to our mortgage platform and providing a robust source of origination for our securitization and trading operations*** . . . . We reorganized our institutional fixed income division to better manage risks, improve efficient use of the firm's balance sheet and enhance growth prospects. . . .

177.   The statements in Defendant O'Neal's February 22, 2007 letter to shareholders concerning the Company's mortgage origination and securitization prospects were materially false and misleading because Defendant O'Neal failed to disclose that Merrill was already bearing the weight of toxic subprime mortgages in a worsening market, the risks of which were only heightened by Merrill's acquisition of First Franklin.  Just weeks earlier, subprime originators ResMAE and MLN had filed for bankruptcy due, in large part, to their respective inabilities to satisfy EPD "put" rights on subprime loans that they originated and sold to Merrill. In the face of these known risks, as well as the material downturn in the ABX and TABX indices as alleged below in ¶¶ 218-20, 361-69, Defendants misled investors concerning the Company's "growth prospects" at a time when Defendants knew that the mortgage collateral underlying Merrill's massive CDO machine was weakening almost daily.  Defendant O'Neal had fired Kronthal for raising these very issues in July 2006.

178.   Merrill announced its fiscal year 2006 financial results in the Company's 2006 Form 10-K filed with the SEC on February 27, 2007.  Among other things, the 2006 Form 10-K

represented that Merrill achieved:  (i) net earnings of $7.5 billion, an increase of 47% from fiscal

year 2005, and (ii) net earnings per diluted share of $7.59 per share, an increase of 47% from

$5.16 per share in fiscal year 2005.

179.    The 2006 Form 10-K did not substantively address Merrill's involvement with

subprime mortgages and failed to disclose either the nature or the extent of Merrill's

securitization activities or the Company's rampant use of subprime mortgage debt in structuring

CDOs.  Instead, the 2006 Form 10-K blended the financial results from CDOs (not directly

referred to as such) and subprime RMBS with other debt products and reported that:  "In 2006,

FICC net revenues of $8.1 billion increased 31% from 2005, as net revenues increased for all

major products.  The increases in net revenues were primarily driven by record year-over-year

results in commodities, credit trading, foreign exchange, and structured finance."

180.    Merrill failed to disclose in its 2006 Form 10-K the billions of dollars in exposure

to subprime ABS CDOs despite, among other clear signs that Merrill's subprime ABS CDOs

were imperiling the Company, the ongoing failure of the subprime mortgage market and the

material downturn in the ABX and TABX indices alleged below in ¶¶ 218-20, 361-69.

181.    Merrill's 2006 Form 10-K also contained material misrepresentations and

omissions concerning the Company's Residential Mortgage Lending.  In this regard, and in light

of growing news about the downturn in the U.S. housing market, Defendants assured Plaintiff and

the Company's other investors that:  (i) Merrill managed risk resulting from certain mortgage loans

through "adherence to underwriting guidelines"; (ii) "[c]redit risk was closely monitored"; and

(iii) loans were "*predominantly extended to high credit quality borrowers*":

> We originate and purchase residential mortgage loans, certain of which include
> features that may result in additional credit risk when compared to more
> traditional types of mortgages.  The potential additional credit risk arising from
> these mortgages is addressed through *adherence to underwriting guidelines* as

described below. ***Credit risk is closely monitored in order to confirm that
reserves are sufficient and valuations are appropriate. These loans are
predominantly extended to high credit quality borrowers. . . .***

*       *       *

During the third quarter of 2006, Merrill Lynch announced an agreement to
acquire the First Franklin mortgage origination franchise and related servicing
platform which is focused on originating non-prime residential mortgage loans
through a wholesale network.  As a result of this acquisition which was completed
in the fiscal first quarter of 2007, ***the credit profile of our mortgage lending
portfolio may be impacted*** in future periods.

182.    The statements above were materially false and misleading because, well before

Merrill's acquisition of First Franklin, the Company was actively originating and purchasing

subprime mortgages pursuant to deliberately reduced credit standards to generate the loan

product necessary for Merrill's CDOs.  As alleged herein, borrowers subject to these poorly

underwritten loans were defaulting *en masse* by the end of 2006, forcing subprime lenders with

which Merrill did business into bankruptcy.  In this regard, Merrill had experienced hundreds of

millions of dollars worth of EPDs on loans purchased from other subprime originators.  The

credit profile of Merrill's mortgage lending portfolio was, therefore, already suffering a

downturn.  Based upon the Company's efforts to "put" defaulted loans back to other subprime

originators, Defendants knew that their representation that the mortgage loans the Company

originated and purchased were "predominantly extended to high credit quality borrowers" was

materially false and misleading.

183.    Defendants also materially misrepresented Merrill's risk management policies and

procedures in the 2006 Form 10-K.  Specifically, Defendants asserted that Merrill conducted

regular and thorough reviews of the various risks associated with its business activities by stating

the following in the 2006 Form 10-K:

70

Prudent Governance

We manage the growth and composition of our assets and set limits on the overall level of unsecured funding. Funding activities are subject to *regular senior management review and control* through Asset/Liability Committee meetings with Treasury management and other independent risk and control groups. Our funding strategy and practices are reviewed by the Risk Oversight Committee ("ROC"), Merrill Lynch's executive management and the Finance Committee of the Board of Directors.

\*       \*       \*

Senior managers of our core businesses are responsible and accountable for management of the risks associated with their business activities. *In addition, independent risk groups manage market risk, credit risk, liquidity risk and operational risk.* These independent risk groups fall under the management responsibility of our Chief Financial Officer. Along with other independent control groups, including Corporate Audit, Finance and the Office of General Counsel, *these disciplines work to ensure risks are properly identified, measured, monitored, and managed throughout Merrill Lynch.* To accomplish this, we have established a risk management process which includes:

- *A formal risk governance structure* that defines the oversight process and its components;

- *A regular review of the risk management process by the Audit Committee* of the Board of Directors (the "Audit Committee") as well as a *regular review of credit, market and liquidity risks and processes by the Finance Committee* of the Board of Directors ("the Finance Committee");

- Clearly defined risk management policies and procedures supported by a rigorous analytical framework;

- Communication and coordination among the businesses, executive management, and risk functions while maintaining strict segregation of responsibilities, controls, and oversight; and

- Clearly articulated risk tolerance levels, defined and *regularly reviewed by the ROC,* that are consistent with our business strategy, capital structure, and current and anticipated market conditions.

The risk management and control process ensures that our risk tolerance is well-defined and understood by our businesses as well as by our executive management. Independent risk and control groups interact with the core businesses to establish and maintain this overall risk management control process.

&ast;  &ast;  &ast;

Market and credit risk tolerance levels are represented in part by framework limits, which are established by the ROC and ***reviewed and approved annually by the Executive Committee,*** which must also approve certain intra-year changes. Substantive market and credit risk framework limit changes are reported to the Audit and Finance Committees.  The frameworks are reviewed by the Finance Committee in the context of its evaluation of market and credit risk exposures. ***Risk framework exceptions and violations are reported and investigated at predefined and appropriate levels of management.***

Both the Audit Committee and the Finance Committee are provided with ***regular risk updates,*** and significant issues and transactions are reported to the Executive Committee, the Audit Committee and the Finance Committee.  Various governance committees exist to create policy, review activity, ***and verify that new and existing business initiatives remain within established risk tolerance levels.*** Representatives of the independent risk and control groups participate as voting members of these committees.  The activities of these committees are monitored by the ROC.

184. The foregoing statements in the 2006 Form 10-K were materially false and misleading at the time they were made because, among other things, they misrepresented the effectiveness and application of the Company's risk controls.  Defendants deliberately ignored known risks from Merrill's origination activities which resulted in a material, but undisclosed, concentration of credit risk in connection with the Company's subprime-laden CDOs.

185. As Defendant O'Neal would eventually admit in connection with Merrill's $7.9 billion revised write-down on its CDO and subprime exposures announced on October 24, 2007, Merrill's "assessment of the potential risk and our mitigation strategies were inadequate."  This admission was later confirmed by John Thain when he stepped in after O'Neal as Merrill's CEO.

186. Defendants O'Neal and Edwards signed certifications under Section 302 of the Sarbanes-Oxley Act of 2002 that were included in the 2006 Form 10-K in which they made substantially the same statements set forth in the Third Quarter 2006 Form 10-Q.  These certifications in the 2006 Form 10-K were materially false and misleading for the same reasons and omitted the same material facts alleged above in ¶ 170.

187.     Merrill's materially incomplete financial reporting continued during the next several months of 2007, during which the housing market was in an undeniable downward spiral, the ABX and TABX indices (discussed below in ¶¶ 218-20, 361-69) were tanking, and subprime default rates were climbing.  Merrill had billions of dollars of subprime mortgage exposure during this time.  As the summer of 2007 approached, the likelihood that the decline in the value of Merrill's CDO holdings would have a material negative impact upon the Company's financial results grew to a certainty.

188.     When the Company finally addressed its subprime mortgage exposure, it made materially false and misleading statements.  For example, in its April 19, 2007 Form 8-K addressing first quarter 2007 earnings, Merrill touted the Company's putative performance while misleadingly dismissing growing market concerns regarding exposure to subprime mortgages:

> 'This was a terrific quarter.  In an environment which was volatile at times, we took full advantage of market opportunities and delivered value to our clients and our shareholders,' said Stan O'Neal, chairman and chief executive officer.
>
> *          *          *
>
> Revenues from mortgage-related activities declined, resulting from a difficult environment for the origination, securitization and trading of non-prime mortgage loans and securities in the U.S.  ***Revenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1% of Merrill Lynch's total net revenues over the past five quarters.***

189.     Defendant O'Neal's statements in the April 19, 2007 Form 8-K regarding Merrill's first quarter earnings were materially false and misleading.  While deliberately minimizing the impact of the meltdown in the housing market, Defendant O'Neal failed to disclose that Merrill was exposed to tens of billions of dollars in risk through its subprime ABS CDOs.  Far from being a "terrific quarter," Defendants knew that the material declines in the ABX and TABX indices alleged herein indicated that the Company's subprime ABS CDO holdings were materially overvalued.  Moreover, almost a year earlier, Kronthal had warned top

Merrill executives of the unacceptable risk of Merrill's exposure to these risky assets. Merrill was already largely unable to sell its subprime ABS CDOs. Defendant O'Neal's contention that "[r]evenues from activities related to U.S. non-prime mortgages comprised less than 1% of Merrill's total net revenue over the past five quarters" was materially misleading because the activities resulting in those putative revenue amounts had exposed the Company to billions of dollars of undisclosed risk in 2006

190.     During the April 19, 2007 Analyst Call, Defendant Edwards also made materially false and misleading statements and omitted material facts in an effort to deflect and conceal Merrill's exposure to losses from subprime-backed CDOs. Specifically, Defendant Edwards stated:

> The benefits of [Merrill's] diversification become especially evident in quarters such as this one, where ***a clear dislocation in an individual market, the subprime mortgage space in the U.S., did not impede the overall momentum of our franchise.***
>
> *       *       *
>
> I want to pause here to make a few comments about our U.S. subprime mortgage business, since I know it has been a topic of much discussion and speculation. Let me put this business into context. As we noted in our earnings release, if you looked at both last year and the first quarter of this year and added up all of the origination, securitization, warehouse lending, trading and servicing revenues, both directly in our subprime business as well as our CDO activity involving subprime, including all of the retained interests, you would see that ***revenues from subprime mortgage-related activities comprise less than 1% of our net revenues for those five quarters.*** And even if you were to incorporate, pro forma, the revenues of First Franklin as if they were a part of our firm for all of 2006, the aggregate contribution would still be less than 2%.
>
> That said, this is an asset class that will continue to be significant both in the U.S. and worldwide. And the strategic importance of the First Franklin acquisition was clearly evident this quarter, ***as having both origination and servicing capabilities enabled us to see trends emerge sooner and adjust underwriting standards and pricing more rapidly.***

191.     The foregoing statements, designed to convince the market that the acknowledged

troubles in the subprime mortgage market would not materially affect Merrill, were materially false and misleading, and Defendant Edwards knew it. Among other things, Merrill had amassed a stockpile of subprime-backed CDOs on its books that the Company could not sell. Moreover, Defendant Edwards' statements regarding the benefits of Merrill's putative "diversification" were false. In fact, Merrill's concentration of risk directly and indirectly in subprime mortgages had increased substantially above the levels that caused Kronthal to warn Merrill executives of the Company's excessive risk.

192.    Defendant Edwards' statement that subprime mortgage-related activities comprised less than 1% of Merrill's net revenues was also materially misleading because it deliberately concealed the billions of dollars in exposures that the Company had amassed in earning those claimed revenues. Finally, Defendant Edwards' contention that Merrill's acquisition of First Franklin "enabled [Merrill] to see trends emerge sooner and adjust underwriting standards and pricing more rapidly" was materially misleading. The only information or "trend" that the First Franklin acquisition could have provided was confirmation of the burgeoning subprime default risk, and Merrill certainly did not adjust its underwriting standards based upon that information. Instead, it continued to issue or finance loans to unqualified purchasers to feed Merrill's securitization desires.

193.    In a further effort to convince investors and analysts that Merrill had little or no exposure to losses from the subprime market turmoil, Defendant Edwards made material misrepresentations concerning the Company's risk management capabilities during the April 19, 2007 Analyst Call. In this regard, Defendant Edwards claimed that Merrill's superior risk management had enabled the Company to dodge any impact from the subprime market:

> *I would also point out that our risk management capabilities are better than ever*, and crucial to our success in navigating turbulent markets. In fact, we've

been capitalizing on the market dislocation by recruiting the best talent from competitors, and we fully expect to emerge from this cyclical downturn even better positioned.

*At this point, we believe the issues in this narrow slice of the market remain contained and have not negatively impacted other sectors.*

194.    In addition to the statement above, Defendant Edwards made the following

materially false and misleading statements concerning Merrill's risk management during the

April 19, 2007 Analyst Call:

**William Tanona, Analyst, Goldman Sachs**:

Good morning Jeff.  Obviously, the environment became a little bit more tricky this first quarter and ***there were concerns with subprime, which you guys seem to have squashed any concerns regarding your exposure there***.  But I'm wondering if you guys have changed your appetite in this environment, or kind of rethinking what you put on your balance sheet or what type of risks you might take?  Or if at all it has changed how you are approaching the business right now?

**Defendant Edwards**:

*[R]isk management, as I said in the prepared remarks, is a crucial aspect of our business.  I think we have done a very good job in negotiating these markets as a result of that.*  So how are we approaching that?  We are certainly looking at new ways to do business where there are opportunities for us to either share risk or pre-sell some of the risk and still do good business.  ***So I think we are approaching it in a prudent way*** given the environment.

**William Tanona:**

[I]n terms of sharing risk, obviously I think there is a lot of concern out there because you guys are pretty active on the CDO side and the warehouse side of that business.  Can you share your thought process as it relates to that and what the trends you are seeing there in the overall business, as well as possibly even in the subprime space there?

**Defendant Edwards**:

Well, it was a very active quarter for securitizations, both in the ABS space directly and in the CDO space broadly.  In CDOs, in addition to having a very active ABS calendar, we saw the tension in that business broadening out to other asset classes as well.  But I would point out that even during the most uncertain times during the quarter, we were able to price transactions.  We priced 28 CDO transactions in the quarter, 19 of them were ABS CDOs and more than 10 of those deals were in the first couple of weeks of March, so while it was certainly a more

difficult environment, we continued to see an ability to transact and to move
volume.

And on the subprime business, maybe just a couple more comments there.  While
it was a difficult environment, we were able to actually increase origination
volumes at First Franklin in the quarter.  And in fact, we had record volumes in
both January and February.  ***And we did that in a background where we were
enhancing our already strong underwriting standards.***  We rationalized our
array of products, eliminating certain products that were performing less well, and
we successfully raised coupon rates.  And we also saw during the quarter the first
payment defaults at First Franklin, of First Franklin originated paper fall steadily
throughout the quarter.  They started out and remain at a level far below the
industry.

So I think the trends there show some signs of positiveness. . . .

195.    Contrary to Defendant Edwards' false assurances, Merrill's risk management

capabilities were not "better than ever."  In fact, in ignoring the obvious downturn in the

subprime market and Kronthal's July 2006 warning that Merrill was amassing far too much

subprime exposure, the Company built an excessive and crippling concentration of risk in

subprime ABS CDOs.

196.    Defendant Edwards' April 19, 2007 statements regarding Merrill's underwriting

standards for mortgage origination were also knowingly false.  In fact, Merrill had lowered

underwriting standards to increase subprime originations for the Company's securitizations.

197.    Defendant Edwards' statements concerning retained interests in the Company's

mortgage securitizations were materially false and misleading as the Company had billions of

dollars of subprime-infected products festering on its balance sheet, which Defendants were

unable to sell.

198.    With respect to Merrill's retained interests in CDO deals, which were dramatically

increasing, Defendant Edwards also falsely represented that there was "only a small part that

reflects the subprime residuals":

**Michael Hecht, Analyst, Banc of America**:

Is it possible for you to touch on the level of your overall retained interest for mortgage securitizations, non-investment grade in particular and are you seeing any big shifts since the beginning of the year?

**Defendant Edwards:**

If you look at our retained interest in general, I mean, one important point to make there is that the majority of them clearly are investment grade rated securities that are either part of our CDO warehouse or the result of securitizations that are effectively in inventory, that we intend to sell on to investors. ***So, there is only a small part that reflects the sub-prime residuals.***  And in general, given the level of activity and securitization that I described earlier, you would expect and you will see retained interest will be up.  The residual on that will be up at a much lower rate.

199.    Merrill's First Quarter 2007 Form 10-Q, which the Company filed on May 7, 2007, limited Merrill's description of its RMBS exposure as almost entirely consisting of prime mortgages.  For example, the Company's First Quarter 2007 Form 10-Q, stated, among other things:

> Retained interests in securitized assets were approximately $8.7 billion and $6.8 billion at March 30, 2007 and December 29, 2006, respectively, which related primarily to residential mortgage loan [approximately $7.3 billion as of March 30, 2007] and municipal bond securitization transactions.  The majority of the retained interest balance consists of mortgage-backed securities that have quoted market prices.  The majority of these retained interests include mortgage-backed securities that Merrill Lynch expects to sell to investors in the normal course of its underwriting activity, and ***only a small portion of the retained interests represent residual interests from subprime mortgage securitizations.***

200.    The statements above in the First Quarter 2007 Form 10-Q were materially false and misleading because Defendants failed to disclose any information relating to the Company's retained interests in CDOs for which *subprime* mortgage securitizations were the underlying collateral.  The omission of these material facts created a materially false and misleading impression that Merrill's exposure to subprime mortgage-related assets was well managed and limited.  Moreover, Defendants' representation that Merrill expected to sell its retained interests

in the "normal course of its underwriting activity" was materially false and misleading because

***Defendants knew that Merrill could not find willing purchasers of its CDO and RMBS***

***holdings collateralized by subprime mortgages***.

201.   The Company's First Quarter 2007 Form 10-Q also contained the following

material misrepresentation concerning the Company's subprime originations:

> *Residential Mortgage Lending*
>
> We originate and purchase residential mortgage loans, certain of which include features that may result in additional credit risk when compared to more traditional types of mortgages. ***The potential additional credit risk arising from these mortgages is addressed through adherence to underwriting guidelines. Credit risk is closely monitored in order to ensure that reserves are sufficient and valuations are appropriate.*** For additional information on residential mortgage lending, see the 2006 Annual Report.

202.   Unlike a substantially similar statement in the 2006 Form 10-K, Defendants no

longer pretended that Merrill's residential mortgage loans were "predominantly extended to high

credit quality borrowers."  Defendants, however, attempted to incorporate that materially false

and misleading representation into the above-referenced statement.  In all other respects, the

statement above was materially false and misleading for same reasons as stated above in ¶ 184 in

connection with the substantially similar statement that Defendants made in Merrill's 2006 Form

10-K.

203.   Defendants made the following representation concerning the Company's risk

management in the First Quarter 2007 Form 10-Q:

> Senior managers of our core businesses are responsible and accountable for management of the risks associated with their business activities.  In addition, independent risk groups manage market risk, credit risk, liquidity risk and operational risk.  These independent risk groups fall under the management responsibility of our Chief Financial Officer.  Along with other independent control groups, including Corporate Audit, Finance and the Office of General Counsel, ***these disciplines work to ensure risks are properly identified, measured, monitored, and managed throughout Merrill Lynch.*** For a full discussion of our risk management framework, see our 2006 Annual Report.

204.    Contrary to the statement above regarding Merrill's risk management function, Defendants were deliberately ignoring the obvious downturn in the subprime market and Kronthal's July 2006 warning that Merrill was amassing far too much subprime exposure. Instead, the Company built an excessive and crippling concentration of risk in subprime ABS CDOs.  As Defendant O'Neal would eventually admit, Merrill's "assessment of the potential risk and mitigation strategies were inadequate."  Moreover, as Thain confirmed during an interview conducted in connection with an article published in *The Wall Street Journal* on January 18, 2008, Merrill failed because of, among other things, a "lack of understanding of the risk in [subprime] positions and the lack of balance-sheet control."

205.    In the First Quarter 2007 Form 10-Q, Defendants also purported to categorize the Company's assets into Levels 1, 2 and 3 in accordance with the requirements of FASB Statement of Financial Accounting Standards No. 157 — "Fair Value Measurements" ("SFAS 157").  As explained more fully below in Section VII, SFAS 157 sets forth a standardized framework to be used by a company in assessing the fair value of its assets.  SFAS 157 specifies that fair value "should be determined based on the assumptions that market participants would use in pricing the asset or liability," and requires that "[v]aluation techniques used to measure fair value shall maximize the use of observable inputs and minimize the use of unobservable inputs."

206.    Under SFAS 157, "observable inputs" are criteria used in pricing an asset or liability that are based on independent market data, whereas "unobservable inputs" reflect the reporting company's own assumptions about how market participants would price a given asset or liability.  SFAS 157 creates a fair value hierarchy that prioritizes "inputs" into Levels 1, 2, and 3.  Assets assigned a Level 1 ranking are considered to have the most reliable fair value assessment since they are based on quoted prices of identical assets being sold in the market.

Level 2 inputs are other directly or indirectly observable market-based indicators of asset value, such as quoted prices for similar, but not identical, assets or liabilities being sold in the market. A Level 3 asset designation is considered to be the least reliable since it is based on "unobservable inputs" such as the reporting company's own valuation methodology or model as opposed to actual market indicators. The designation of assets as Level 3 is only appropriate if there are no other Level 1 or 2 inputs that can be used to value a given asset or liability.

207.    In the First Quarter 2007 Form 10-Q, Defendants purported to use the fair value hierarchy of SFAS 157 in categorizing Merrill's assets. Defendants defined Level 1 as "[f]inancial assets and liabilities whose values are based on unadjusted quoted prices for identical assets and liabilities in an active market." Level 2 was defined as "[f]inancial assets and liabilities whose values are based on," among other things, "[q]uoted prices for similar assets or liabilities in active [and non-active] markets." Finally, Merrill defined Level 3 as "[f]inancial assets and liabilities whose values are based on prices or valuation techniques" reflecting the Company's "own assumptions about the assumptions a market participant would use in pricing the asset or liability."

208.    In the First Quarter 2007 Form 10-Q, Defendants represented that Merrill's Level 3 assets at that point in time consisted of:  (i) trading assets, excluding contractual agreements, of $3.830 billion; (ii) contractual agreements of $5.341 billion; and (iii) investment securities of $5.922 billion. The First Quarter 2007 Form 10-Q also represented that "[t]he Condensed Consolidated Financial Statements are presented in accordance with U.S. Generally Accepted Accounting Principles, which include industry practices."

209.    The foregoing statements regarding Merrill's Level 3 asset valuations in the First Quarter 2007 Form 10-Q were materially false and misleading because Defendants failed to use

relevant and available Level 1 and Level 2 inputs on certain assets that they categorized and accounted for as Level 3. Mark-to-market accounting is an accounting standard which assigns a value to a position held by a company in a financial instrument (*i.e.*, securities, debt instruments, derivatives) based on the current fair market price for the instrument or similar instruments. Mark-to-model accounting involves the valuation of a company's assets at prices determined by that company's internal financial models or assumptions rather than market prices. In violation of U.S. GAAP, Merrill therefore marked-to-model certain assets it categorized as Level 3 which should have been marked-to-market. Thus, Merrill's trading assets and liabilities reported in the First Quarter 2007 Form 10-Q failed to properly account for the true value of Merrill's subprime ABS CDO exposures.

210. Defendants O'Neal and Edwards signed certifications under Section 302 of the Sarbanes-Oxley Act of 2002 that were included in the First Quarter 2007 Form 10-Q in which they made substantially the same certifications set forth in the Third Quarter 2006 Form 10-Q, discussed above at ¶ 169. The certifications in the First Quarter 2007 Form 10-Q were materially false and misleading for the same reasons and omitted the same material facts as alleged above in ¶ 170.

211. Prior to Merrill's release of its results for the second quarter of 2007, the downturn in the subprime mortgage market and investments related to it markedly intensified. Among other things, two Bear Stearns subprime mortgage-infected hedge funds in which Merrill was heavily invested had collapsed. Specifically, when the Bear Stearns High Grade Structured Credit Strategies Master Fund, Ltd. and Bear Stearns Enhanced Leverage Structured Credit Strategies Master Fund, Ltd. (together, the "Bear Funds") imploded in June 2007, Merrill moved in to seize $850 million in collateral assets based upon an $850 million loan that Merrill provided

to Bear in exchange for the Bear Funds' purchase of Merrill CDOs.  Merrill sought to sell the

seized assets through an auction.  On June 20, 2007, Merrill was presented with stark

confirmation of the severely diminished value that the market placed on CDO assets

substantially similar to those saddling the Company's balance sheet:  Merrill was unable to sell a

significant portion of the seized assets, and those that it was able to unload in 2007 were sold for

as little as 30% of their supposed "par" value.

212.   In addition to Merrill's inability to sell the assets that it seized from the Bear

Funds, the Company was unable to sell the billions of dollars in subprime ABS CDO exposure

that was festering on its balance sheet.  The value of these holdings had sharply declined, but

Defendants did not disclose Merrill's exposure or the material impairment of these assets.

213.   In the July 17, 2007 Form 8-K, Merrill announced its financial results for the

second quarter of 2007.  Among other things, the Company claimed to have earned "very strong

net revenues, net earnings and earnings per diluted share for the second quarter of 2007, which

enabled the Company to achieve record net revenues, net earnings and net earnings per diluted

share for the first half of 2007."  Despite the material declines in the ABX and TABX indices,

which indicated a clear impairment of the approximately $40 billion in subprime ABS CDO

exposures that Merrill carried on its balance sheet — flouting Kronthal's warning a year earlier

— Defendants did not disclose either the Company's CDO holdings or their impairment.

Instead, Defendant O'Neal falsely claimed:

> We delivered another strong quarter in a volatile and, at times, hostile market
> environment, . . . *These results reflect our revenue diversification, which makes
> possible strong performance despite uneven market conditions*.  Our focus on
> business and revenue growth, expense discipline and global expansion continues
> to enhance the earnings power of our franchise.

214.   Defendant O'Neal's contention that Merrill had successfully diversified was

materially false and misleading.  In fact, the Company had an unacceptably high, yet

undisclosed, concentration of risk in subprime ABS CDOs, which was severely impaired by the intensifying market downturn.

215.    During the July 17, 2007 Analyst Call, Defendants fielded numerous questions demonstrating that investors were particularly interested in Merrill's exposure to subprime debt. During this call, Defendants continued to conceal the truth; namely that Merrill had a stockpile of impaired subprime-related assets that it could not sell and that the Company had deliberately delayed taking appropriate write-downs on these assets in the hope of somehow offloading this enormous risk.  Moreover, Defendants continued to falsely claim that the Company's putative financial results and sound future prospects in this "difficult" market were the result of Merrill's outstanding risk management.  In this regard, Defendant Edwards claimed:

> While we have seen some positive signals, such as improving first-payment default levels for First Franklin, the environment for U.S. subprime mortgages and related CDOs has yet to fully stabilize.  ***Risk management, hedging, and cost controls in this business are especially critical during such periods of difficulty, and ours have proven to be effective in mitigating the impact on our results.***

216.    In addition to this materially false and misleading statement lauding the purported role that Merrill's risk management measures played in navigating the Company through the escalating subprime crisis, Defendant Edwards engaged in the following exchange on the July 17, 2007 Analyst Call, during which he gave materially misleading and incomplete explanations of Merrill's performance for the second quarter of 2007:

**Glenn Schorr, Analyst, UBS:**

[I]n terms of both subprime and CDO exposure. . . . You are one of the largest — or the largest — underwriter of CDOs, and maybe try to give some color around myth versus reality in how people should think about a) what's on your books in terms of residuals and exposure, and b) maybe even comment related to some of the Bear hedge funds what collateral you have taken on your books or have not. And just overall comfort there, as well.

**Defendant Edwards:**

Okay. Well, look, again I want to make two points.  The first is that this is another example where ***I think proactive, aggressive risk management has put us in [an] exceptionally good position.***  Obviously the market has gone through a period of flux.  We think that remains the case.  ***But aggressive risk management I think has certainly helped transform our risk profile since the end of the year.  We've seen significant reductions in our exposure to lower-rated segments of the market.***  Our warehouse lines are down materially, our whole-loan inventory is down materially.  As was the case in the last quarter, we will see a modest increase in our residual position, but it will be small relative to our overall retained interest piece.  And I think the majority of our exposure continues to be now in the highest credit segment of the market.

. . . [T]his is obviously an area that has received a lot of attention and that receives a lot of attention as we work to risk-manage it.  But it is only a part of our business, our broader business.  It's a part of our structured finance and investment business, which has many other pistons around the world, other asset classes.  And in turn, structured finance is only a part of our broader FICC business, which is obviously only a part of GMI and a part of the firm. I think the importance of diversification came through yet again this quarter in these results . . . .

*      *      *

. . . Obviously we have a very robust process around marking these [CDO and subprime] assets, and we're confident in how they were marked, how they'll mark.

217.     Moreover, when questioned during the July 17, 2007 Analyst Call on the

percentage of Merrill's earnings that was subprime-related, Defendant Edwards once again

minimized the impact of the subprime mortgage market on Merrill, even though he knew and/or

recklessly disregarded that the Company had an undisclosed exposure of at least $40 billion

which was significantly impaired by this time.  Defendant Edwards represented:

**Mike Mayo, Analyst, Deutsche Bank:**

. . . [W]hat percent of your earnings are related to mortgage or subprime mortgage, and if you could include in that CDOs and warehouse lines or anything else?

85

**Defendant Edwards:**

Well, just to remind everybody, we made the comment in the first quarter that over the previous five quarters, all of that activity as broadly as we could define it, represented less than 2%.  As I said, the business overall was down compared to last year, it was up compared to the first quarter.  *I don't think there's anything that would change that comment that I made in the first quarter.*

**Mike Mayo:**

. . . [H]ow much of your capital is at risk or how much in total assets do you have that's somehow related to that same category?

**Defendant Edwards:**

Well, we obviously have a robust economic capital model that we employ to address risk around all of our different assets.  From an overall asset standpoint, again the point I would make there *is that there's been, we think, an important transformation of the components of that asset base, where the exposure that we retain is in the higher-rated tranches of the exposure, and what we've done is reduce exposure in some of the broader or lower-rated categories.*

*       *       *

**Richard Bove, Analyst, Punk, Ziegel & Company:**

And I guess finally, just overall in the broad high-yield market, it appears that yield on high-yield bonds has gone up 55 basis points in the last five to six weeks, and the ABX index, which I guess has a lot of relevance or no relevance depending on how you use it, has dropped about 40% over the year.  What has that done to the valuation of the overall assets of Merrill Lynch?

**Defendant Edwards:**

. . . At any point in time, we've got assets and hedges in place that are directly affected by all of these items.  *And in the course of the quarter we seek to mark all of those things, and again, it highlights I think the importance of having effective risk management, which we believe thus far we've demonstrated has been very effective.*

*       *       *

**Meredith Whitney, Analyst, CIBC World Markets:**

I need a little extra help on the values you ascribing to the mortgage piece and the CDO piece, and I appreciate your comments earlier that you are comfortable with how you are valuing them.  But for an outsider who doesn't have the benefit of what you see, can you give a little bit more of a qualitative overview in terms of

86

what methods you are using to value these securities, how the methods have changed, at what point have you decided the market deserves a revaluation of these securities?  Did you revalue and write down these securities during the second quarter?  Any extra color you can give that would help me. . . .

**Defendant Edwards:**

Okay.  Well, of course **we are constantly revaluing these assets and related hedges on a constant basis.**  So in some cases they get marked down.  In some cases they get marked up.  Offsets sometimes move in other directions; so the broad answer to your question is **yes, we absolutely marked all of that, all of those assets and related hedges during the quarter.  In general when there's an active observable market, we have mark to market.**  When there are related markets that we can use to interpolate, we also can mark effectively to market.  There are some parts, such as the residuals, which are more on a mark to model basis based on inputs that we can observe, such as cumulative default curves, for example.  And then there are loans that we also make judgments on using a lower cost to markets. So, that is a broad explanation as to how we look at those assets.

*     *     *

*Everything will affect our valuations and the related hedges, and we'll constantly be updating for all the new input that comes into the market.*

**Meredith Whitney:**

Okay, just one last follow-up in terms of the severity of these marks.  Would you qualify the second quarter severity to be greater than the first quarter?

**Defendant Edwards:**

Well, overall as I pointed out, the business performed better in the second quarter than it did in the first quarter.  Still did not perform as well as it did in the second quarter last year, and I think that appropriately gives you benchmarks.

**Meredith Whitney:**

Okay.  But the indexes are down dramatically from the first quarter this year and the second quarter of last year, so that - really speaking about valuations.

**Defendant Edwards:**

*All of which [is] reflected in those results.*

218.    The foregoing statements by Defendant Edwards were materially false and

misleading because, among other things, they failed to account for the significant decline in the

ABX and TABX indices at this time, and how such declines negatively impacted the valuation of Merrill's ABS CDO holdings. Both the ABX and TABX indices are accepted market-based indicators of RMBS and CDO pricing, and were so during the Relevant Period. Far from an inactive market, financial services institutions such as Merrill focused intensely on the ABX and TABX pricing structures during the Relevant Period since they were an accurate barometer for the market movement of subprime RMBS value.

219.    The ABX index is made up of five different sub-indices that track the value of CDS contracts on selected RMBS tranches across a range of credit ratings (AAA, AA, A, BBB, and BBB-). As the price of obtaining CDS credit protection on these RMBS increases, the affected portions of the ABX index decline. The TABX is an index that tracks the pricing of CDS contracts providing credit protection for the lower rated (BBB and BBB-) tranches of the ABX index. The TABX divides the lower rated tranches of the ABX index into a series of separate tranches ranging from AAA to BBB or lower based on the risk of loss on the underlying RMBS collateral.

220.    By the beginning of 2007, the ABX and TABX experienced material declines based upon an increase in both the number of investors seeking CDS protection against RMBS and CDO defaults and the price of such CDS contracts themselves. By mid-July, the portion of the ABX index tracking the lower rated BBB tranches dropped 7.5% to record lows. With this drop, the ABX lost half its value in the first half of 2007. The ABX indices tracking higher quality mortgage bonds (those rated AAA and AA) were also suffering severe declines by the middle of 2007. In addition, the Senior TABX Tranche, which tracked the performance and risk levels of CDO tranches similar to those which Merrill had exposure to, had dropped by approximately 30% at this time.

221.   The statements by Defendant Edwards cited in ¶¶ 215-17 above knowingly or recklessly disregarded these relevant declines in the ABX and TABX indices, which reflected impairments in the value of Merrill's ABS CDO holdings.  At the time these statements were made, Defendant Edwards knew or recklessly disregarded that Merrill had an undisclosed ABS CDO exposure of at least $40 billion, which was, given the decline in the ABX and TABX indices, also severely impaired.

222.   Merrill filed its Second Quarter 2007 Form 10-Q on August 3, 2007.  For the first time, Merrill purported to publicly disclose facts pertaining to the impact of the disintegrating subprime mortgage market on the Company's massive CDO portfolio.  In this regard, Merrill stated:

> [T]he challenging market conditions in certain credit markets that existed during the first half of 2007 have intensified in the beginning of the third quarter. Characteristics of this environment include increased volatility, wider credit spreads, reduced price transparency, lower levels of liquidity, and rating agency downgrades.  These factors have impacted and may continue to impact the sub-prime mortgage market, including certain collateralized debt obligations (CDOs), as well as other structured credit products and components of the leveraged finance origination market.  ***Merrill Lynch continues to be a major participant in these markets with risk exposures through cash positions, loans, derivatives and commitments.***  Given current market conditions, significant risk remains that could adversely impact these exposures and results of operations.  ***We continue our disciplined risk management efforts to proactively execute market strategies to manage our overall portfolio of positions and exposures with respect to market, credit and liquidity risks.***

223.   Although Defendants finally disclosed that Merrill's CDO portfolio faced exposure to losses from subprime mortgages, this "disclosure" was materially incomplete and misleading.  Among other things, Defendants knowingly failed to disclose the amount of the Company's exposure to seriously impaired subprime mortgages.  Moreover, Defendants omitted the material fact that borrowers of the mortgages supporting these exposures were defaulting in high volume and that Merrill was unable to sell the CDOs that were festering on its books.  As a

result, undisclosed losses and write-downs were a certainty.  For this reason, Defendants'

statement that the Company was managing these dangerously impaired positions through

"disciplined risk management efforts" was knowingly false.  In fact, Merrill was secretly

entrenched in disaster mode precisely because it had abandoned prudent risk management

measures and ignored internal warnings by assuming the massive risks now coming home to

roost in connection with the Company's subprime ABS CDOs.

224.   The Company's Second Quarter 2007 Form 10-Q made similar

misrepresentations concerning Merrill's purportedly disciplined risk-taking in connection with

the subprime mortgages that it originated:

> [Merrill Lynch] originate[s] and purchase[s] residential mortgage loans, certain of
> which include features that may result in additional credit risk when compared to
> more traditional types of mortgages.  ***The potential additional credit risk arising
> from these mortgages is addressed through adherence to underwriting
> guidelines.  Credit risk is closely monitored in order to ensure that reserves are
> sufficient and valuations are appropriate.***

The foregoing statements were materially false and misleading because Merrill did not adhere to

prudent underwriting standards for subprime mortgages.  Instead, Merrill's goal was to originate

and to purchase from other originators as many mortgage loans as possible for the Company's

CDO securitizations.  As alleged herein (¶¶ 63-66), to serve its own financial interests, Merrill

had insisted that other originators lower their underwriting standards to enable Merrill to

purchase a greater volume of loans.

225.   The Second Quarter 2007 Form 10-Q also categorized Merrill's assets into Levels

1, 2 and 3 pursuant to SFAS 157.  The categories were described in a substantially similar way as

in the First Quarter 2007 Form 10-Q.  Merrill represented that it had the following Level 3 assets

at this time:  (i) trading assets, excluding contractual agreements, of $3.648 billion; (ii)

contractual agreements of $6.601 billion; and (iii) investment securities of $5.784 billion.  The

Second Quarter 2007 Form 10-Q also represented that "[t]he Condensed Consolidated Financial Statements are presented in accordance with U.S. Generally Accepted Accounting Principles, which include industry practices."

226.    The foregoing statements regarding Merrill's Level 3 asset valuations in the Second Quarter 2007 Form 10-Q were materially false and misleading because Defendants failed to use relevant and available Level 1 and Level 2 inputs on certain assets that they categorized as Level 3.  In violation of GAAP, Merrill therefore marked-to-model certain Level 3 assets which should have been marked-to-market.  Thus, Merrill's trading assets and liabilities reported in the Second Quarter 2007 Form 10-Q failed to properly mark-to-market the true value of Merrill's subprime ABS CDO exposures.

227.    Defendants O'Neal and Edwards signed certifications under Section 302 of the Sarbanes-Oxley Act of 2002 that were included in the Second Quarter 2007 Form 10-Q in which they made substantially the same certifications set forth in the Third Quarter 2006 Form 10-Q, discussed above in ¶ 169.  The certifications in the Second Quarter 2007 Form 10-Q were materially false and misleading for the same reasons and omitted the same material facts alleged above in ¶ 170.  In addition, the certifications were materially false and misleading because they failed to disclose that Merrill had overridden its risk control systems.  Moreover, the assertion that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of the Company, was materially false and misleading because Merrill's statements of assets and liabilities did not take into consideration the substantial impairment of Merrill's subprime ABS CDO exposures.

**B.      Defendants' Materially False And Misleading Statements And Omissions Of Material Fact Concerning Merrill's Hedging Activities With Poorly Capitalized Monoline Insurers**

228.    Beginning in late 2006, in order to help mask the true risk in Merrill's CDO activities, the Company entered into billions of dollars of CDS contracts with monoline insurers. The CDS contracts were designed to provide Merrill, or the Merrill-sponsored CDO, with credit protection against the risk of loss on Merrill's CDOs.  Often, these swap agreements also purported to protect Merrill or Merrill's CDO issuing-entity on the total return the particular CDO tranche was supposed to yield.

229.    Merrill's Relevant Period SEC filings failed to disclose material facts concerning Merrill's exposure to, and the effectiveness of, CDS contracts issued by monoline insurers on the Company's CDOs and other assets.

230.    For example, Merrill's Third Quarter 2006 Form 10-Q made no reference to the CDS contracts purportedly hedging the Company's CDO exposure.  Nor did it even reference Merrill's substantial and growing portfolio of retained senior tranche CDO notes.  The Third Quarter 2006 Form 10-Q merely indicated that "[i]n the normal course of business, Merrill Lynch securitizes: commercial and residential mortgages and home equity loans . . ." and used "Special Purpose Entities" ("SPEs") to do so.  Merrill went on to state that it "engages in derivative transactions with SPEs" as one of several listed activities, but provided no further details on the nature of these derivatives.  The report also stated that as of the end of the quarter, Merrill had a $5.459 billion retained interest in its residential mortgage loan securitizations, "excluding the offsetting benefit of *financial instruments used to hedge risk*," but provided no information whatsoever on the nature of the financial instruments used, the precise risk that was purportedly hedged, or the counterparties to any such hedging transactions.

231.    The Company's 2006 Form 10-K was equally opaque in its references to derivative instruments and hedging activities.  The 2006 Form 10-K stated that "Merrill Lynch enters into derivatives to facilitate client transactions, for proprietary trading and financing purposes, *and to manage its risk exposures arising from trading assets and liabilities*." Defendants went on to tout Merrill's purported oversight of its hedges and its ability to effectively monitor their performance by representing that the Company "*formally assesses, both at the inception of the hedge and on an ongoing basis, whether the hedging derivatives are highly effective in offsetting changes in fair value or cash flows of hedged items*."  However, no detail was provided by the Company on the CDS contracts it had entered into with monoline insurers to hedge its growing CDO exposures.

232.    The Company's 2006 Form 10-K also represented that Merrill entered into hedges in connection with guarantees it provided on assets held by SPEs, which included its CDOs:

> To protect against declines in value of the assets held by the SPEs for which [Merrill] provide[s] either liquidity facilities or default protection, **[*Merrill*] *generally economically hedge[s]* [*its*] *exposure through derivative positions that principally offset the risk of loss of these guarantees.*

No details were provided on the notional amount of these hedges, who the hedge counterparties were, or what specific underlying assets they hedged.  As of the February 27, 2007 filing of the 2006 Form 10-K, Merrill had already entered into CDS contracts with at least MBIA and XL Capital which hedged over $1.84 billion in CDO senior interests (*i.e.*, the Broderick 2, Highridge, Broderick 3, and West Trade II CDOs), and which Defendants knew, but failed to disclose, were at a heightened risk of default.

233.    Like the Company's 2006 Form 10-K, Merrill's First Quarter 2007 Form 10-Q stated that Merrill used derivatives to hedge its trading positions, and that "Merrill Lynch *formally assess[ed], both at the inception of the hedge and on an ongoing basis, whether the*

***hedging derivatives [were] highly effective in offsetting changes in fair value or cash flows of***

***hedged items.***"  Merrill's Second Quarter 2007 Form 10-Q used identical language to describe

the Company's hedges.  However, aside from these generalized statements, Defendants provided

no further detail in the First Quarter 2007 Form 10-Q or in the Second Quarter 2007 Form 10-Q

regarding Merrill's CDS contracts with monoline insurers.  In fact, the only reference to CDS in

the quarterly reports concerned swap agreements to "mitigate [Merrill's] credit exposure related

to funded and unfunded commercial loans," and to *Merrill* CDS serving as payment guarantees

by the Company on certain undisclosed underlying assets.

234.    Both the First and Second Quarter 2007 Form 10-Q failed to disclose detailed

information about Merrill's CDS contracts with monoline insurers despite the fact that Merrill

had hedged a significant amount of its CDO exposure through such contracts by the time each

quarterly report was filed.  By the filing of the First Quarter 2007 Form 10-Q, Merrill had

entered into CDS contracts with MBIA and XL Capital which alone collectively hedged over

$3.5 billion in CDO senior interests (*i.e.*, the Broderick 2, Highridge, Broderick 3, West Trade II,

Newbury Street and Silver Marlin CDOs).  In addition, when the Second Quarter 2007 Form 10-

Q was filed, Merrill had at a minimum, entered into CDS contracts with these same two

monolines which collectively hedged over $5.5 billion in CDO senior interests (*i.e.,* the

Broderick 2, Highridge, Broderick 3, West Trade II, Newbury Street, Silver Marlin, West Trade

III, Tazlina, Jupiter, and Robeco CDOs).  None of this exposure to these monoline CDS

contracts, or any others executed at this time, was disclosed in the First or Second Quarter 2007

Form 10-Q.

235.    Merrill's representations in its Third Quarter 2006 Form 10-Q, 2006 Form 10-K,

First Quarter 2007 Form 10-Q and Second Quarter 2007 Form 10-Q were materially false and

misleading and omitted material facts because Defendants failed to disclose the full extent of the

Company's exposure to CDS contracts issued by over-leveraged and thinly-capitalized monoline

financial guarantors such as MBIA and XL Capital.  Nor did Merrill's SEC filings disclose that

the underlying collateral assets supporting the hedged CDOs were of poor credit quality creating

a heightened risk of default.  This, in turn, increased the likelihood that the inadequately

capitalized monoline insurers with whom Merrill hedged this risk would be forced to pay claims

that exceeded their financial resources.  Details regarding Merrill's CDS contracts should have

been disclosed in these SEC filings given what Merrill knew at the time about the precarious

financial status of the hedged assets and the monoline insurers.

236.    Defendant Edwards made similar materially false and misleading statements and

omissions of material fact in the July 17, 2007 Analyst Call addressing the Company's financial

results for the second quarter of 2007.  As noted above, during the July 17, 2007 Analyst Call,

Defendant Edwards gave assurances that the Company's risk management and hedging strategies

were effective in mitigating loss on Merrill's CDO exposures.  Specifically, Defendant Edwards

stated that:

> While we have seen some positive signals, such as improving first-payment
> default levels for First Franklin, the environment for U.S. subprime mortgages
> and related CDOs has yet to fully stabilize.  ***Risk management, hedging, and cost
> controls in this business are especially critical during such periods of difficulty,
> and ours have proven to be effective in mitigating the impact on our results***.

When he was asked specifically about Merrill's subprime and CDO exposure, Defendant

Edwards went on to state:

> ***I think proactive, aggressive risk management has put us in [an] exceptionally
> good position.***  Obviously the market has gone through a period of flux. We think
> that remains the case.  ***But aggressive risk management I think has certainly
> helped transform our risk profile since the end of the year.  We've seen
> significant reductions in our exposure to lower-rated segments of the market. . .
> . And I think the majority of our exposure continues to be now in the highest
> credit segment of the market.***

. . . [T]his is obviously an area that has received a lot of attention, and ***that receives a lot of attention as we work to risk-manage it***.

237.    In response to questions regarding the concentration of Merrill's total assets in the subprime mortgage and CDO categories, Defendant Edwards stated:

> From an overall asset standpoint, again the point I would make there ***is that there's been, we think, an important transformation of the components of that asset base where the exposure that we retain is in the higher-rated tranches of the exposure, and what we've done is reduce exposure in some of the broader lower-rated categories.***

In terms of the valuation methodology used by Merrill for its CDO holdings, Defendant Edwards also stated that "we are constantly reevaluating these assets ***and related hedges*** on a constant basis."

238.    The statements in ¶¶ 236-37 above were materially false and misleading as Defendants failed to disclose that Merrill had entered into CDS contracts with undercapitalized monoline insurers such as MBIA and XL Capital to hedge against the risk of loss on the Company's senior tranche CDO exposures.  Defendants also knew, but failed to disclose, that the assets hedged by these CDS contracts were subject to a heightened risk of default that the swap agreements could not cover.

## VI.    LOSS CAUSATION—MERRILL GRADUALLY DISCLOSES ITS FRAUD

239.    In October 2007, Defendants began to disclose previously misrepresented and/or concealed facts concerning, among other things:  (i) Merrill's true exposure to poorly underwritten subprime mortgages, particularly the CDOs festering on the Company's balance sheet; (ii) the value of the Company's subprime-exposed assets and liabilities; and (iii) the ineffectiveness of Merrill's risk management and risk monitoring policies and procedures, including its reckless attempts to hedge its subprime mortgage exposure through transactions with thinly capitalized monoline insurers.

240.    Defendants' materially false and misleading statements and omissions of material

fact caused Merrill's common stock to trade at artificially inflated prices during the Relevant

Period.  As alleged below, when Merrill gradually disclosed previously misrepresented and/or

concealed risks, the value of Plaintiff's investments declined as the market digested these

material facts and removed portions of the artificial inflation from the Company's stock price.

While other companies with subprime exposure experienced declining stock prices due to

declining market conditions, Merrill's *own* disclosures of previously misrepresented and/or

concealed facts relating to Merrill directly caused the declines in Merrill's *own* stock price.  As

detailed below, the price of Merrill's common stock declined in a series of material steps from

$76.67 per share on October 5, 2007 to $11.64 per share on December 31, 2008 as the market

processed each set of previously undisclosed facts during this portion of the Relevant Period.

241.    For example, on October 5, 2007, Merrill issued its October 5, 2007 Form 8-K in

which the Company finally purported to report the mark-to-market "value" of its CDO holdings.

The October 5, 2007 Form 8-K omitted any reference to Merrill's effort to unload its senior

tranche CDO exposures through CDS contracts with monoline insurers.  In reference to the

announced $4.5 billion quarterly write-down on the Company's CDO portfolio, the press release

stated:

> The company expects to report a net loss per diluted share of up to $0.50,
> resulting from significant negative mark-to-market adjustments to its positions in
> two specific asset classes:  collateralized debt obligations (CDOs) and sub-prime
> mortgages; and leveraged finance commitments.
>
> *             *             *
>
> ***Write-downs of an estimated $4.5 billion, net of hedges, related to incremental***
> ***third quarter market impact on the value of CDOs and sub-prime mortgages.***
> These valuation adjustments reflect in part ***significant dislocations in the highest-***
> ***rated tranches of these securities*** which were affected by unprecedented move[s]
> in credit spreads and a lack of market liquidity in these securities, ***which***

> *intensified during the third quarter*.  *During the quarter, the company significantly reduced its overall exposure to these asset classes.*

In commenting on the foregoing results, Defendant O'Neal stated "we are disappointed in our performance in structured finance and mortgages.  We can do a better job in managing this risk. . . . "  The October 5, 2007 Form 8-K nonetheless failed to report the true extent of the write-downs on Merrill's CDO holdings.

242.    On October 8, 2007, the first trading day following Merrill's October 5, 2007 Form 8-K, the Company's common stock declined $2.55 per share, or approximately 3%, to close at $74.12 per share on volume of more than 10 million shares.

243.    A little more than two weeks later, Merrill issued its October 24, 2007 Form 8-K, which purported to provide additional information concerning the financial results that the Company reported in its October 5, 2007 Form 8-K.  In the October 24, 2007 Form 8-K, Merrill announced that it had a net loss from continuing operations of $2.3 billion.  According to a November 2, 2007 *Bloomberg* article, this loss was "six times [Merrill's] forecast and the biggest quarterly loss in [Merrill's] 93-year history."

244.    In announcing its results for the quarter ended September 30, 2007, Merrill stated that the company *was increasing its third quarter CDO and subprime charge from $4.5 billion to a staggering $7.9 billion*.  Merrill attributed this approximately 76% increase in the figure announced on October 5 to "additional analysis and price verification completed as part of the quarter-end closing process, including the use of more conservative loss assumptions in valuing the underlying collateral."

245.    In commenting on these dismal quarterly results during the October 24, 2007 Analyst Call, Defendant O'Neal made reference to Merrill's attempt to reduce its CDO exposure through hedges:

*As the market for these [CDO] securities began to deteriorate during the first quarter [of 2007]*, we began substantially reducing our warehouse risk by constructing CDOs and retaining the highest parts of the capital structure which we expected then to be more resistant to market disruptions in terms of both liquidity and price.

We sold and hedged our exposures to the lower-rated tranches of these securities, *but our hedging of the higher-rated tranches was not sufficiently aggressive nor was it fast enough*.  Despite the fact that nearly all of our remaining CDO exposure is super senior, it turned out that *both our assessment of the potential risk and our mitigation strategies were inadequate.*

246.     During the October 24, 2007 Analyst Call, Mike Mayo, an analyst from Deutsche Bank, asked Defendant O'Neal whether he felt "comfortable that there's not another shoe to drop and a lot more write-downs on the ABS CDOs."  Defendant O'Neal misleadingly stated:

[W]e've tried to capture everything that we can capture at this point in the market and the expectation for progression of these securities as of the date that we took the mark-downs. . . . [L]ooking at it as we sit here today and observing the general environment we're comfortable that we've marked these positions conservatively.

247.     The statements in the October 5, 2007 Form 8-K, the October 24, 2007 Form 8-K, and the October 24, 2007 Analyst Call concerning Merrill's subprime exposures and losses were materially false and misleading and continued to omit material facts.  Despite announcing its first write-downs of subprime-infected assets, Merrill's October 24, 2007 revisions continued to conceal its true exposure to these losses.  Moreover, while continuing to suppress the true extent of its losses, Merrill also failed to disclose the material fact that many of the Company's hedges on subprime ABS CDOs were with poorly capitalized or highly leveraged counterparties, including XL Capital, MBIA and ACA, and thus materially increased Merrill's counterparty risk.

248.     In response to the financial information set forth in the Company's October 24, 2007 Form 8-K and Analyst Call, Merrill's common stock closed that day at $63.22 per share, marking a decline of $3.90 per share, or approximately 6%, from the stock's close on October 23, 2007, on volume of approximately 52 million shares.  The next day, October 25, 2007,

Merrill's common stock declined an additional $2.32 per share, or approximately 4%, to close at $60.90 per share on volume of approximately 41 million shares.  Not coincidentally, Merrill announced Defendant O'Neal's "retirement" as the Company's CEO on October 30, 2007.

249.    On November 1, 2007, news emerged that the SEC was investigating Merrill's losses from its subprime business and its valuation of securities collateralized by subprime mortgages.  In response to this information, which called into question the same concealed material information that was the subject of the Company's October 5, 2007 Form 8-K and October 24, 2007 Form 8-K, Merrill's common stock declined from a closing price on October 31, 2007 of $66.02 per share to close at $62.19 per share on November 1, 2007 — a decline of $3.83 per share, or approximately 6%, on volume of approximately 20 million shares.

250.    On November 2, 2007, *The Wall Street Journal* reported that the SEC was investigating a variety of different means that Merrill may have employed to withhold facts concerning its known losses from the Company's investors.  Later that same day, Merrill issued a press release in which the Company disputed the information in *The Wall Street Journal* as "unfounded."  While on November 26, 2007, *The Wall Street Journal* published an article retracting certain of the information set forth in the November 2, 2007 article announcing the SEC's investigation, the SEC's investigation of Merrill based upon the Company's subprime losses and valuation methods was not included in this limited retraction.  In fact, in its Third Quarter 2007 Form 10-Q, Merrill confirmed that "[o]n October 24, 2007, the SEC staff initiated an inquiry into matters related to Merrill Lynch's subprime mortgage portfolio."

251.    Merrill's common stock declined an additional $4.91 per share or approximately 8% to close at $57.28 per share on volume of approximately 77 million shares on November 2, 2007.

252.    On November 7, 2007, Merrill filed its Third Quarter 2007 Form 10-Q, setting forth the Company's financial results for the quarter ended September 28, 2007.  This filing repeated the financial results announced in the Company's October 24, 2007 Form 8-K and further discussed in Merrill's October 24, 2007 Analyst Call, to which the market had already negatively reacted.  Merrill's representations in its Third Quarter 2007 Form 10-Q continued to be materially false and misleading for the reasons stated above in ¶ 247.

253.    The Third Quarter 2007 Form 10-Q also provided certain details concerning Merrill's mortgage finance operations and activities which caused the Company to suffer the losses that it reported on October 5, 2007 and October 24, 2007 (as well as further losses that Merrill had not yet reported).  As alleged herein, Defendants had previously remained silent in the face of a duty to speak concerning Merrill's subprime mortgage and mortgage-related ABS CDO activities — and had misleadingly minimized the Company's disastrous subprime exposure, including in Merrill's April 19, 2007 statement that "[r]evenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1% of Merrill Lynch's total net revenues over the past five quarters."   The Company now disclosed in the Third Quarter 2007 Form 10-Q that:

> During the third quarter of 2007, Merrill Lynch recorded a net loss of approximately $7.9 billion related to U.S. ABS CDO securities positions and warehouses, as well as U.S. sub-prime mortgage-related assets including whole loans, warehouse lending, residual positions and residential mortgage-backed securities.
>
> *         *         *
>
> In addition, Merrill Lynch through its U.S. bank subsidiaries has SFAS 115 investment securities and *off-balance sheet arrangements that have exposure to U.S. sub-prime residential mortgage-related assets of $5.7 billion at September 28, 2007.*

254.    In addition to the statements above, Merrill finally provided long-absent details on

the Company's extensive and reckless subprime origination and securitization activities under a

heading entitled "U.S. Sub-prime Residential Mortgage-Related and ABS CDO Activities."

Among other things, the Company disclosed the following concerning its securitization

activities:

> We retain and purchase securities from the securitizations of loans, including sub-prime residential mortgages.  Valuation of RMBS securities is based on observable prices and securitization cash flow model analysis.

*       *       *

> We have other retained and warehouse exposures related to our CDO business, which consists of RMBS and CDO positions previously held in CDO warehouses awaiting securitization, retained securities from CDO securitizations, and related hedges.

*       *       *

> The investment portfolio of Merrill Lynch Bank USA ("MLBUSA") and Merrill Lynch Bank & Trust Co. FSB ("MLBT-FSB") includes certain sub-prime mortgage-related securities, as well as ABS CDOs whose underlying collateral includes certain sub-prime residential mortgage-backed securities.

As detailed below, despite Merrill's statements that the Company marked its subprime-related

securities and mortgage ABS CDO positions conservatively, Merrill continued to take billions of

dollars in write-downs through the remainder of 2008 as the Company could no longer fully

conceal its enormous exposures to these toxic assets.

255.    For the first time, Merrill's Third Quarter 2007 Form 10-Q also provided some

detail on the Company's super senior CDO exposures.  The quarterly report stated:

> Our U.S. ABS CDO net exposure primarily consists of our AAA-rated super senior CDO portfolio, as well as retained and warehouse exposures related to our CDO business.

> <u>Super senior CDO portfolio</u>

> Super senior positions represent our exposure to the senior most tranche in a CDO's capital structure.  In bankruptcy, this tranche's claims have priority to the proceeds from liquidated cash CDO assets.  Our exposure to AAA-rated super

senior CDOs includes the following securities, *which are primarily held as derivative positions in the form of total return swaps*:

• High-grade super senior positions, which are CDOs with underlying collateral having an average credit rating of Aa3/A1 by Moody's Investor Services;

• Mezzanine super senior positions, which are CDOs with underlying collateral having an average credit rating of Baa2/Baa3 by Moody's Investor Services; and

• CDO-squared super senior positions, which are CDOs with underlying collateral consisting of other CDO securities which have collateral attributes typically similar to high grade and mezzanine super senior positions.

Despite the high credit rating of these CDO securities (typically AAA), their fair value at September 28, 2007 reflects unprecedented market illiquidity *and the deterioration of underlying sub-prime collateral*.

The quarterly report also provided the following figures on its super senior CDO exposures:

*(dollars in millions)*

| | Net Exposures as of June 29, 2007 | | Gain/(Loss) Included in Income (1) | | Other Net Changes in Net Exposures (2) | | Net Exposures as of Sept. 28, 2007 |
|---|---|---|---|---|---|---|---|
| Super senior CDO net exposures: | | | | | | | |
| High-grade | $ | 22,648 | $ | (1,841) | $ | (11,882) | $ 8,925 |
| Mezzanine | | 8,022 | | (3,084) | | 299 | 5,237 |
| CDO-squared | | 1,454 | | (826) | | 2 | 630 |
| Total super senior CDO net exposures | | 32,124 | | (5,751) | | (11,581) | 14,792 |
| Other retained and warehouse net exposures | | 1,740 | | (1,104) | | 390 | 1,026 |
| Total CDO-related net exposures | $ | 33,864 | $ | (6,855) | $ | (11,191) | $ 15,818 |

*(1) Primarily represents unrealized losses on net exposures.*
*(2) Primarily consists of hedging activity such as entering into credit default swaps that are matched to specific CDO securities. **This activity is conducted with***

> *various third parties, including monoline financial guarantors, insurers and other market participants.*

256.     The above statements in the Third Quarter 2007 Form 10-Q were materially false and misleading as they still failed to disclose the details of the specific CDS contracts purportedly hedging Merrill's CDO exposures, or who the monoline financial guarantors were. The Third Quarter 2007 Form 10-Q did not disclose that a substantial portion of the hedges on Merrill's CDO exposure was with poorly capitalized or over-leveraged monoline insurers such as MBIA and XL Capital, that were themselves subject to credit downgrades and defaults.  Further, the Third Quarter 2007 Form 10-Q concealed the billions of dollars of CDS contracts between Merrill and these monoline insurers to purportedly hedge against losses on the Company's other structured finance products.  Thus, Merrill still concealed the counterparty risk posed by its substantial CDS contracts with monoline insurers.

257.     In response to the information set forth in the Third Quarter 2007 Form 10-Q, Merrill's stock declined $2.38 per share, or approximately 4.2%, to close at $53.99 per share on volume of approximately 22 million shares on November 7, 2007, compared to its November 6, 2007 closing price of $56.37 per share.

258.     Merrill's January 17, 2008 Form 8-K, which the Company first issued as a press release before the market opened, announced Merrill's financial results for the fourth quarter and full year of 2007.  Among other things, the release and the attachments thereto demonstrated that the Company had amassed net losses from continuing operations for 2007 of $8.6 billion, or $10.73 per diluted share.  The January 17, 2008 Form 8-K revealed that Merrill's net loss for 2007 was $7.8 billion, or $9.69 per diluted share.  The Company further reported that its net revenues had decreased by 67%, falling from $33.8 billion in 2006 to $11.3 billion in 2007. Significantly, the January 17, 2008 Form 8-K also disclosed that Merrill's gross exposure to

ABS CDOs was $46.1 billion as of September 28, 2007 and $30.4 billion as of December 28, 2007.

259.    According to the January 17, 2008 Form 8-K:

The firm's substantially reduced performance in 2007 was primarily driven by significant declines in Fixed Income, Currencies & Commodities (FICC) net revenues for the second half of the year. . . . During the second half of 2007, FICC net revenues were materially impacted by a weaker business environment and ***net write-downs that included $7.9 billion in the third quarter and $11.5 billion in the fourth quarter related to U.S. ABS CDOs and U.S. sub-prime residential mortgages outside of the firm's U.S. bank-related investment securities portfolio***. ***In addition, credit valuation adjustments of $2.6 billion related to hedges with financial guarantors on U.S. ABS CDOs were recorded in the fourth quarter of 2007***.  (footnote omitted.)

*        *        *

U.S. ABS CDOs:

At the end of the fourth quarter 2007, net exposures to U.S. ABS CDOs, including both super senior ABS CDOs and secondary trading, totaled $4.8 billion, down from $15.8 billion at the end of the third quarter 2007.  Net write-downs related to these exposures were $9.9 billion in the fourth quarter.  ***The majority of these write-downs were related to the high-grade super senior ABS CDO exposures, the collateral for which is primarily comprised of 2006 vintage mortgages***.

Thus, Merrill began to acknowledge that the significant write-downs it was forced to take on its ABS CDO portfolio were mainly attributable to the Company's reckless accumulation of subprime mortgages during the tenure of Defendants O'Neal and Edwards.

260.    Merrill held an analyst call on January 17, 2008 to provide further details on the Company's fourth quarter and annual 2007 financial results.  During the call, Thain acknowledged the Company's poor CDO risk management during Defendant O'Neal's tenure. To respond to these failings, Thain announced the reinstitution of a risk committee of which he would be a member, and a new Global Head of Trading position that would report directly to him.  Notably, Thain also stated that he had re-hired Jeff Kronthal — who Defendant O'Neal fired for sounding alarms concerning Merrill's reckless accumulation of CDOs — to help Merrill

"work through our CDO and mortgage-related positions."  Thain indicated that these announced changes to Merrill's risk management processes were intended to "make sure this doesn't happen again."

261.    Despite these disclosures, the January 17, 2008 Form 8-K was nonetheless materially false and misleading as Merrill continued to conceal its precarious financial condition, including the risk of loss associated with the Company's CDO and subprime exposures.  Such exposures required Merrill to take massive additional write-downs throughout 2008.  Moreover, the disclosure of Merrill's $2.6 billion write-down related to hedges with financial guarantors was still woefully inadequate.  Merrill provided no detail on the nature of the hedges or who the hedge counterparties were.  Indeed, the January 17, 2008 Form 8-K failed to disclose that Merrill had massive CDS positions with under-capitalized monoline insurers who were themselves at risk of default.

262.    On January 17, 2008, Merrill's common stock closed at $49.45 per share, a decline of $5.64 per share, or approximately 10%, on volume of more than 70 million shares from the stock's closing price on January 16, 2008 of $55.09 per share.

263.    Merrill's April 17, 2008 Form 8-K reported financial results for the quarter ended March 30, 2008, which included "a net loss from continuing operations for the first quarter of 2008 of $1.97 billion, or $2.20 per diluted share. . . ."  The Company's overall net loss was "$1.96 billion, or $2.19 per diluted share."  Additionally, Merrill reported that its net revenues were "down 69% from the prior-year period, ***primarily due to net write-downs totaling $1.5 billion related to U.S. ABS CDOs*** . . . ."  (footnote omitted.)

264.    Continuing the adjustments based upon the Company's CDS contracts with monoline insurers, Merrill's April 17, 2008 Form 8-K reported "credit valuation adjustments

related to the firm's hedges with financial guarantors [of] negative $3 billion, including negative

$2.2 billion related to U.S. super senior ABS CDOs" for the quarter ended March 28, 2008.

265.    The April 17, 2008 Form 8-K was materially false and misleading and omitted

material facts because Merrill continued to conceal:  (i) the true amount of deterioration and

impairment on the Company's subprime-related securities and assets; and (ii) the enormous

concentration of CDS — both for its ABS CDOs and other structured finance products — that

the Company maintained with a limited group of poorly capitalized monoline insurers which left

Merrill exposed to billions of dollars in foreseeable losses during 2008.

266.    On May 6, 2008, Merrill filed its First Quarter 2008 Form 10-Q, setting forth the

Company's financial results for the first quarter of 2008.  This filing repeated the financial

results announced in the Company's April 17, 2008 Form 8-K.  Merrill's representations in its

First Quarter 2008 Form 10-Q were materially false and misleading for the reasons stated above

in ¶ 265.

267.    On May 7, 2008, Merrill common stock closed at $48.48 per share, a decline of

$2.87 per share, or approximately 6%, on volume of more than 17 million shares from the

stock's closing price on May 6, 2008 of $51.35 per share.

268.    Merrill continued to announce staggering losses in its July 17, 2008 Form 8-K,

where it disclosed its financial results for the second quarter of 2008.  Specifically, Merrill

reported a net loss from continuing operations of $4.6 billion, or $4.95 per diluted share, and an

overall net loss for the second quarter of $4.7 billion, or $4.97 per diluted share.  The July 17,

2008 Form 8-K also revealed that Merrill's net revenues were negative $2.1 billion which was

"driven by net losses totaling $3.5 billion related to U.S. super senior ABS CDOs and credit

valuation adjustments of negative $2.9 billion related to hedges with financial guarantors, about half of which related to U.S. super senior ABS CDOs."  (footnote omitted.)

269.     During the analyst call on July 17, 2008, Thain once again acknowledged that Merrill was in the process of recovering from the burdensome ABS CDO assets which were accumulated by Defendants O'Neal and Edwards.  He indicated that Merrill was taking steps to mitigate against further loss in this portfolio by "reducing our risky assets," and "de-risking our positions."  Thain pointedly stated during the call that he "did not create any of these CDOs."

270.     Although Merrill wrote-down its subprime-related securities and assets during the second quarter of 2008, the Company still had billions of dollars in exposure to subprime securities, including ABS CDOs, that it failed to disclose.  Thus, the July 17, 2008 Form 8-K was materially false and misleading and omitted material facts because Merrill continued to conceal: (i) the true amount of deterioration and impairment on the Company's subprime-related securities and assets; and (ii) the enormous concentration of CDS — both for Merrill's ABS CDOs and other structured finance products — that the Company maintained with a limited group of poorly capitalized monoline insures which left Merrill exposed to billions of dollars in foreseeable losses during 2008.

271.     In the July 28, 2008 Form 8-K, Merrill announced a "series of actions to significantly reduce the company's risk exposures and further strengthen its capital position."  Merrill listed its purported actions, in pertinent part, as follows:

- Announced substantial sale of U.S. super senior ABS CDO securities, resulting in an exposure reduction of $11.1 billion from June 27, 2008 (footnote omitted);

- Agreement to terminate ABS CDO hedges with monoline guarantor [XL Capital] and settlement negotiations with other monoline counterparties; and

- Plans to issue new common shares with gross proceeds of approximately $8.5 billion through a public offering launched today. . .

The Form 8-K further explained that the ABS CDO sale involved an agreement for Merrill to sell $30.6 billion gross notional amount of U.S. super senior ABS CDOs to an affiliate of Lone Star Funds ("Lone Star") for $6.7 billion. Thain stated that this "sale of the substantial majority of our CDO positions represents a significant milestone in our risk reduction efforts."

272.    Notably, Merrill also stated in the July 28, 2008 Form 8-K that it would take a second quarter 2008 write-down of approximately $5.7 billion, consisting of a "$4.4 billion loss associated with the sale of CDOs, a $0.5 billion net loss on the termination of hedges with [XL Capital] and an approximate $0.8 billion maximum loss related to the potential settlement of other CDO hedges with certain monoline counterparties."

273.    The July 28, 2008 Form 8-K was materially false and misleading as it failed to disclose that Merrill still held significant CDO assets which were subject to the same risk of loss as the CDOs sold to Lone Star. The Form 8-K also omitted any reference to the approximately **$50 billion** in notional amount of CDS contracts Merrill had entered into with poorly capitalized monoline insurers to hedge against losses on the Company's non-CDO exposures.

274.    On August 5, 2008, Merrill filed its Second Quarter 2008 Form 10-Q, setting forth the Company's financial results for the period ended June 27, 2008. This filing repeated the financial results announced in the Company's July 17, 2008 Form 8-K. Merrill's representations in its Second Quarter 2008 Form 10-Q continued to be materially false and misleading because, among other things, they misrepresented the Company's full exposure and concentration of credit risk in connection with Merrill's subprime-related securities, ABS CDOs, and ineffective hedges with monoline insurers.

275.   On August 7, 2008, Merrill's common stock closed at $26.10 per share, a decline of $2.12 per share, or approximately 8%, on volume of more than 51 million shares from the stock's closing price on August 5, 2008 of $28.22 per share.

276.   On September 15, 2008, both Merrill and BOA issued a press release (the "September 15, 2008 Press Release") announcing the $50 billion Merger of the companies and stating that the transaction "creates a company unrivaled in its breadth of financial services and global reach."  The September 15, 2008 Press Release also provided the exchange ratio for the Merger, in which BOA "would exchange .8595 shares of Bank of America common stock for each Merrill Lynch common share," and stated that the Merger was expected to close in the first quarter of 2009.

277.   In the October 16, 2008 Form 8-K, Merrill reported its financial results for the third quarter of 2008.  Merrill announced a "net loss from continuing operations for the third quarter of 2008 of $5.1 billion, or $5.56 per diluted share."   Merrill's overall net loss was $5.2 billion, or $5.58 per diluted share.  Merrill further announced the following "significant items" for the third quarter, including:

- Net write-downs of $5.7 billion resulting from the previously announced sale of U.S. super senior ABS CDOs and the termination and potential settlement of related hedges with monoline guarantor counterparties;

- Net write-downs of $3.8 billion, principally from severe market dislocations in September, including real estate-related asset write-downs and losses related to certain government-sponsored entities and major U.S. broker-dealers, as well as the default of a U.S. broker-dealer; and

- Net losses of $2.6 billion, resulting primarily from completed and planned asset sales across residential and commercial mortgage exposures.

Overall, the October 16, 2008 Form 8-K disclosed that Merrill had taken "$8.5 billion in net write-downs, primarily related to U.S. ABS CDO and residential mortgage-related exposures."

278.     The above statements in the October 16, 2008 Form 8-K were materially false and misleading and omitted material facts because Merrill continued to conceal and failed to disclose:

> (i)      the true amount of deterioration and impairment on the Company's subprime-related securities and assets;
>
> (ii)     the enormous concentration of CDS contracts for Merrill's ABS CDOs that the Company maintained with a limited group of poorly capitalized monoline insurers; and
>
> (iii)    that Merrill's October 2008 losses were more than $7 billion.

Additionally, the above statements concerning Merrill's monoline hedges failed to disclose that as of at least September 26, 2008, Merrill had **$50 billion** in gross notional CDS with monoline financial guarantors purporting to provide credit protection on non-CDO assets, including RMBS.

279.     On November 5, 2008, Merrill filed its Third Quarter 2008 Form 10-Q, setting forth the Company's financial results for the period ended September 26, 2008.  This filing repeated the financial results announced in the Company's October 16, 2008 Form 8-K.  The representations in Merrill's Third Quarter 2008 Form 10-Q continued to be materially false and misleading for the reasons stated above in ¶ 278.

280.     On November 6, 2008, Merrill's common stock closed at $16.23 per share, a decline of $1.39 per share, or approximately 8%, on volume of more than 31 million shares from the stock's closing price on November 5, 2008 of $17.62 per share.

281.     In the December 5, 2008 Form 8-K, Merrill announced that its shareholders voted to approve the Merger with BOA and that it was expected to close by the end of the year.  The Form 8-K continued to conceal:

> (i)      the true amount of deterioration and impairment on the Company's subprime-related securities and assets;

(ii)     the Company's enormous concentration of CDS with poorly capitalized monoline insurers, including more than $50 billion in total notional CDS on non-CDO assets such as RMBS; and

(iii)    Merrill's fourth quarter 2008 pre-tax losses were more than $15.3 billion by the end of November 2008.

282.    On December 31, 2008, Merrill's last day of existence as an independent Company, its common stock price closed at $11.64 per share on volume of approximately 50 million shares.  From October 5, 2007, when Merrill first disclosed that it would take a $4.5 billion write-down on its CDO and subprime-related exposures, to the end of the Relevant Period, Merrill's common stock declined a staggering $65.03 per share from $76.67 per share on October 5, 2007 to $11.64 per share on December 31, 2008 as the market processed each set of previously undisclosed and/or misrepresented material facts.

283.    As detailed herein, each of the price declines following Merrill's statements addressed in this Section was directly and proximately caused by the disclosure of previously concealed and/or misrepresented material information.  The price declines did not result from general market trends or financial industry news.  Instead, each of the above referenced disclosures partially corrected the materially false and misleading information and undisclosed material facts relating to Merrill's structured finance and mortgage-related activities, securitizations, and/or risk management.  Plaintiff seeks recovery for its losses that Defendants' misconduct proximately caused.

284.    Plaintiff only learned that Merrill had more than **$50 billion** of non-CDO-related hedges with monoline insurers on January 16, 2009, when BOA filed its Form 8-K and held an analyst call discussing both BOA's and Merrill's financial results for the fourth quarter of 2008. During BOA's analyst call, BOA's CFO Joseph Price disclosed that Merrill's "credit default swaps with monoline financial guarantors, excluding those that I just mentioned covering the

U.S. ABS CDOs, **total notional was $50 billion**." This was the first time that any information was disclosed to investors, including Plaintiff, concerning the scope of Merrill's CDS contracts with monoline insurers purportedly hedging the Company's non-CDO exposures. Additionally, Price further disclosed that Merrill wrote-down an additional $1.7 billion on its CDO portfolio and subprime-related securities for the fourth quarter of 2008.

285.    Similarly, in BOA's January 16, 2009 Form 8-K, Plaintiff learned for the first time that Merrill suffered **a fourth-quarter 2008 net loss of $15.31 billion**, or $9.62 per diluted share. **Merrill's fourth quarter 2008 pre-tax losses were reported to be over $21 billion.**

## VII.   DEFENDANTS' VIOLATIONS OF GENERALLY ACCEPTED ACCOUNTING PRINCIPLES AND OTHER REPORTING REGULATIONS

286.    Generally Accepted Accounting Principles ("GAAP") are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. GAAP are the official standards accepted by the SEC and promulgated, in part, by the American Institute of Certified Public Accountants ("AICPA"). GAAP consists of a hierarchy of authoritative literature. The highest priority is comprised of Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Standards ("FAS"), followed by FASB Interpretations ("FIN"), Accounting Principles Board Opinions ("APB"), AICPA Accounting Research Bulletins ("ARB"), and AICPA Statements of Position ("SOP"). GAAP provides other authoritative pronouncements including, among others, the FASB Concept Statements ("FASCON").

287.    In each of the Relevant Period financial statements that Defendants filed with the SEC, Merrill falsely stated that they complied with GAAP. For example, in its 2006 Form 10-K, the Company stated that "[t]he Consolidated Financial Statements are presented in accordance with U.S. Generally Accepted Accounting Principles." Similarly, the Company's First Quarter

2007 Form 10-Q claimed that "[t]he Condensed Consolidated Financial Statements are presented in accordance with U.S. Generally Accepted Accounting Principles."  Merrill's Second Quarter 2007 Form 10-Q and Third Quarter 2007 Form 10-Q made the same representation.

288.    Defendants' fraud upon Plaintiff included their knowing and/or reckless misrepresentations and omissions of material facts based, in part, upon violating GAAP in Merrill's financial reporting.  Set forth below are Merrill's violations of GAAP and other financial reporting regulations during the Relevant Period.

### A.    Regulation S-X

289.    As a threshold matter, Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not prepared in compliance with GAAP are *presumed to be misleading or inaccurate*:

> Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided.

290.    Regulation S-X applies with equal force to the annual SEC filings that Defendants made on Form 10-K as well as those filed on an interim or quarterly basis on Form 10-Q. Moreover, Accounting Principles Board Opinion 28 ("APB 28") — "Interim Financial Reporting" states that "each interim period should be viewed primarily as an integral part of an annual period." (¶ 9).  APB 28 specifically emphasizes the importance of accounting in the areas of, among others, revenues, expenses, and income, contingent items and significant changes in financial position (¶ 30), and "commentary [*i.e.*, disclosure] relating to the effects of significant events upon the interim financial results." (¶ 32).

291.    The responsibility for preparing the financial statements in conformity with GAAP rested with Merrill's management.  In this regard, the AICPA Auditing Standards ("AU") provide:

> The financial statements are management's responsibility . . . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management . . . . Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility. (footnote omitted.)

(AU 110.03).

292.    As set forth in this Section of the Complaint, numerous statements that Defendants made were materially misleading, in part, because such statements resulted from knowing and/or reckless failures to comply with GAAP.

**B.    Materiality Of Reported Financial Information**

293.    The subject matter of the false and misleading statements and omissions, as well as the accounting misstatements pled herein, was material to Merrill's financial statements during the Relevant Period, and, therefore, material to Plaintiff.  In this regard, the glossary of FASB Concept Statement No. 2 ("CON 2") — the authoritative guidance on materiality in the accounting hierarchy — provides the following definition of materiality:

> The magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement.

294.    CON 2 ¶ 132 similarly states,

> The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.

115

295.    Moreover, Regulation S-X, Rule 1-02 (17 CFR § 210.1-02(o)) states that a material matter is one "about which an average prudent investor ought to be reasonably informed."  Further, 17 CFR § 210.4-01(a) states that material information is "information as is necessary to make the required statements, in the light of the circumstances under which they are made, not misleading."

296.    SEC Staff Accounting Bulletin No. 99 ("SAB 99"), which specifically applies to financial statements, provides that "[a] matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."  Pursuant to GAAP, materiality is measured both quantitatively and qualitatively.  In this regard, Public Company Accounting Oversight Board AU §312 provides:  "As a result of the interaction of quantitative and qualitative considerations in materiality judgments, misstatements of relatively small amounts that come to the auditor's attention could have a material effect on the financial statements."

297.    In connection with the interrelation between quantitative and qualitative measures of materiality, the SEC provides specific examples of circumstances in which a "quantitatively small misstatement" may well be rendered qualitatively material, including, but not limited to:

- Whether the misstatement masks a change in earnings or other trends;

- Whether the misstatement changes a loss into income or vice versa;

- Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability;

- Whether the misstatement affects the registrant's compliance with regulatory requirements; or

- Whether the misstatement has the effect of increasing management's compensation - for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation.

298.    Authoritative SEC guidance further provides that, in assessing whether a misstatement results in a violation of a registrant's obligation to keep books and records that are accurate and "in reasonable detail," registrants should consider:

- The significance of the misstatement;

- How the misstatement arose;

- The cost of correcting the misstatement; and

- The clarity of authoritative accounting guidance with respect to the misstatement.

299.    Whether measured quantitatively or qualitatively, Defendants': (i) failure to disclose Merrill's material concentration of CDOs and other subprime-related risk; (ii) failure to properly value or to take appropriate mark-to-market write-downs on the Company's CDOs and related derivative securities linked to subprime mortgages; and (iii) overstatement of the value of the Company's assets that were, in fact, exposed to subprime-related securities and understatement of its corresponding liabilities, which resulted in Merrill materially overstating its net earnings and understating its net losses as reported in the Company's 2007 interim financial statements, were material to Plaintiff and to Merrill's other investors.

C.    **Accounting For Contingent Loss And Risks**

1.    **SFAS 5**

300.    GAAP required Defendants to make disclosures based upon Merrill's material exposure to losses arising from its subprime ABS CDOs and related subprime mortgage exposures. Throughout the Relevant Period, Defendants knew or recklessly disregarded the substantial risk of default present in subprime loans attributable, in part, to the gross abandonment of prudent underwriting standards driven by Merrill's reckless campaign to maximize mortgage securitizations. Numerous provisions of GAAP, including those discussed

below, clearly required Defendants to make, at a minimum, public disclosures of the known risks of loss.

301.    FASB Statement of Financial Accounting Standards No. 5 — "Accounting for Contingencies" ("SFAS 5") governs, in part, the accounting and reporting for gain and loss contingencies.  The first paragraph defines a "loss contingency" as "an existing condition, situation, or set of circumstances involving uncertainty as to possible … loss to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur."

302.    Pursuant to SFAS 5 ¶ 8, an entity is required to *accrue* a loss contingency, with a concomitant charge to net income, when the loss is both "probable" and "reasonably estimated":

>   a.    Information available prior to issuance of the financial statements indicates that ***it is probable that an asset had been impaired*** or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss. (footnote omitted.)
>
>   b.    The amount of loss can be reasonably estimated.

303.    SFAS 5 ¶ 3(a) indicates that the term probable applies when "[t]he future event or events are likely to occur."  The pronouncement goes on to state that disclosure of the nature and/or the amount of an accrual may be necessary in order for the financial statements to not be misleading.

304.    Based upon the significance of loss contingencies and their materiality to investors, the FASB clearly *mandates disclosure* of contingencies even when resulting losses are not probable or susceptible to reasonable estimation.  In this regard, SFAS 5 ¶ 10 states:

>   If no accrual is made for a loss contingency because one or both of the conditions in paragraph 8 are not met, or if an exposure to loss exists in excess of the amount accrued pursuant to the provisions of paragraph 8, ***disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred.***  The disclosure shall indicate the nature

of the contingency and shall give an estimate of the possible loss or range of loss
or state that such an estimate cannot be made.  (footnote omitted.)

Thus, *disclosure* (as opposed to accrual) of the contingency must be made as long as it is

"reasonably possible" that a loss *may have been* incurred, and/or even if the loss cannot be

reasonably estimated, as required for *accrual* under SFAS 5 ¶ 8.

305.    According to SFAS 5 ¶ 3(b), a likelihood of a future event or events is

"reasonably possible" when the occurrence is "*more than remote but less than likely*."  When the

likelihood of loss is "more than remote" (a comparatively low threshold) and/or, even if the loss

cannot be estimated, *disclosure* of a loss contingency is required by GAAP.  In fact, SFAS 5

goes on to state that "[i]f a disclosure is deemed necessary, the financial statements shall indicate

the nature of the loss or loss contingency and give an estimate of the amount or range of loss or

possible loss or state that such an estimate cannot be made."

306.    The following chart represents the loss contingency disclosure decision-making

process:

Loss Contingency Flow Chart



119

307.    The FASB specifically states that a loss need not be a virtual certainty before a loss contingency is required.  In fact, SFAS 5 ¶ 84 states that, "[t]hose conditions are not intended to be so rigid that they require virtual certainty before a loss is accrued."  While this language is specifically relevant to the probable and estimable criteria in SFAS 5 ¶ 8, the same rationale holds true for disclosure under ¶ 10 when losses are reasonably possible (*i.e.*, more than remote).

308.    In sum, contingent losses that meet the "probable" and "reasonably estimable" standard are required to be reserved for under SFAS 5.  Losses recognized under SFAS 5 are run directly through the income statement (*i.e.*, expensed) at the time the loss is accrued and the liability is accrued to the balance sheet at the time the contingent losses are expensed, thereby putting users of the financial statements on notice of the impending contingent losses.  Those losses that do not meet the "probable" criteria, but instead meet the "reasonably possible" criteria (more than remote, but less than likely) are required to be disclosed.  Such disclosure similarly puts users of the financial statements on notice of the reasonable possibility of impending losses.

309.    As alleged herein, Defendants knew of and/or recklessly disregarded the significant declines in the fair value of Merrill's subprime-related securities, particularly its subprime ABS CDOs during the Relevant Period.  As such, contingent losses should have been accrued, or at a minimum, disclosure of the material decline in the fair value and related losses of the Company's subprime-related securities should have been made because of the significance to the financial statements.  Although the losses on its subprime-related securities were, at a minimum, *reasonably possible,* the Company's 2006 annual financial statements, in violation of GAAP (FAS 5), did not include any such disclosures.

310.     Furthermore, the Company's interim financial statements filed during the

Relevant Period prior to Merrill's Third Quarter 2007 Form 10-Q failed to *recognize* the losses

on Merrill's subprime-related securities.  Moreover, Merrill failed in its interim financial

statements prior to the Third Quarter 2007 Form 10-Q to *disclose* such losses, which were, at a

minimum, *reasonably possible,* in violation of GAAP (FAS 5), misleading investors with regard

to its true financial position and results of operations.

## 2.     SOP 94-6

311.     AICPA Statement of Position No. 94-6, "Disclosure of Certain Significant Risks

and Uncertainties" ("SOP 94-6"), requires disclosure of information about the nature of a

company's operations, significant estimates in the financial statements, and current vulnerability

to certain concentrations of risk.  SOP 94-6 also augments the disclosure requirements under

SFAS 5.  SOP 94-6 ¶ 12 specifically states:

> In addition to the disclosures required by FASB Statement No. 5 and other
> accounting pronouncements, this SOP requires disclosures regarding estimates
> used in the determination of the carrying amounts of assets and liabilities or in
> disclosures of gain or loss contingencies. . . .

Further, the AICPA makes it clear that SOP 94-6 complements SFAS 5:

> This SOP's disclosure requirements are separate from and do not change in any
> way the disclosure requirements or criteria of FASB Statement No. 5; rather, the
> disclosures required under this SOP supplement the disclosures required under
> Statement No. 5. . . .

(SOP 94-6 ¶ 16).

312.     SOP 94-6 ¶ 13(a)-13(b) provides that in using estimates, including those relating

to contingent losses, a company is required to disclose the nature of the estimate and indicate that

it is at least reasonably possible that the estimate will change in the near term (within one year

from the date of the financial statement at issue) when such a reasonable possibility exists and

when the effect of the change would be material to the financial statements.  SOP 94-6 ¶ 17

further states that "this SOP does not depend on the amount that has been reported on the financial statements, but rather the materiality of the effect that using a different estimate would have had on the financial statements." Therefore, this pronouncement placed a responsibility on Merrill to disclose any factors that might change in the near term which would have materially affected amounts reported in the Company's financial statements.

313. As alleged herein, Defendants knew that conditions within the subprime mortgage market consistently worsened during the Relevant Period, through irresponsible underwriting standards and escalating defaults. Based upon information available during this time, Defendants knew, but failed to disclose, that it was at least "reasonably possible" that Merrill was vulnerable to its various subprime exposures, including the tens of billions of dollars of subprime ABS CDOs piling up on Merrill's balance sheet. Readily observable facts, including, but not limited to: (i) the precipitous decline of the ABX and TABX indices; (ii) significant increases in mortgage delinquencies; (iii) Merrill's increasing inability to sell its CDOs; and (iv) the increasing likelihood that the ratings agencies would finally downgrade the CDOs that Merrill assembled and sponsored, indicated that Merrill was and would be suffering significant losses.

314. Contingent losses should have been accrued and disclosed from the inception of many of these transactions pursuant to SFAS 5. It is also clear that SOP 94-6 required disclosures concerning the liabilities evidenced by the billions of dollars of subprime-related write-downs that Merrill belatedly took. SOP 94-6 was issued for the explicit purpose of informing investors that these types of risks existed.

315. In addition to the above, SOP 94-6 requires the disclosure of certain significant concentrations of assets or exposures to risk. Specifically, ¶ 21 states:

Financial statements should disclose the concentrations described in paragraph 22 if, based on information known to management prior to the issuance of the financial statements, *all* of the following criteria are met:

    a.    The concentration exists as of the date of the financial statements.

    b.    The concentration makes the enterprise vulnerable to the risk of a near-term severe impact.

    c.    It is at least reasonably possible [more than remote, but less than likely] that the events that could cause the severe impact will occur in the near term.

(emphasis in original.)

316.    SOP 94-6 ¶ 22 says that concentrations, including group concentrations, require disclosure as long as they meet the criteria in ¶ 21 (above).  ¶ 22 also says: "Group concentrations exist if a number of counterparties or items that have similar economic characteristics collectively expose the reporting entity to a particular kind of risk."  The foregoing clearly applied to Merrill's CDOs, which were declining in value based upon the abysmally underwritten subprime mortgages underlying these structures.  Had Defendants appropriately applied the provisions of SOP 94-6 and other relevant accounting pronouncements discussed herein, the concentration of enormous loss exposures engendered by Merrill's subprime ABS CDOs would have been revealed and the Company's common share price, rather than being inflated, would have reflected Merrill's true condition.

317.    The AICPA also describes the categories of concentrations that require disclosure under SOP 94-6, including: "concentrations in revenue from particular products, services, or fundraising events. . . ." and "*concentrations in the market . . . in which an entity conducts its operations*.  The potential for the severe impact can result, for example, from negative effects of the economic and political forces within the market. . . ."  During the Relevant Period, Merrill's revenues increased significantly as a result of its subprime mortgage origination and

securitization activities.  Defendants knew, but failed to disclose, that the Company's revenues arising from these concentrations were at risk based upon readily observable market forces. Pursuant to SOP 94-6, these risks should have been disclosed.  Similarly, these concentrations qualified for disclosure under SOP 94-6 ¶ 22(d) because a significant portion of Merrill's operations was concentrated in the *subprime market*.

### 3.     FSP SOP 94-6-1

318.     FASB Staff Position SOP 94-6-1 — "Terms of Loan Products That May Give Rise to a Concentration of Credit Risk" ("FSP SOP 94-6-1") was issued in December 2005 to serve as a warning about the risks inherent in the nontraditional loan products, particularly subprime mortgages and other alternative loans, which were then proliferating and putting the financial markets at risk.  This was an unusual step because the FASB does not often issue this type of warning.  By issuing such a promulgation, the FASB underscored the gravity of the situation, which was warranted no later than December 2005.

319.     SOP 94-6-1 specifically warned of the two major causes of the subprime meltdown:  "affordability products" (*i.e.*, nontraditional mortgage products, including subprime mortgages) and the declining housing market.  Merrill failed to heed the FASB's warning and instead continued to originate subprime mortgages, extend warehouse lines to other originators, and securitize subprime mortgages into RMBS and ABS CDOs with knowingly inflated credit ratings and abysmal underwriting standards, all while ignoring its reporting obligations under GAAP.

320.     According to FSP SOP 94-6-1 ¶ 2, "[t]he FASB staff is aware of loan products whose contractual features may increase the exposure of the originator, holder, investor, guarantor, or servicer to risk of nonpayment or realization."  FSP SOP 94-6-1 ¶ 2 goes on to provide a non-exhaustive list of features that may increase credit risk including, among others:

(i) negative amortization; (ii) high-loan to value ratios; (iii) adjustable rate mortgages; (iv) step-up loans; and (v) interest only loans. Further, FSP SOP 94-6-1 sounded alarms related to subprime mortgages in general. The loan types that the FASB specifically identified as high risk collateralized the structured finance products (RMBS, CDOs, etc.) central to Merrill's demise.

321. Exposure to the products subject to the FASB's warnings increased credit risk, and the FASB cautioned that resulting losses were likely to manifest on a delayed basis. The FASB warned at ¶ 3 that the particular features of these loans created an environment where companies could not rely on traditional loan default patterns to determine loss accruals, resulting in failure to comply with FASB Statements No. 5 and No. 114:

> Certain lending products often have features that provide for reduced payment requirements in the early part of the loan's term, which *may delay defaults. For these loans, evidence of credit losses may not become apparent until the contractual provisions of the loans cause a change in the required payment because the borrower's ability to make reduced initial payments may delay a creditor's determination that the conditions have been met for the accrual of a loss,* and the establishment of an allowance for loan losses, under FASB Statements No. 5, *Accounting for Contingencies*, and No. 114, *Accounting by Creditors for Impairment of a Loan*.

322. Moreover, the FASB outlined the very problems that led to massive defaults on the assets underlying CDOs and other conduit structures, including adjustable rate mortgages ("ARMs") (and other mortgage products that had an "adjustable" feature), to which Merrill was exposed: "[P]ayment increases could affect a borrower's ability to repay the loan and *lead to increased defaults and losses*."

323. The risks that the FASB warned about (*i.e.* adjustments leading to increased defaults and losses) directly contributed to Merrill's massive losses. Considering that the FASB specifically and thoroughly warned of these significant risks as well as the fact that Defendants knew that a large number of Merrill's loans would be resetting in 2007 and 2008, the risk of resulting loss was, at a minimum, reasonably possible. Under both SFAS 5 and SOP 94-6,

Merrill was required to disclose this reasonable possibility of loss.  This is especially true as the underlying assets continued to perform poorly throughout 2007 and 2008.  Despite this, and in contravention of SFAS 5, Defendants waited until losses had actually occurred before making any disclosures.

324.    The FASB also warned about the effects of a downturn in the housing market in FSP SOP 94-6-1 ¶ 5: "[a]lso, some loans have high initial loan-to-value ratios based on anticipated appreciation of the collateral's value, increasing the risk of loss if that appreciation does not materialize and the borrower defaults."  By December 2005, when this statement was issued, the Office of Federal Housing Enterprise Oversight's House Price Index had already started a precipitous decline and the risk of loss, as a result of the fact that expected appreciation was not materializing, increased every quarter throughout 2006, 2007, and 2008.  In light of this specific warning, combined with the significant and well documented declines that were being experienced in the housing market, Merrill should have recognized (or at least disclosed) contingent losses long before it did.

325.    Finally, it is important to note that FSP SOP 94-6-1 specifically references much of the same GAAP discussed herein, which required additional disclosure of Defendants' exposures, including SFAS 107, SOP 94-6, and Item 303 of Regulation S-K.  In particular, this SOP explicitly suggests that the shared contractual characteristics of these new nontraditional loan products (*e.g.* borrowers subject to significant payment increases, loans with high loan-to-value ratios, etc.), including subprime loans, may give rise to a concentration of credit risk as defined in SFAS 107 ¶ 7, thus requiring the more detailed disclosures of that statement.

**D.    Principles Governing Valuation**

326.    Defendants also violated GAAP by failing to properly apply valuation principles to Merrill's subprime-related securities.  In particular, a majority of the Company's positions in

ABS CDOs were held in the "available-for-sale" category ($50.9 billion at fiscal year end ("FYE") 2007) and the "trading" category ($5 billion at FYE 2007).  Collectively, the Company's ABS CDO holdings consisted of mortgages, mortgage-backed securities, other asset-backed securities, investment securities classified for trading, and other derivative instruments. Securities classified as "available-for-sale" or held for "trading," *i.e.*, securities intended to be held to maturity, are required to be accounted for at fair value.  Merrill did not do so.

### 1.    SFAS 115

327.    FASB Statement of Financial Accounting Standards No. 115 — "Accounting for Certain Investments in Debt and Equity Securities" ("SFAS 115") relates to the accounting for investments in debt securities, such as RMBS and CDOs, and requires that certain investments in debt securities be marked to fair value.

328.    According to SFAS 115 ¶ 6, "[a]t acquisition, an enterprise shall classify debt and equity securities into one of three categories:  held-to-maturity, available-for-sale, or trading." "Held-to-maturity" securities are debt securities for which a company has the "positive intent and ability to hold those securities to maturity."  Such held-to-maturity securities are measured at "amortized cost" as of the balance sheet date.  Held-to-maturity was by far Merrill's smallest investment category at 2007 FYE, but grew significantly by the end of 2008, as Merrill began to retrench its investments from the trading and available-for-sale categories to held-to-maturity. Such actions required Merrill to mark the assets to a new cost basis based on the current fair value and should have engendered significant additional reported losses.

329.    Pursuant to SFAS 115 ¶ 12, investments in debt securities that are not classified as held-to-maturity shall be classified either as "trading" securities or "available-for-sale" securities, both of which are measured at fair value in the statement of financial position.

330.    SFAS 115 ¶ 12 defines these types of securities as follows:

*Trading securities.*  Securities that are bought and held principally for the purpose of selling them in the near term (thus held for only short period of time) shall be classified as trading securities.  Trading generally reflects active and frequent buying and selling, and trading securities are generally used with the objective of generating profits on short-term differences in price.

*Available-for-sale securities.*  Investments not classified as trading securities (nor as held-to-maturity securities) shall be classified as *available-for-sale securities.*

As stated above, these types of securities are accounted for at fair value on the balance sheet.

331.    Specifically, SFAS 115 ¶ 13 states:

Unrealized **holding gains and losses** for trading securities shall be included in earnings.  Unrealized holding gains and losses for available-for-sale securities (including those classified as current assets) shall be excluded from earnings and reported in other comprehensive income until realized. . . . (emphasis in original.)

While both trading and available-for-sale securities are required to be marked to fair value, the

changes in value for trading securities are actually realized in earnings (*i.e.* net income).  The

changes in value of available-for-sale securities are reported in an equity account on the balance

sheet called "other comprehensive income" ("OCI").  The chart below illustrates the applicable

accounting:

| Type of Security | Valuation Method | Recognition of Unrealized Holding Gains and Losses |
|---|---|---|
| Trading | Fair Value | Net Income |
| Available-for-sale | Fair Value | Other Comprehensive Income |
| Held-to-maturity | Amortized Cost | Not Recognized |

332.    Appropriate determination of fair value, as governed primarily by SFAS 157

during the Relevant Period (discussed below) is an extremely important aspect of the valuation

of trading and available-for-sale securities.  However, as alleged herein, Defendants failed to use

appropriate models and/or relevant contemporaneous market data to determine the value of

Merrill's holdings.  As a result, the Company failed to adequately value the trading and

available-for-sale securities (generally in the form of RMBS and/or CDOs) in its portfolio. Defendants' failure to appropriately write-down such securities led to both an overstatement of earnings on the income statement (related to trading securities) and an overstatement of OCI on the balance sheet (related to the available-for-sale securities).

333.    Had Defendants appropriately valued such securities, or, at a minimum, disclosed the reasonable possibility of the impending losses consistent with SFAS 5, Plaintiff and other investors would have been put on notice of the significant problems that Merrill faced well before the Company's belated disclosures beginning in October 2007, and the Company's common share price would not have become inflated.

334.    During the Relevant Period, SFAS 115 and the related FSP FAS 115-1, FAS 124-1 and EITF 99-20 also spoke to the requirement to write certain securities down for other-than-temporary impairment ("OTTI").  Because trading investments are marked to fair value directly through earnings, they are not subject to OTTI analysis; however, because available-for-sale investments are marked to fair value in OCI and held-to-maturity investments are held at amortized cost, they must be tested for impairment.

335.    Specifically, SFAS 115 ¶ 16 states:

> For individual securities classified as either available-for-sale or held-to-maturity, an enterprise shall determine whether a decline in fair value below the amortized cost basis is other than temporary.

336.    If an asset is "underwater," that is if the fair value of an asset is less than the amortized cost of that asset, it is impaired.  According to SFAS 115, entities must determine if that impairment is "other-than-temporary."  If it is determined that impairment is other-than-temporary, the asset must be permanently written down directly through earnings to a new cost basis:

> If the decline in fair value is judged to be other than temporary, the cost basis of the individual security shall be written down to fair value as a new cost basis and the amount of the write-down shall be included in earnings (that is, accounted for as a realized loss).

337.    Consistent with the above, Defendants were required to analyze the investments in Merrill's portfolio classified as available-for-sale and held-to-maturity for other than temporary impairment.  If OTTI existed, then Defendants were required to write-down the investments with a charge directly to net income.  It is important to note that the FASB and the SEC have both stated that "other-than-temporary" impairment does *not* mean "permanent" impairment.

338.    Defendants also failed to appropriately analyze available-for-sale securities for OTTI and take appropriate and timely write-downs to net income.  Thus, as a result of their failure to appropriately analyze and write-down the Company's available-for-sale securities for OTTI, Defendants further overstated Merrill's net income and fundamentally misstated the balance of its OCI account during the Relevant Period.

339.    In addition to any actual OTTI write-downs required, FSP FAS 115-1 and FAS 124-1 ¶ 17 list the necessary disclosures for investments in an unrealized loss position.  Specifically, ¶ 17 requires that for all investments, both available-for-sale and held-to-maturity, in an unrealized loss position for which other-than-temporary impairments have not been recognized, an entity shall disclose:

> (1)    The aggregate related fair value of investments with unrealized losses; and

> (2)    The aggregate amount of unrealized losses (that is, the amount by which cost exceeds fair value).

340.    These disclosures must further be "segregated by those investments that have been in a continuous unrealized loss position for less than 12 months and those that have been in

a continuous unrealized loss position for 12 months or longer." In addition, FSP FAS 115-1 and FAS 124-1 require additional disclosure of information in narrative form (in the notes to the financial statements) sufficient to allow users of the financial statements to "understand the quantitative disclosures and the information that the investor considered (both positive and negative) in reaching the conclusion that the impairment(s) are not other than temporary." Further, ¶ 17 suggests that such disclosure could include:

> (1)    The nature of the investment(s)
>
> (2)    The cause(s) of the impairment(s)
>
> (3)    The number of investment positions that are in an unrealized loss position
>
> (4)    The severity and duration of the impairment(s)
>
> (5)    Other evidence considered by the investor in reaching its conclusion that the investment is not other-than-temporarily impaired, including, for example, industry analyst reports, sector credit ratings, volatility of the security's fair value, and/or any other information that the investor considers relevant.

341.    Defendants failed to timely disclose, at least, the nature of the investments (*i.e.*, high risk subprime-related products) and the true number of investment positions that were in an unrealized loss position through their inappropriate fair value marks.

## 2.    SFAS 107

342.    FASB Statement of Financial Accounting Standards No. 107 — "Disclosures About Fair Value of Financial Instruments" ("SFAS 107"), which Merrill purportedly applied prior to January 1, 2007, provides disclosure requirements regarding both the fair value of financial instruments as well as concentrations of credit risks to certain financial instruments. According to SFAS 107:

> A financial instrument is defined as cash, evidence of an ownership interest in an entity, or a contract that both:

      a.        Imposes on one entity a contractual obligation (1) to deliver cash or another financial instrument to a second entity or (2) to exchange other financial instruments on potentially unfavorable terms with the second entity

      b.        Conveys to that second entity a contractual right (1) to receive cash or another financial instrument from the first entity or (2) to exchange other financial instruments on potentially favorable terms with the first entity.

(footnote omitted.)

343.    Merrill's transactions in subprime-related securities, including RMBS, CDOs, and synthetic CDOs, required the CDO entity to make payments to the security holders, and some involved contracts that imposed an obligation on the sponsor, transferor, and/or insurer to make payments through CDS and other similar guarantees to provide last resort funding for the commercial paper that supported them.  As such, each of these arrangements constituted a "financial instrument" under SFAS 107, which requires that "[a]n entity shall disclose, either in the body of the financial statements or in the accompanying notes, the fair value of financial instruments for which it is practicable to estimate that value."  (¶ 10).

344.    According to the FASB, quoted market prices are the best evidence of the fair value of financial instruments.  If such prices are not available to estimate the fair value of financial instruments (or a class of instruments), the following disclosures are required:

      a.        Information pertinent to estimating the fair value of that financial instrument or class of financial instruments such as the carrying amount, effective interest rate, and maturity

      b.        The reasons why it is not practicable to estimate fair value.

Except for certain inapplicable exempted situations, SFAS 107 specifically requires disclosures about the fair value for *all* financial instruments, whether they are "on-balance-sheet" or "off-balance-sheet."

345.    Further, SFAS 107, as amended by SFAS 133, specifically requires that

*concentrations* of credit risk be disclosed:

> [A]n entity shall disclose all significant concentrations of credit risk arising from *all* financial instruments, whether from an individual counterparty or groups of counterparties.  *Group concentrations* of credit risk exist if a number of counterparties are engaged in similar activities and have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions.  The following shall be disclosed about each significant concentration:
>
> > a.     Information about the (shared) activity, region, or economic characteristic that identifies the concentration
> >
> > b.     The maximum amount of loss due to credit risk that, based on the gross fair value of the financial instrument, the entity would incur if parties to the financial instruments that make up the concentration failed completely to perform according to the terms of the contracts and the collateral or other security, if any, for the amount due proved to be of no value to the entity
> >
> > c.     The entity's policy of requiring collateral or other security to support financial instruments subject to credit risk, information about the entity's access to that collateral or other security, and the nature and a brief description of the collateral or other security supporting those financial instruments. . . .

Because Merrill was subject to significant credit risk by acting as a counterparty on numerous CDS contracts as well as the large number of subprime-laden securities held in its portfolio, Defendants were required to disclose the fact that Merrill had concentrated credit risk with regard to those financial instruments.

346.    Further, Defendants were required to disclose under SFAS 107 information about the shared characteristics of the credit risk concentrations, as well as information about the collateral supporting those financial instruments, including, but not limited to, the fact that they were significantly dependent upon subprime mortgages originated through abysmal underwriting standards.

### 3.    SFAS 133

347.    As a holder of CDS contracts, Merrill was required to make certain disclosures regarding these derivative instruments under SFAS 133.  Specifically, SFAS 133, ¶ 44 provides that:

> An entity that holds or issues derivative instruments . . . shall disclose. . . . [i]ts objectives for holding or issuing those instruments, the context needed to understand those objectives, and its strategies for achieving those objectives.

The disclosure requirements further dictate that an entity must distinguish between derivative instruments designed as fair value hedges, cash flow hedges, and hedges on net investments in a foreign corporation.  In addition, SFAS 133, ¶ 44 requires an entity holding derivative instruments to indicate its risk management policy for each type of hedge, including a description of the items or transactions that are hedged.

348.    SFAS 133, ¶ 45 provides specific disclosure requirements for fair value hedges, cash flow hedges, and hedges of net investments in a foreign corporation.  Further, each of the specific hedge classification disclosure requirements includes a requirement to disclose ineffective hedges.  Essentially, SFAS 133, ¶ 45 requires an entity holding derivative instruments to disclose whether those instruments are functioning properly to mitigate against the risk of loss.

349.    As noted above in ¶¶ 228-38, Merrill failed to even disclose the existence of its significant CDS contracts with monoline insurers such as MBIA and XL Capital during the Relevant Period.  Nor did Merrill provide any explanations in its financial statements regarding the Company's objectives for holding billions in notional CDS protection for its CDO and RMBS exposures.  Moreover, Merrill failed to provide information on the nature of the CDO and RMBS holdings putatively hedged through monoline CDS contracts.  Merrill plainly did not meet its disclosure requirements under SFAS 133, ¶¶ 44-45 with respect to the massive monoline CDS positions it held.

### E.   Determining Fair Value

350.   FASB Statement of Financial Accounting Standards No. 157 — "Fair Value Measurements" ("SFAS 157"), effective for financial statements issued for fiscal years beginning after November 15, 2007 (including interim periods), specifically defines fair value and provides a standardized framework for determining fair value.  Merrill putatively adopted and applied SFAS 157 as of January 1, 2007.

351.   SFAS 157 specifies that fair value "should be determined based on the assumptions that market participants would use in pricing the asset or liability," and that "valuation techniques used to measure fair value shall maximize the use of observable inputs and minimize the use of unobservable inputs."  (*See* SFAS 157 at ¶ 21.)

352.   SFAS 157 defines fair value as "the price that *would be* received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."  Put simply, SFAS 157 defines fair value as an "exit price" based on the current economics of the market.  Because the "sale" of the asset is hypothetical, companies like Merrill must look to comparable market transactions or use other valuation techniques to measure the asset's fair value.  As noted above, observable market transactions as well as any data or assumptions used in valuation techniques are considered "inputs" under the language of SFAS 157, which provides guidance concerning which "inputs," if available, *must* take priority over others.

353.   SFAS 157 divides inputs into two categories:

a.   *Observable inputs* are inputs that reflect the assumptions market participants would use in pricing the asset or liability developed based on market data obtained from sources independent of the reporting entity.

b.   *Unobservable inputs* are inputs that reflect the reporting entity's own assumptions about the assumptions market participants would

> use in pricing the asset or liability developed based on the best
> information available in the circumstances.  (emphasis in original.)

SFAS 157 further requires that a reporting entity measuring fair value "maximize the use of observable inputs and minimize the use of unobservable inputs."

354.     While observable inputs clearly take priority over unobservable inputs, not all observable inputs are created equal.  Thus, SFAS 157 develops a fair value hierarchy that prioritizes inputs into three broad levels (Level 1, Level 2, and Level 3), with Level 1 holding the highest priority and Level 3 the lowest.

355.     Observable inputs classified as Level 1 are unadjusted quoted prices in "*active* markets for *identical* assets or liabilities . . . at the measurement date."  These quoted market prices are generally the "most reliable" indication of fair value, and, as such, have been classified as Level 1.

356.     Level 2 inputs are any other directly or indirectly observable *market-based* inputs, including:  (i) quoted prices for *similar*, rather than identical, assets or liabilities; and (ii) quoted prices for identical (or similar) assets in *inactiv*e markets, rather than active markets.  Level 2 inputs also include other types of observable information such as interest rates and inputs that can be corroborated by observable market data.

357.     All unobservable inputs are classified as Level 3 and their use is appropriate only as a last resort when Level 1 and Level 2 inputs are not available.  Thus, the existence of a sale of a similar financial asset, even in a very inactive market, creates an observable transaction (*i.e.* Level 2 input) which would disallow the use of a proprietary model under SFAS 157 (unless the value derived by the model is consistent with the observable transaction).  Even if the use of a Level 3 proprietary model were somehow deemed appropriate, the assumptions going into the

model would have to consider and appropriately weigh the valuation information provided by the

Level 2 input.

358.    According to the Center for Audit Quality, even transactions in an inactive market

should be viewed as indicators of true fair value:

> It would not be appropriate to disregard observable market prices, even if that
> market is relatively thinner as compared to previous market volume.  Even if the
> volume of observable transactions is not sufficient to conclude that the market is
> 'active,' such observable transactions would still constitute Level 2 inputs that
> must be considered in the measurement of fair value.

*        *        *

> If a market is not considered active due to transaction volume that is insufficient
> to produce reliable pricing information, then observable transactions in that
> market still are considered Level 2 inputs, which also cannot be ignored when
> measuring fair value.

359.    The Center for Audit Quality further makes clear that Level 1 inputs are to be

used for asset valuation, when available.  When Level 1 inputs are not available, Level 2 inputs

should be used *even when derived from inactive markets*.  Importantly, the Center for Audit

Quality further advised as of October 2007:

> Some observers of current market conditions have asserted that market pricing is
> irrational, and they have suggested that entities should instead default to a model-
> based measurement that is based on the economic fundamentals of the asset.
> However, FAS 157 states that the use of an entity's own assumptions about future
> cash flows is compatible with an estimate of fair value, *as long as there are no*
> *contrary data indicating that marketplace participants would use different*
> *assumptions.  If such data exist, the entity must adjust its assumptions to*
> *incorporate that market information* (FAS 157, par. C85, and CON 7, par. 38).
> (emphasis in original.)

360.    Based upon the downturn in the credit markets, a large number of the extremely

risky and esoteric securities that Merrill held ceased trading.  In light of these conditions,

Defendants attempted to rationalize their use of mark-to-model and other Level 3 valuations.

Defendants' efforts to sidestep other inputs, even in inactive markets, were impermissible.  Had

137

relevant assets been appropriately and timely marked-to-market based on the available Level 1 and Level 2 inputs (and/or the use of appropriate models with appropriate underlying assumptions), including the fact that Merrill was unable to sell many of its securities except at a steep discount, the massive losses that Merrill reported would have been spread over a wider time-frame, putting Plaintiff on notice of the significant problems much earlier. Instead, Defendants violated GAAP by self-servingly determining that a mark-to-model accounting methodology was more appropriate over the long-term than a mark-to-market methodology.

361. One mechanism for Merrill to gauge the "fair value" of its ABS CDO holdings was the ABX index, which, as noted above, consists of five different sub-indices that reference RMBS. Like the TABX, described below, the ABX is and was an accepted market-based indicator of RMBS and CDO pricing during the Relevant Period. The ABX tracks the value of CDS contracts providing credit protection for selected RMBS. The ABX is functionally divided into segments based upon the ratings (AAA, AA, A, BBB, and BBB-) assigned to the securities to which CDS contracts are extended. In simple terms, as the price of providing credit protection for RMBS through CDS contracts increases, the impacted portions of the ABX index decline, and vice versa.

362. The TABX, which became operational in February 2007, is an index that tracks the prices of CDS contracts intended to hedge against the risk of loss on the BBB and BBB- tranches of the ABX index. The TABX divides these lower-rated tranches of the ABX into six new tranches based upon both rating and the level of subordination, *i.e.,* the tranches of the TABX are arranged according to exposure to the first dollar of loss such that the TABX BBB tranche is the most exposed and the AAA tranche (the "Senior TABX Tranche") is, theoretically, the most insulated.

363.    The ABX began a material decline by the beginning of 2007, reaching all-time lows based upon the volume of investors seeking credit protection against defaults and the increased cost of obtaining CDS contracts.  In other words, CDS purchasers were reacting to the fact that the known downturn in the housing market was deepening and were seeking increased protection against default.  This was a clear indication that ABS CDO values, including Merrill's ABS CDOs, were materially declining at the time.

364.    Likewise, from their February 14, 2007 launch date, the TABX tranches materially declined, also indicating that Merrill's ABS CDOs were materially declining in value at that time.  As one of the 16 licensed market makers in the ABX and TABX (in addition to its direct role in originating and securitizing subprime mortgages), Merrill was undeniably aware of these declines.  During the second half of February 2007 alone, the Senior TABX Tranche dropped from a price of nearly 100 to approximately 85.  The TABX continued declining into October 2007.  Despite these significant declines, Merrill failed to timely disclose the deteriorating state of its subprime ABS CDO exposures or properly write-down the value of these assets.

365.    As of the end of the first quarter of 2007, Defendants knew of Merrill's increasing subprime mortgage defaults, materially declining housing prices, and the growing depression in the ABX and TABX indices.  Nonetheless, Defendants still did not write-down Merrill's exposure in response to this market information, nor did Defendants even disclose the reasonable possibility of imminent losses on the Company's CDO holdings.

366.    By mid-July 2007, the ABX index tracking BBB RMBS had sunken to a record low of 45.28, losing half of its value in the first half of 2007.  In addition, the portion of the ABX index tracking to higher quality mortgage bonds — those rated AAA and AA — was also

suffering precipitous drops.  Moreover, as of the end of the second quarter of 2007, the Senior

TABX Tranche had declined to below 70, and continued its sharp decline into October 2007.

Yet, even in light of all these specific indicators and "observable inputs," Defendants failed to

take any action to write-down or properly account for the fair value of Merrill's significant ABS

CDO exposures.

367.     Notwithstanding Defendants' failure to properly write-down the value of Merrill's

CDO holdings during the Relevant Period, it is clear that there was a distinct correlation between

the valuation of Merrill's CDOs and the steep decline in the relevant ABX and TABX indices.

Such correlation is evident from Merrill's subsequent CDO sales, which were entirely consistent

with ABX and TABX pricing.

368.     For example, in the July 28, 2008 Form 8-K, Merrill announced the sale of $30.6

billion gross notional amount of its super senior ABS CDOs to an affiliate of Lone Star for a

purchase price of $6.7 billion.  As part of this transaction, Lone Star required Merrill to provide

75% of the $6.7 billion purchase price in the form of a loan from Merrill to Lone Star that could

only be recovered from the assets represented by the purchased CDOs.  Without recourse to any

other assets of Lone Star, the loan meant that Merrill received a mere $1.68 billion for its $30.6

billion of super senior ABS CDOs.  This price equated to approximately 5.5% of the total CDO

notional amount sold to Lone Star.

369.     Notably, the lowest rated BBB- tranche of the ABX index, which tracked

subprime RMBS deals closed in the first half of 2007 (*i.e.*, the ABX.HE BBB-07-02 Index),

traded at 5.56 cents on the dollar at the time of the Lone Star transaction.  This ABX price was

entirely consistent with the $1.68 billion Merrill obtained from Lone Star for the sale of its ABS

CDOs.  Thus, the steeply discounted price at which Merrill agreed to sell more than $30 billion

in purportedly super senior ABS CDOs was commensurate with the pricing for the lowest rated tranches on the ABX index.  As a member of the ABX consortium of investment banks, Merrill was clearly aware of ABX pricing and, as evidenced by the Lone Star transaction, the Company willingly sold a significant ABS CDO position in its portfolio at prices commensurate with the index.  Despite this, Merrill failed to timely write-down the deteriorating value of its ABS CDOs during the Relevant Period based on concurrent and observable ABX and TABX price declines.

370.    The collapse of two Bear Stearns subprime mortgage-infected hedge funds in which Merrill was heavily invested provided the Company with yet another basis to mark down its subprime CDO exposure.  Specifically, when the Bear Funds imploded in June 2007, Merrill moved in to seize $850 million in collateral assets based upon a loan of $850 million that Merrill had provided to Bear in exchange for the Bear Funds' purchase of Merrill CDOs.  Merrill sought to sell the seized assets through an auction.  On June 20, 2007, Merrill was presented with stark confirmation of the severely diminished market value of CDO assets substantially similar to those saddling the Company's balance sheet when it was unable to sell a significant portion of the Bear Stearns assets.  Those assets that Merrill was able to unload in 2007 were sold for as little as 30% of their supposed "par" value.

371.    Defendants knowingly and/or recklessly omitted these undeniable market trends in considering and reporting the "fair value" of the Company's subprime holdings and exposures.

372.    As set forth in Section VI above addressing loss causation, Defendants did not disclose material information concerning the dangerous erosion of the value of Merrill's subprime ABS CDO holdings until October 5, 2007.  This first disclosure, however, was materially false and misleading and would require further corrective disclosures, as alleged herein.  Indeed, by the end of the third quarter of 2007, Merrill had reported approximately $8.0

billion in write-downs largely based upon previously undisclosed subprime-related securities, including subprime ABS CDO holdings.  For the year ended December 28, 2007, Merrill recorded an additional $12.6 billion in losses, bringing the total losses for 2007 to $20.6 billion, largely based upon the Company's subprime-related securities.  Of this amount, approximately $16.7 billion consisted of losses on subprime ABS CDO holdings and other subprime-related instruments that the Company classified as Level 3 assets.

373.    As a result of the material overstatement of the Company's ABS CDO and subprime RMBS positions and the related net revenues, Merrill overstated its net earnings and earnings per diluted share reported in the Second Quarter 2007 Form 10-Q.  Similarly, Merrill understated net losses and losses per diluted common share in its Third Quarter 2007 Form 10-Q.

### F.    SEC Disclosure Requirements:  Item 303 Of Regulation S-K

374.    Item 303 of Regulation S-K, "Management's Discussion and Analysis ("MD&A") of Financial Condition and Results of Operations," provides the SEC's blueprint for appropriate disclosures by a reporting entity.  In a recent Final Rule regarding the disclosure of off-balance-sheet arrangements and aggregate contractual obligations in the MD&A section, the SEC announced the overarching purpose of the MD&A disclosure requirements and summarized the disclosure requirements of Item 303, Regulation S-K:

> The disclosure in MD&A is of paramount importance in increasing the transparency of a company's financial performance and providing investors with the disclosure necessary to evaluate a company and to make informed investment decisions.  MD&A also provides a unique opportunity for management to provide investors with an understanding of its view of the financial performance and condition of the company, *an appreciation of what the financial statements show and do not show*, as well as important trends and risks that have shaped the past or are *reasonably likely* to shape the future.
>
> *          *          *
>
> They [the MD&A rules] are designed to cover a wide range of corporate events, *including events, variables and uncertainties not otherwise required to be*

*disclosed under U.S. generally accepted accounting principles ("GAAP").* For
example, the current MD&A rules require disclosure of:

- Information necessary to an understanding of the registrant's
  financial condition, changes in financial condition and results of
  operations;

- Any known trends, demands, commitments, events or uncertainties
  that will result in, or that are reasonably likely to result in, the
  registrant's liquidity increasing or decreasing in any material way;

- The registrant's internal and external sources of liquidity, and any
  material unused sources of liquid assets;

- The registrant's material commitments for capital expenditures as
  of the end of the latest fiscal period;

- Any known material trends, favorable or unfavorable, in the
  registrant's capital resources, including any expected material
  changes in the mix and relative cost of capital resources,
  considering changes between debt, equity and any off-balance-
  sheet financing arrangements;

- Any unusual or infrequent events or transactions or any significant
  economic changes that materially affected the amount of reported
  income from continuing operations and, in each case, the extent to
  which income was so affected;

- Significant components of revenues or expenses that should, in the
  Company's judgment, be described in order to understand the
  registrant's results of operations;

- Known trends or uncertainties that have had, or that the registrant
  reasonably expects will have, a material favorable or unfavorable
  impact on net sales or revenues or income from continuing
  operations;

- Matters that will have an impact on future operations and have not
  had an impact in the past; and

- Matters that have had an impact on reported operations and are not
  expected to have an impact upon future operations.

375.    Item 303 also specifically requires MD&A disclosures regarding liquidity, capital

resources, results of operations, *off-balance-sheet arrangements — such as sponsored-CDOs*, as

well as contractual obligations.  Specifically, Item 303 ¶ 4, which includes CDOs in the

definition of "off-balance sheet arrangements," states that:

> The disclosure shall include the items specified in paragraphs (a)(4)(i)(A), (B),
> (C) and (D) of this Item to the extent necessary to an understanding of such
> arrangements and effect and shall also include such other information that the
> registrant believes is necessary for such an understanding.

> (A)   The nature and business purpose to the registrant of such off-
> balance-sheet arrangements;

> (B)   The importance to the registrant of such off-balance-sheet
> arrangements in respect of its liquidity, capital resources, market
> risk support, credit risk support or other benefits;

> (C)   The amounts of revenues, expenses and cash flows of the registrant
> arising from such arrangements; the nature and amounts of any
> interests retained, securities issued and other indebtedness incurred
> by the registrant in connection with such arrangements; and the
> nature and amounts of any other obligations or liabilities
> (including contingent obligations or liabilities) of the registrant
> *arising from such arrangements that are or are reasonably likely
> to become material and the triggering events or circumstances
> that could cause them to arise*; and

> (D)   Any known event, demand, commitment, trend or uncertainty that
> *will result in or is reasonably likely to result in the termination,
> or* material reduction in availability to the registrant, of its off-
> balance-sheet arrangements that provide material benefits to it, and
> the course of action that the registrant has taken or proposes to take
> in response to any such circumstances.

376.   According to the SEC, "reasonably likely" is a lower disclosure threshold than

"more likely than not."  That is, "reasonably likely" means less than a 50% likelihood of

occurrence.  Merrill's ABS CDOs qualified for the disclosure requirements under Item 303,

¶ 4(i).

377.   The applicable rules also prescribe the following disclosure threshold for such

off-balance sheet arrangements at subsection B as follows:

> Companies with off-balance sheet arrangements, such as SIVs, CDOs, and asset-
> backed commercial paper conduits, are required to provide certain disclosures

under Item 303(a)(4) of Regulation S-K if their off-balance sheet arrangements are reasonably likely to have a current or future effect on the company's financial condition, revenues or expenses, results of operations, liquidity, capital expenditures, or capital resources that is material to investors. A company would typically discuss the following, if material:

- the nature and business purpose of the off-balance sheet arrangements;

- the importance of the off-balance sheet arrangements to the company in respect of its liquidity, capital resources, market risk support, credit risk support, or other benefits;

- the amounts of the company's revenues, expenses, and cash flows arising from the arrangements;

- the nature and amounts of any interests the company has retained, securities it has issued, and other indebtedness it incurred in connection with the arrangements; and

- the nature and amounts of any other obligations or liabilities.

A company is also required to provide any other information to the extent it is necessary for an investor to understand the arrangements.

378.    The SEC's recent Final Rule regarding the disclosure of off-balance sheet arrangements and aggregate contractual obligations in the MD&A section (17 C.F.R. parts 228-229, 249) sets forth a "principles-based requirement," pursuant to which a registrant must provide additional information that it believes necessary for a true and substantive understanding of its off-balance-sheet arrangements and the material effects of those arrangements. Some of the major requirements found in the amendments include requirements to disclose:

- The nature and business purpose of the off-balance sheet arrangements. This disclosure should explain to investors why a registrant engages in off-balance sheet arrangements and should provide the information that investors need to understand the business activities advanced through a registrant's off-balance-sheet arrangements.

- The importance of [the entity's] off-balance-sheet arrangements to its liquidity, capital resources, market risk support, credit risk support, or other benefits. This disclosure should provide investors with an understanding of the importance of off-balance sheet arrangements to the registrant as a financial matter.

- The overall magnitude of a registrant's off-balance sheet activities, the specific material impact of the arrangements on a registrant, and the circumstances that could cause material contingent obligations or liabilities to come to fruition. This disclosure should provide information to provide investors with an understanding of amounts of revenues, expenses, and cash flows provided by the off-balance sheet arrangements, information regarding the registrant's involvement in interests retained, securities issued, and other indebtedness incurred in connection with the arrangements, and the nature and amount of any other material obligations or liabilities (including contingent obligations and liabilities) that arise or are ***reasonably likely*** to arise and the triggering events that could cause them to arise.

- Any known event, demand, commitment, trend, or uncertainty that will, or is ***reasonably likely*** to, result in the termination, or material reduction in availability to the registrant, of its off-balance sheet arrangements that provide the registrant with material benefits. [This disclosure should also] address factors that are ***reasonably likely*** to affect the registrant's ability to continue using off-balance sheet arrangements that provide it with material benefits.

379. Merrill's MD&A, filed with the SEC as part of the Company's 2006 Form 10-K and its Forms 10-Q for the quarterly periods ended March 30, 2007, June 29, 2007 and September 28, 2007 failed to comply with the requirements of Item 303 of Regulation S-K. In particular, Merrill did not adequately disclose the material decline in the fair value and related losses of the Company's subprime-related CDOs, demonstrating that the reported financial information was not indicative of the Company's future financial position or results of operations.

### G.      Disclosures Concerning Internal Controls Over Financial Reporting

380.      Section 404(b) of the Sarbanes-Oxley Act of 2002 requires management to assess

the effectiveness of its internal control over financial reporting ("ICOFR") as of a company's

fiscal year-end.  The Public Company Accounting Oversight Board ("PCAOB"), through

Auditing Standard 2 ("AS 2"), which was issued in March 2004 and was effective for fiscal

years ending on or after November 15, 2004, defines ICOFR as follows:

> A process designed by, or under the supervision of, the company's principal
> executive and principal financial officers, or persons performing similar
> functions, and effected by the company's board of directors, management, and
> other personnel, to ***provide reasonable assurance regarding the reliability of
> financial reporting and the preparation of financial statements for external
> purposes in accordance with generally accepted accounting principles***. . . .

AS 2, ¶ 17 defines "reasonable assurance" to mean "a remote likelihood that material

misstatements will not be prevented or detected on a timely basis.  ***Although not absolute***

***assurance, reasonable assurance is, nevertheless, a high level of assurance***."  PCAOB

Auditing Standard No. 5 (AS 5), which is applicable to audits of fiscal years ending on or after

November 15, 2007 also uses the ICOFR requirements for AS 2.

381.      A public company is also required to annually report on the effectiveness of its

internal control over financial reporting.  Specifically, AS 2 states in relevant part:

> A company subject to the reporting requirements of the Securities Exchange Act
> of 1934 (an "issuer") is required to include in its annual report a report of
> management on the company's internal control over financial reporting. . . .  The
> report of management is required to contain management's assessment of the
> effectiveness of the company's internal control over financial reporting as of the
> end of the company's most recent fiscal year, including a statement as to whether
> the company's internal control over financial reporting is effective.

382.      During the Relevant Period, Defendants explicitly stated in Merrill's Management

Report on Internal Controls Over Financial Reporting that the Company's ICOFR was effective.

For example, in its 2006 Form 10-K, Defendants stated:

Management recognizes its responsibility for establishing and maintaining adequate internal control over financial reporting and has designed internal controls and procedures to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements and related notes in accordance with generally accepted accounting principles in the United States of America. ***Management assessed the effectiveness of Merrill Lynch's internal control over financial reporting as of December 29, 2006. . . . Based on our assessment, management believes that Merrill Lynch maintained effective internal control over financial reporting as of December 29, 2006.***

The Company's 2007 Form 10-K made these same representations and stated that "management believes that Merrill Lynch maintained effective internal control over financial reporting as of December 28, 2007."

383.    These representations regarding the effectiveness of Merrill's ICOFR were materially false and misleading because, as noted above, Defendants caused Merrill to issue financial statements during the Relevant Period that misstated the Company's total exposure to ABS CDOs. Merrill was able to conceal material losses on its ABS CDO holdings as a result of its ineffective internal control over financial reporting. Moreover, Defendants ignored clear signs of the deterioration of Merrill's subprime-related holdings known to Defendants through the Company's subprime origination activities and through internal Company warnings from Kronthal and others.

384.    As noted above, Merrill also engaged in numerous GAAP violations during the Relevant Period — in stark contrast to Defendants' assertions regarding the effectiveness of Merrill's ICOFR. Merrill did in fact disclose in the 2008 Form 10-K that it had material weaknesses in its ICOFR related to intercompany swaps and that its ICOFR was not effective for 2008. As alleged herein, the fact that Defendants did not properly value Merrill's exposure to ABS CDOs, and failed to disclose such exposures, indicates that Merrill also had significant deficiencies and material weaknesses related to asset valuation and disclosure during the Relevant Period which Defendants failed to disclose.

## VIII.   DEFENDANTS' MOTIVE AND OPPORTUNITY TO COMMIT FRAUD

385.   As alleged herein, the Individual Defendants acted with scienter during the Relevant Period in that they knew and/or recklessly disregarded that the public statements and documents issued and disseminated in Merrill's name were materially false and misleading, and knew and/or recklessly disregarded that such statements and documents would be issued and disseminated to the investing public.

386.   In addition to their conscious misbehavior, the Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein.  The Individual Defendants were senior executive officers of Merrill and, thus, controlled the information disseminated to the investing public in the Company's press releases, SEC filings and communications with analysts.  The Individual Defendants were privy to confidential financial information concerning the Company's business, financial condition and future business outlook, and had access to material, nonpublic information concerning the Company's true financial condition, including Merrill's substantial exposure to subprime-related securities which ultimately led to the Company's demise.  As a result, the Individual Defendants could falsify and/or conceal information concerning the Company's business and performance.

### A.      Defendant O'Neal's Insider Stock Sales And Compensation

387.   During the Relevant Period, Defendant O'Neal was motivated to engage in the fraudulent practices detailed herein, resulting in the artificial inflation of the Company's common stock, so that he could sell his personally held shares at artificially inflated prices. Notwithstanding his duty to disclose the non-public, inside information prior to selling his stock, Defendant O'Neal sold Merrill common stock at prices that were artificially inflated by Defendants' materially false and misleading statements and omissions of material fact.

388.     During the Relevant Period, Defendant O'Neal sold 199,887 shares of Merrill common stock at artificially inflated prices, and at a time when Merrill common stock was trading at or near its all-time high price, for proceeds of approximately $18,836,063.64.  These stock sales were unusual and suspicious in both timing and amount.  Defendant O'Neal sold approximately 70% more of his personal Merrill common stock in 2007 as compared to 2006 and 300% more than in 2005.

389.     The timing of Defendant O'Neal's sales was also suspicious.  All of his sales during the Relevant Period were on February 5 and 6, 2007.  These sales occurred approximately two weeks after Merrill's January 18, 2007 Form 8-K and Analyst Call disclosing Merrill's 2006 annual financial results which, as detailed in ¶¶ 173-75, contained materially false and misleading statements and omissions of material facts concerning Merrill's purported financial strength and subprime exposure.  Due to Merrill's material misstatements and omissions, Defendant O'Neal's sales occurred when Merrill's common stock price reached its all-time high of $90-$97 per share.

390.     The timing of these sales was also suspicious because they occurred a day after MLN filed for bankruptcy on February 4, 2007 and a few days before ResMAE filed for bankruptcy on February 12, 2007.  Merrill had invested millions of dollars in these two subprime loan originators through the Company's purchases of subprime-related securities and assets.

391.     Finally, Defendant O'Neal's sales were also suspicious because they occurred just prior to the February 2007 decline of the ABX and TABX indices — a key indicator signaling the demise of the subprime market.  In making these profitable sales, O'Neal read the "writing on the wall" provided by subprime originator bankruptcies and the impending decline of

relevant indices, and sold his shares before publicly disclosing the adverse impact of these events on the Company.

**B.      Merrill's Securities Offerings During The Relevant Period**

392.    Defendants were also motivated to maintain Merrill's artificially inflated common stock price during the Relevant Period so that the Company could issue more than $28 billion in securities at prices inflated by Defendants' materially false and misleading statements and omissions detailed above.

393.    For example, during the fourth quarter of 2006 and the first three quarters of 2007, Merrill received approximately $5.2 billion in proceeds from its issuance of preferred and common securities, including $980 million in securities issued to former First Republic shareholders as part of Merrill's $1.8 billion acquisition of First Republic on September 21, 2007.  Not including the securities issued as part of the First Republic acquisition, the following chart depicts Merrill's proceeds from its securities issuances during the fourth quarter of 2006 and first three quarters of 2007:

| Security | Date | Proceeds |
|---|---|---|
| Merrill Lynch Capital Trust I Preferred | December 14, 2006 | $1.05 billion |
| Merrill Series 5 Preferred | March 20, 2007 | $1.5 billion |
| Merrill Lynch Capital Trust II Preferred | May 2, 2007 | $950 million |
| Merrill Lynch Capital Trust III Preferred | August 22, 2007 | $750 million |

The chart below depicts Merrill's proceeds from securities it issued as part of the September 21, 2007 First Republic acquisition:

| Security | Value |
|---|---|
| Merrill Lynch Common Stock | $865 million |
| Merrill Lynch & Co. Series 6 Preferred | $65 million |
| Merrill Lynch & Co. Series 7 Preferred | $50 million |

394.    The valuation of these securities was based upon Merrill's financial statements, purported financial strength, and ability to effectively manage risks, including the Company's exposures to subprime-related securities.  As detailed herein, at the time of the above securities issuances, Defendants were well aware of Merrill's massive risk and exposure to subprime-related securities.  However, Defendants failed to disclose the mounting deterioration of Merrill's subprime assets and failed to take any write-downs until *after* the First Republic acquisition closed.   In fact, Merrill first disclosed its initial write-downs on October 5, 2007 — approximately two weeks after the closing of the First Republic acquisition.

395.    On December 24, 2007, Merrill entered into an agreement with Temasek Holdings and Davis Selected Advisors to sell 116.7 million shares of its common stock at $48 per share for total proceeds of approximately $5.6 billion.

396.    On January 15, 2008, Merrill issued a press release entitled "Merrill Lynch Enhances Its Capital Position With Agreement to Issue $6.6 Billion in Preferred Stock to Long-Term Investors," announcing another issuance of its securities.  In this press release, Merrill touted its financial strength and stated that the Company "enhanced its capital position by reaching agreements to issue $6.6 billion of mandatory convertible preferred stock in private placements to long-term investors, primarily from Korea Investment Corporation, Kuwait Investment Authority, and Mizuho Corporate Bank."

397.    On April 29, 2008, Merrill announced a preferred stock offering of 106,920,000 depository shares at $25 per share for total proceeds of approximately $2.7 billion.  Each depository share represents 1/1200 interest in a share of Merrill Series 8 8.625% Non-Cumulative Preferred Stock.  102 million depository shares were initially issued and 4.92 million

additional depository shares were sold through an over-allotment conducted pursuant to the same offering materials.

398.    On July 29, 2008, Merrill released an underwriting agreement to sell an aggregate of 380,000,000 shares of common stock at $22.50 per share for total proceeds of approximately $8.5 billion.  The transaction included an over-allotment option for up to 57,000,000 additional shares of common stock.  On the same day, Merrill issued a press release entitled "Merrill Lynch Prices $8.55 Billion Common Stock Offering," announcing the issuance of these securities.  In this press release, Merrill once again touted its financial strength.

399.    In total, Merrill received more than $28 billion in proceeds from its issuances of common and preferred stock during the Relevant Period.  Additionally, Merrill received at least $24.7 billion in proceeds from issuing debt securities during the Relevant Period.  Given the Company's desperate need for capital as market conditions worsened, Defendants were strongly motivated to artificially inflate Merrill's stock price through their materially false and misleading statements and omissions concerning the Company's true financial condition, including its subprime exposures.

## IX.    GROUP PLEADING

400.    The Individual Defendants are liable for the materially false and misleading statements pleaded herein that were issued by or in the name of the Company, as each of those statements was "group-published" information, and resulted from the collective actions of these Defendants.  It is appropriate to treat the Individual Defendants as a group and to presume that the public filings, press releases and other public statements complained of herein are the product of the collective actions of the Individual Defendants.  The Individual Defendants, by virtue of their high-level positions at Merrill, directly and actively participated in the management and day-to-day operations of the Company, and were privy to confidential non-public information

153

concerning the business and operations of Merrill.  In addition, the Individual Defendants were involved in drafting, reviewing and/or disseminating the materially false and misleading statements issued by Merrill and approved or ratified those statements, and, therefore, adopted them as their own.

## X.    FRAUD ON THE MARKET PRESUMPTION

401.    At all relevant times, the market for Merrill common stock was an efficient market for the following reasons, among others:

(a)    Merrill's common stock was listed and actively traded on the NYSE, a highly efficient national market, with more than 1.5 billion shares issued and outstanding and a public trading float of more than 1.2 billion shares as of the end of the Relevant Period;

(b)    As a registered and regulated issuer of securities, Merrill filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information described in this Complaint;

(c)    Merrill regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

(d)    Merrill was followed by several different securities analysts employed by major brokerage firms, including Goldman Sachs, Credit Suisse, and Deutsche Bank, which followed Merrill's business and wrote reports that were distributed to the sales force and customers of their respective brokerage firms.  Those reports were publicly available and affected the public marketplace;

(e)    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Merrill's securities; and

(f)    Without knowledge of the misrepresented or omitted facts, Plaintiff purchased or otherwise acquired Merrill securities between the time that Defendants made the material misrepresentations and omissions and the time that the truth was revealed, during which time the price of Merrill securities was

artificially inflated by Defendants' misrepresentations and omissions.

402.    As a result of the above, the market for Merrill common stock promptly digested current information with respect to the Company from all publicly available sources and such information influenced the price of Merrill's common stock.  Plaintiff, therefore, suffered injuries through its purchases of Merrill shares at prices that were artificially inflated by Defendants' misrepresentations and omissions.  Thus, a presumption of reliance applies.

## XI.    THE SAFE HARBOR PROVISION OF THE PSLRA IS INAPPLICABLE

403.    As alleged herein, Defendants acted with scienter because at the time that they issued public documents and other statements in Merrill's name, they knew or recklessly disregarded the fact that such statements were materially false and misleading or omitted material facts.  Moreover, Defendants knew that such documents and statements would be issued or disseminated to the investing public; knew that persons were likely to rely upon those misrepresentations and omissions; and knowingly and/or recklessly participated in the issuance and/or dissemination of such statements and/or documents as primary violators of the federal securities laws.

404.    As set forth in detail in this Complaint, Defendants' control over, and/or receipt of Merrill's materially misleading statements, and/or their association with the Company, made them privy to confidential proprietary information concerning Merrill that was used to artificially inflate its financial results.  Defendants caused or were informed of, participated in and knew of the fraudulent scheme alleged herein.  With respect to non-forward looking statements and/or omissions, Defendants knew and/or recklessly disregarded the falsity and misleading nature of that information, which they caused to be disseminated to the investing public.

405.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint because none of the statements pleaded herein is a "forward-looking" statement, and no such statement was appropriately identified as a "forward-looking statement" when made.  Rather, each of the statements alleged herein to be false and misleading relates to facts and conditions existing at the time the statements were made.  Moreover, to the extent that putatively cautionary statements accompanied any of the alleged misstatements, such language was ineffective because the Defendants did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statements.

406.    In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein which is deemed to be forward-looking, Defendants are liable for the false forward-looking statements because at the time each such statement was made, each Defendant actually knew that any such forward-looking statement was materially false or misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of Merrill who actually knew that each such statement was false and/or misleading when made.  None of the historic or present tense statements made by Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## XII.   TOLLING OF THE STATUTE OF LIMITATIONS

407.    Any applicable statute(s) of limitations with respect to Plaintiff's claims were tolled no later than October 30, 2007 by the filing and pendency of the class action complaint in

the action captioned *Life Enrichment Foundation v. Merrill Lynch & Co., et al.*, No. 07-CV-9633

(S.D.N.Y.), pursuant to the doctrine announced in *American Pipe & Construction Co. v. Utah*,

414 U.S. 538, 552 (1974) and *In re WorldCom Securities Litigation*, 496 F.3d 245 (2d Cir.

2007).  The *Life Enrichment* action was consolidated on March 12, 2008 into the action

captioned *In re Merrill Lynch & Co., Inc. Sec., Derivative and ERISA Litig.*, No. 07-CV-9633

(JSR) (DFE) (S.D.N.Y.).  The tolling of the two-year statue of limitations applicable to

Plaintiff's claims herein continued through and including July 6, 2009.  Plaintiff has thus timely

filed its claims.

**COUNT I:      Violation of Section 10(b) of the Exchange Act and Rule 10b-5
                Promulgated Thereunder**

408.    Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.  This claim is asserted against all Defendants.

409.    During the Relevant Period, Defendants used the means and instrumentalities of

interstate commerce, the mails and the facilities of national securities exchanges to make

materially false and misleading statements and omissions of material fact to:  (i) deceive the

investing public, including Plaintiff, as alleged herein; (ii) artificially inflate and maintain the

market price of Merrill common stock; and (iii) cause Plaintiff to purchase Merrill common

stock at artificially inflated prices that did not reflect its true value.  As Defendants gradually

disclosed the truth, the trading price of Merrill common stock fell precipitously.  In furtherance

of their unlawful scheme, plan and course of conduct, Defendants took the actions set forth

herein.

410.    Defendants, individually and in concert, directly and indirectly, by use of the

means and instrumentalities of interstate commerce, the mails and the facilities of national

securities exchanges, made untrue statements of material fact and/or omitted material facts

necessary to make the statements made not misleading, and/or substantially participated in the creation of the alleged misrepresentations and/or omissions.  Defendants' material misstatements and omissions operated as a fraud and deceit upon Plaintiff in connection with its purchases of Merrill common stock in an effort to maintain artificially high market prices for Merrill common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

411.    Defendants were privy to and participated in the creation, development and issuance of the materially false and misleading statements alleged herein, and/or were aware of other Defendants' dissemination of information to the investing public that they either knew or recklessly disregarded was materially false and misleading.

412.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were readily available to them. Defendants' material misrepresentations and omissions were made knowingly, or recklessly, and for the purpose and effect of concealing from Plaintiff the truth with respect to Merrill's operations, business, performance and prospects, and supporting the artificially inflated price of its common stock.

413.    The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Merrill's common stock during the Relevant Period.  In ignorance of the fact that the market prices of Merrill common stock were artificially inflated, and relying directly or indirectly on the materially false and misleading statements made by Defendants, and on the integrity of the market in which Merrill common stock traded, or on the absence of material adverse information

that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Relevant Period, Plaintiff purchased Merrill common stock during the Relevant Period at artificially high prices.  As the truth eventually emerged, the price of Merrill common stock fell, and Plaintiff suffered damages.

414.    At the time of the material misrepresentations and omissions alleged herein, Plaintiff was ignorant of their falsity, and believed them to be true.  Had Plaintiff known the truth with respect to the business, operations, performance and prospects of Merrill, which was misrepresented and concealed by Defendants, Plaintiff would not have purchased Merrill's common stock, or if it had purchased such securities, would not have done so at the artificially inflated prices that it paid.

415.    By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

416.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its transactions in Merrill's common stock during the Relevant Period.

**COUNT II:   Violation of Section 20(a) of the Exchange Act**

417.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Claim is asserted against the Individual Defendants.

418.    During the Relevant Period, the Individual Defendants were senior executive officers of Merrill and were privy to confidential and proprietary information concerning Merrill and its business, operations, performance and prospects, including its compliance with applicable federal, state and local laws and regulations.  Because of their high-level positions within Merrill, the Individual Defendants exercised day-to-day control over the Company and had regular access to non-public information about Merrill's business, operations, performance and

prospects through access to internal corporate documents and information, conversations and connections with other corporate officers and employees, attendance at management meetings and/or meetings of the Company's Board of Directors, and committees thereof, and reports and other information provided to them in connection therewith.

419.    Because of their possession of the material information described above, the Individual Defendants knew, or recklessly disregarded, that the statements complained of herein were materially false and misleading and/or omitted material facts when made.  Accordingly, the Individual Defendants were culpable participants in Merrill's violations of Section 10(b) and Rule 10b-5.

420.    Defendant O'Neal was Merrill's CEO and Chairman of the Board from 2002 and 2003, respectively, until his resignation on October 30, 2007.  As detailed in ¶¶ 140-47, for example, during the Relevant Period, Defendant O'Neal knew and/or recklessly ignored Merrill's severe subprime exposures, which increased during the Relevant Period, and fired executives who issued warnings about Merrill's increasing exposure to subprime debt to ensure that Merrill continued to purportedly demonstrate improved financial results to the market. Despite Defendant O'Neal's knowledge of Merrill's increased exposures to subprime-related securities, Defendant O'Neal made and/or permitted to be made numerous materially false and misleading statements and omissions of material fact concerning the effectiveness of the Company's risk management controls, hedging, and overall ability to avert substantial impairment and/or deterioration of its subprime assets, among other things.

421.    Defendant Edwards was Senior Vice President and CFO of Merrill during the Relevant Period.  As detailed in ¶¶ 140-47, for example, Defendant Edwards knew throughout the Relevant Period of Merrill's massive exposure to subprime-related securities.  Defendant

Edwards supervised Merrill's control groups that managed credit and market risks. Despite Defendant Edward's knowledge of Merrill's increased exposures to subprime-related securities, Defendant Edwards made and/or permitted to be made numerous materially false and misleading statements and omissions of material fact concerning the effectiveness of the Company's risk controls, hedging, and overall ability to avert substantial impairment and deterioration of its subprime assets, among other things.

422.   In addition to the Individual Defendants' general positions and duties in their respective positions, pursuant to which they exercised day-to-day control over the Company, Defendants O'Neal and Edwards were also members of Merrill's Executive Committee. As part of this Committee, these Defendants participated in and/or oversaw Merrill's Risk Oversight Committee, which purported to manage Merrill's risk exposures. As detailed herein, the Individual Defendants knew, but failed to disclose, the enormous amount of risk and exposure to subprime-related securities that ultimately led to Merrill's demise.

423.   As detailed in ¶ 147, the Individual Defendants knew of Merrill's massive subprime exposures from a variety of sources, including the letter written by Fleming and Fakahany warning Merrill's Board of Directors, Defendant O'Neal, and Rosemary Berkery, Merrill's General Counsel, of the mounting losses Merrill would incur from its subprime assets, including the significant deterioration in subprime-related securities in July 2007.

424.   The Individual Defendants participated in writing, reviewing, preparing, and/or disseminating materially false and misleading statements and omissions of material fact concerning Merrill's massive exposures to subprime-related securities which caused the Company to take write-downs of approximately $31 billion by the end of the Relevant Period. These material misstatements and omissions were found in, among other documents, Merrill's

quarterly and annual financial reports filed with the SEC, press releases, analyst conference calls, registration statements, prospectuses, and other solicitation materials.

425.   Each of the Individual Defendants acted as a controlling person of Merrill within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements Plaintiff alleges were materially false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after those statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

426.   In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore had, or are presumed to have had, the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

427.   As set forth above, Merrill violated Section 10(b) and Rule 10b-5 by its acts and omissions alleged in this Complaint.  By virtue of their positions as controlling persons of Merrill, the Individual Defendants are also liable pursuant to Section 20(a) of the Exchange Act as each was a culpable participant in Merrill's violations of Section 10(b) and Rule 10b-5.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases of the Company's common stock during the Relevant Period.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment including:

A.    Awarding compensatory damages in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

B.    Awarding Plaintiff its costs and expenses incurred in this action, including counsel fees and expert fees; and

C.    Such other and further relief as the Court may deem just and proper.

## XIV.   JURY DEMAND

Plaintiff hereby demands a trial by jury on all triable claims.

Dated:  July 22, 2010

ENTWISTLE & CAPPUCCI LLP

By: _____
Andrew J. Entwistle
Johnston de F. Whitman, Jr.
Jonathan H. Beemer
Joshua K. Porter
Jordan A. Cortez
280 Park Avenue, 26th Floor West
New York, New York 10017
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Steven E. Fineman
Daniel P. Chiplock
Michael J. Miarmi
250 Hudson Street, 8th Floor
New York, New York 10013
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

ABBEY SPANIER RODD & ABRAMS, LLP
Judith L. Spanier
Karin E. Fisch
Natalie S. Marcus
212 E. 39th Street
New York, New York 10016
Telephone:  (212) 889-3700
Facsimile:  (212) 684-5191

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Richard M. Heimann
Joy A. Kruse
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

*Counsel for Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and as sole Trustee of the New York State Common Retirement Fund*